# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| WELDED CONSTRUCTION, L.P., *et al.*,[1] | ) Case No. 18-12378 (___) |
| Debtors. | ) (Joint Administration Requested) |

## DECLARATION OF FRANK POMETTI
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

1. Effective contemporaneously with the filing of these chapter 11 cases on the Petition Date, I became the chief restructuring officer of Welded Construction, L.P. and hold the same position with its affiliated debtor and debtor-in-possession, Welded Construction Michigan, LLC (collectively, the "**Debtors**"). I am a managing director of the firm Zolfo Cooper, LLC ("**Zolfo**"), and have over twenty (20) years of financial and operational experience, spanning a wide range of industries, including construction as well as oil & gas and onshore exploration. I specialize in assisting distressed and underperforming companies in all areas of operational and financial restructuring, and have advised debtors, creditors, investors, and court-appointed officials in multiple bankruptcy proceedings and out-of-court workouts. In the months prior to the date hereof, I have been working closely with the Debtors' management and professionals, initially in the capacity of financial advisor along with other Zolfo personnel. As a result of this work, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' chapter 11 efforts.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Welded Construction, L.P (5008) and Welded Construction Michigan, LLC (9830). The mailing address for each of the Debtors is 26933 Eckel Road, Perrysburg, OH 43551.

2.     I submit this declaration (the "**Declaration**") in support of the First Day Pleadings (defined below), and to provide information to parties-in-interest regarding the Debtors. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management, my colleagues at Zolfo working on this matter, or the Debtors' professionals; (c) my review of relevant documents; and (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

3.     On the date hereof (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), as well as certain motions and other pleadings (the "**First Day Pleadings**"), with this Court.

4.     Headquartered in Perrysburg, Ohio, the Debtors are a mainline pipeline construction contractor capable of executing pipeline construction projects in lengths ranging from a few hundred feet to over 200 miles. As discussed below, the Debtors also offer a number of other related specialty services. As described in further detail below, the Debtors have filed these chapter 11 cases to preserve and maximize the value of their estates for the benefit of all their stakeholders, by providing the Debtors the time, breathing room, and resources necessary to negotiate completion of the Debtors' existing pipeline projects (the "**Projects"**) with their customers (the "**Customers**").

5.     Unfortunately, as discussed herein, the Debtors have found themselves facing near-term liquidity issues. To address these challenges, the Debtors and their professional

advisors, after considering all available strategic options, have determined that the best course to preserve and maximize the value of the Debtors' estates is to commence these chapter 11 cases.

6. I have reviewed each of the First Day Pleadings (including the exhibits and other attachments to such pleadings), and it is my belief that the facts set forth in each are true and correct. The relief sought in the First Day Pleadings is necessary to the Debtors' efforts to preserve and maximize the value of their assets for the benefit of the Debtors' estates and creditors. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases while the Debtors negotiate completion of their existing pipeline Projects with their Customers, as well as minimize adverse consequences that might otherwise result from the commencement of such cases.

7. Part I of this Declaration provides a brief overview of the Debtors' business. Part II provides a summary description of the Debtors' capital structure. Part III provides a discussion of the circumstances that prompted the commencement of these chapter 11 cases. Part IV addresses the Debtors' strategy to maximize the value of their assets through the prosecution of these chapter 11 cases. Finally, Part V affirms the facts that support the relief requested in the First Day Pleadings.

## Part I
### Overview of Debtors' Business

**A. History of the Debtors**

8. The Debtors' origins trace back to the 1940s when Hank Mogg & Harold Fluharty (both pipeline welders) originally founded the Debtors' business, utilizing the trade name "Mogg & Fluharty Pipe Line Welding Contractors." The Debtors moved their headquarters to Perrysburg, Ohio in the mid-1970s, where it remains today.

9. Although the Debtors' business originated in the Midwest, it has since grown to oversee projects nationwide over the years, and has become one of the largest and most relied upon mainline pipeline construction contractors in the United States. The Debtors' Customers include some of the most prominent oil and gas pipeline operators in the country, including Sunoco, Energy Transfer Partners, Columbia Gas, and Williams Companies.

**B. Business Segments and Operations**

10. The Debtors' organizational structure is a simple one; Debtor Welded Construction Michigan, LLC (a Michigan limited liability company) is wholly owned by Debtor Welded Construction, L.P., a Delaware limited partnership.

**1. Welded Construction, L.P.**

11. Nearly all of the Debtors' business operations are conducted through Debtor Welded Construction, L.P. In addition to mainline pipeline construction, these services include: (i) fabrication welding, foundation construction, instrumentation installation, painting, and fencing for pipeline meter/regulator stations; (ii) heavy wall pipe and fabrication welding for installation of compressor stations; (iii) hydrostatic testing of existing pipelines; (iv) pre-cleaning of pipelines to meet environmental discharge requirements; (v) investigation and repair of pipeline anomalies; and (vi) the replacement or repair of pipeline segments.

12. Aside from the Debtors' corporate headquarters (which is owned, and not leased) and a leased office in Mount Joy, Pennsylvania, which currently has fewer than 10 employees dedicated to administering the Williams Project (defined below), the Debtors utilize certain temporary facilities at worksites, but do not lease or own any other real property.

13. Welded Construction, L.P. has two general partners and two limited partners. The general partners are Ohio Welded Company LLC (owner of 15 partnership units)

and McCaig Welded GP, LLC (owner of 5 partnership units). The limited partners are Bechtel Oil, Gas and Chemicals, Inc. (owner of 735 partnership units) and McCaig US Holdings, Inc. (245 partnership units). The entity is overseen by a five-member board of managers, and governed in accordance with that certain *Second Amended and Restated Limited Partnership Agreement of Welded Construction, L.P.* dated December 1, 2015.

### 2. Welded Construction Michigan, LLC

14. As noted above, Debtor Welded Construction Michigan, LLC is wholly owned by Debtor Welded Construction, L.P. It was formed to provide a single customer with certain of the same services offered by its Debtor parent. These services are concluded or substantially concluded, though certain ongoing tail obligations, such as prepetition indemnity obligations, may remain.

### C. **The Debtors' Current Projects**

15. The Debtors currently are working on portions of five pipeline construction Projects for their Customers, as follows:

> \* The Debtors are working on restoration, cleanup and demobilization efforts at a portion of the Atlantic Sunrise Pipeline (the "**Williams/ASR Project**") for customer Transcontinental Gas Pipe Line Company, LLC, an affiliate of The Williams Companies, Inc. ("**Williams**"). The Debtors constructed a portion of the pipeline, and the pipeline went into service in the past month. As discussed further below, upon the completion of the construction work, Williams unexpectedly withheld $23,563,038.00 from a payment owed to the Debtors for the Williams/ASR Project, and contemporaneously therewith, filed a lawsuit against the Debtors asserting breach of contract, which created acute liquidity issues for the Debtors and concerns in the market about their viability as a going concern.
>
> \* The Debtors are also working on restoration, cleanup and demobilization efforts on a portion of the Saginaw Trail Pipeline (the "**2018 Consumers Project**") for customer Consumers Energy Company ("**Consumers**"). The Debtors constructed a portion of the pipeline, and the pipeline has gone in service.

* The Debtors are contracted to build a portion of another pipeline for Consumers in 2019 (the "**2019 Consumers Project**") for which substantive work has not yet begun.

* The Debtors are constructing a portion of the Mariner East Pipelines (the "**ETP Project**") for Sunoco Partners Marketing & Terminals L.P. and Sunoco Pipeline L.P., affiliates of Energy Transfer Partners, L.P. (collectively, "**ETP**"). Within the next month, most of the Debtors' segments of work on the pipeline are scheduled to achieve "mechanical completion," meaning construction will be concluded other than cleanup and demobilization efforts. However, as discussed in greater detail below, on October 19, 2018, ETP sent a letter to the Debtors, purporting to terminate for cause their agreement. It is the Debtors' position that this purported termination is invalid.

* The Debtors are constructing portions of the Leach Xpress and Mountaineer XPress Pipelines for affiliates of TransCanada, as successor to NiSource Corporate Services Company/Columbia Pipeline Group and Columbia Gas Transmission, LLC, respectively (the "**Columbia Gas Project**"). The Debtors' work on the Columbia Gas Project includes work on the Leach XPress Pipeline in Ohip and the Mountaineer XPress Pipeline in West Virginia. Within the next month, the Debtors' work on the Columbia Gas Project is scheduled to achieve "mechanical completion," meaning construction will be concluded other than cleanup and demobilization efforts.

### D. Debtors' Assets and Liabilities

16.     For the twelve months ending September 30, 2018,[2] the Debtors generated slightly more than $1 billion in gross revenue on a consolidated basis.[3] As of the Petition Date, the book value of the Debtors' assets, after excluding for certain intangible items like accumulated depreciation, are over $265 million, including accounts receivable of over $116

---

[2] The financial information herein reflects the unaudited financial information of the Debtors as of September 30, 2018 unless otherwise noted. The Debtors most recent audited financial statements were for the year ended December 31, 2016.

[3] This revenue amount includes the recognition of revenue from invoiced but unpaid work performed, along with change orders submitted to certain customers. As discussed below, certain of these amounts are subject to dispute. As such, the Debtors' actual gross revenue may be lower.

million (much of which, as discussed below, is subject to payment delays or disputes), and equipment with a recent appraised liquidation value of over $30 million.[4].

17. The Debtors have estimated accrued liabilities owed to third parties of approximately $240 million.

18. The Debtors have cash on hand of approximately $0.9 million as of the Petition Date, which the Debtors believe is not subject to any perfected security interest, but may be subject to unperfected security interests of the Sureties (defined below), as discussed below.

## Part II

## Capital Structure of the Debtors

19. As of the Petition Date, the Debtors have no outstanding secured debt obligations under any term loan or revolving credit facility, but have certain existing or potential secured obligations in connection with surety bonds, discrete equipment financings (with liens in the applicable discrete pieces of equipment), and potential miscellaneous statutory lien claims. However, as discussed below, the Debtors believe certain of these purported security interests are unperfected, and thus subject to avoidance under section 544 of the Bankruptcy Code.

20. The significant liabilities of the Debtors are described in more detail below.

**A. Surety Bonds**

21. In the ordinary course of business, the Debtors are required to provide surety bonds (the "**Surety Bonds**") to certain third parties, including contract counterparties, governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations, including the completion of various projects within the terms of the

---

[4] This equipment in this appraisal excludes the equipment, discussed below, for which Caterpillar Financial Services Corporation and VAR Resources, LLC have filed financing statements. As noted below, the Debtors reserve their rights with respect to whether this equipment is owned or leased.

applicable contracts, and environmental, road damage, lease, licensing and permitting, and contractor obligations (the "**Surety Bond Program**").

22.     As of the Petition Date, the Debtors believe that they have four Surety Bonds on their Projects. As set forth therein, among others, the Surety Bonds were issued by the Chubb, through Federal Insurance Company ("**Chubb**")and Berkshire Hathaway Specialty Insurance Company ("**Berkshire**," and together with Chubb, the "**Sureties**"). There are no outstanding premiums or other amounts under the Surety Bonds as of the commencement of these chapter 11 cases. Bond premiums are based on contract value.

23.     Chubb has issued three Surety Bonds related to the Debtors' pipeline construction Projects:  (i) an approximately $454 million bond related to the Williams/ASR Project; (ii) an approximately $56 million bond related to a project that has been completed by the Debtors for well over a year, which bond the Debtors believe should be released without liability, and (iii) a $14.5 million wage payment bond. Finally, Berkshire has issued an approximately $60 million bond on the Consumers 2018 Project that reached mechanical completion shortly before the Petition Date, but for which cleanup and demobilization work remains.

24.     While the Surety Bonds shift the risk of the Debtors' non-payment or nonperformance from the obligee to the Sureties, the Surety Bonds are not an insurance policy. Rather, if a Surety incurs a loss on a Surety Bond as a result of the Debtors' underlying liability, the Surety will seek repayment from the Debtors. Toward this end, the Debtors have entered into that certain: (i) General Indemnity Agreement dated February 28, 2017 with Chubb (the "**Chubb Indemnity Agreement**"); and (ii) General Agreement of Indemnity dated May 29, 2018 with Berkshire (the "**Berkshire Indemnity Agreement**," and collectively, the "**Indemnity**

**Agreements**"). Pursuant to these Indemnity Agreements, the Debtors have agreed to indemnify Chubb and Berkshire, respectively, on the terms set forth in the agreements in the event they are required to pay or perform under the Surety Bonds they have issued. In addition, among other terms, the Indemnity Agreements purport to grant the Sureties certain security interests in the Debtors' assets, but as of the Petition Date, none of the Sureties have filed a UCC financing statement or otherwise perfected a security interest in the Debtors' cash. Accordingly, at this time, the Debtors believe any security interests of the Sureties are unperfected.[5]

**B. Other Secured Claims**

25. Financing statements have been filed against the Debtors asserting discrete security interests in miscellaneous equipment in connection with certain amounts currently owing to Caterpillar Financial Services Corporation (which has filed liens in over 100 pieces of equipment) and VAR Resources, LLC on account of equipment financings. As of the Petition Date, the Debtors believe approximately $26 million in total liabilities remaining in connection with these equipment financings.[6]

26. Certain third parties, including state and local taxing authorities, also may possess statutory liens in certain of the Debtors' property in accordance with applicable state law.

27. Finally, the Debtors previously entered into a revolving credit facility with The Huntington National Bank ("**Huntington**"), pursuant to a credit agreement dated as of June 28, 2017 (the "**Revolving Credit Facility**"). Debtor Welded Construction, L.P. was the contemplated borrower under the Revolving Credit Facility, and Debtor Welded Construction

---

[5] As such, the Debtors believe they are subject to avoidance under section 544 of the Bankruptcy Code, and no adequate protection is necessary for the Debtors to utilize their cash pursuant to section 363 of the Bankruptcy Code.

[6] The Debtors and their estates reserve all rights regarding whether these alleged equipment financings are financings or are instead personal property leases.

Michigan, LLC was a guarantor. As of the Petition Date, however, there are no borrowings under the Revolving Credit Facility and no amounts are due by the Debtors in connection therewith. Moreover, the Revolving Credit Facility is no longer available to provide financing to the Debtors. The Debtors have previously requested that a UCC termination statement be filed by Huntington with respect to the Revolving Credit Facility.

28. Similarly, the Debtors have requested that a UCC termination statement be filed with respect to a financing statement filed by BNP Paribas for a factoring agreement once used in connection with one of the Debtors' Projects, which agreement no longer secures any remaining receivables owed to the factor.

C. **Unsecured Obligations**

29. In the ordinary course of operating their business, the Debtors utilize certain goods and services from hundreds, if not thousands, of trade vendors and subcontractors. As of the Petition Date, the Debtors estimate that they owe approximately $212 million to trade creditors. Debtor Welded Construction, L.P. also owes approximately $4 million to one of its general partners (or affiliates of one of its general partners). The Debtors do not believe they owe any intercompany liabilities to each other.

**Part III**

**Events Leading to the Commencement of These Cases**

30. For decades, the Debtors' business has been a fundamentally strong one, providing significant value to their Customers' construction Projects. More recently, however, the Debtors began facing a series of discrete challenges on their Projects that combined to impair the Debtors' operating cash flow and its near-term liquidity. These challenges have included: (i) unusual cost overruns on Projects for which the Debtors were compensated on a "lump sum"

or fixed basis; (ii) weather, regulatory delays, shutdowns and other delays that in many instances were not specific to the Debtors; and (iii) significant payment delays or disputes.

31. Taken together, this series of events put a meaningful strain on the Debtors' near-term liquidity, necessitating these chapter 11 bankruptcy filings.

32. In particular, on October 4, 2018, Williams unexpectedly withheld $23,563,538.00 from a payment to the Debtors for the Williams/ASR Project, and filed a lawsuit (the "**Williams Complaint**") against the Debtors that same day, in the District Court of Tulsa County for the State of Oklahoma, styled *Transcontinental Gas Pipe Line Company, LLC v. Welded Construction, L.P.*, asserting breach of contract. According to the complaint, the breach of contract claim is premised on allegations that the Debtors overbilled the amounts comprising the withheld payment and failed to provide proper reconciliation of certain charges, and seeks "delay damages of at least $1,928,571."

33. The Debtors vigorously dispute the allegations contained in the Williams Complaint. Since the filing of the Williams Complaint, the Debtors have engaged in dialogue with Williams and its other Customers in an attempt to consensually resolve the dispute and avert the need for the filing of these chapter 11 cases. However, the filing of the Williams Complaint was quickly made public to the market and Customers became increasingly concerned about how the payment of receivables would be utilized by the Debtors. In particular, Customers sought assurance that any new payables would be solely deployed toward expenses related to their particular Projects. As such, these discussions were unsuccessful, depriving the Debtors of the necessary liquidity to sustain their business operations outside of chapter 11 and absent negotiated arrangements with their Customers, as discussed immediately below.

34. Thereafter, on October 19, 2018, ETP sent a letter purporting to terminate for cause the Debtors' engagement on the ETP Project. The Debtors believe the termination attempt is ineffective and invalid because ETP did not provide proper notice or a cure period, as required under the terms of their agreement. The Debtors have reserved the right to assert all affirmative claims and causes of action it may have against ETP or any affiliated third party arising from this purported termination and otherwise. This includes, but is not limited to, claims for breach of contract and breach of the implied covenant of good faith and fair dealing, as well as tortious interference claims arising from or related to third-parties taking actions and reliance upon the defective termination notice.

**Part IV**

**The Chapter 11 Cases**

35. The Debtors, in consultation with their professional advisors, have diligently evaluated a range of strategic alternatives to address their near-term liquidity challenges. As a result of these efforts, the Debtors have determined it is necessary to commence these chapter 11 cases with a $20 million debtor-in-possession financing facility consisting of entirely new money from North American Pipeline Equipment Company, LLC (the "**DIP Lender**"), an entity under common ownership with the partners of Debtor Welded Construction, L.P., to allow the Debtors the time, breathing spell, and resources necessary to continue discussions with their Customers so as to negotiate arrangements to finalize the Debtors' ongoing Projects with them, all with the overarching goal of maximizing the value of the Debtors' estates for the benefit of the Debtors' creditors and other stakeholders.

36. The success of these chapter 11 cases hinges on negotiations with Customers to complete their Projects. As generally described above, the Debtors furnish and pay for all labor, supervision, technical capability, transportation, materials, supplies, and all other

items or accessories necessary for their work on a particular Project. Further, the Debtors regularly purchase, lease, and maintain equipment for work on the projects, and the Debtors are oftentimes co-signors with their Customers on the state and federal permits that facilitate the projects. Finally, for most of their projects, the Debtors employ and oversee the work of sub-contractors and vendors (collectively, the "**Sub-Contractors**"), and, under certain contracts, the customer has discretion over which Sub-Contractors are utilized. Typically, the Customers compensate the Debtors pursuant to purchase orders for the work they perform on the Projects. In turn, the Debtors pay the Sub-Contractors for the goods and services provided for the respective Projects.

37. As such, it is critical that the Debtors reach acceptable agreements with the Customers on a project-by-project basis to fund ongoing construction and related costs, while satisfying the claims of vendors that have the ability to put mechanics liens on the Projects or otherwise are critical to ongoing Project construction. Sensitive to the concerns expressed by its Customers, the Debtors are negotiating arrangements to receive payments that will be used primarily for completion of their particular Project, as well as certain overhead and other costs. The chapter 11 process affords the Debtors the ability to reach these arrangements and seek the necessary Court approval to provide Customers with the relief they are requiring to continue to fund the Projects. These arrangements will significantly benefit the Debtors' estates, as well as the Customer, by satisfying significant prepetition claims, potentially avoiding construction delays, and resulting litigation. In addition, the Debtors' rights, and the Customers defenses, will be reserved to address any remaining receivables once the Project is on solid footing. Notably, the Projects are either complete, subject to clean-up and demobilization, or nearing completion in approximately one month, except for one Project for which substantive work has not yet begun.

As such, the arrangements are short-term, but vital to get the Projects to completion. Without such arrangements, the Debtors will not have the liquidity to complete the Projects and anticipate that the Customers will make no further payments, attempt to find alternative resources to complete the Projects, and seek to setoff payments against the cost of completion and payment of claims to avoid the imposition of liens against the Projects.

## Part V

### Facts Relevant to the First Day Pleadings

38. To facilitate these chapter 11 cases, the Debtors have filed the First Day Pleadings, requesting various forms of relief. Generally, the First Day Pleadings have been designed to meet the Debtors' goals of: (a) continuing the operations of the Debtors necessary to maximize the value of their estates through these chapter 11 cases while the Debtors negotiate completion of their existing pipeline projects with their Customers; (b) maintaining the confidence and support of their employees and other key constituents during the chapter 11 process; and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

39. I have reviewed each of the First Day Pleadings, and the facts set forth therein are true and correct to the best of my knowledge, information and belief, and are incorporated herein by reference. It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

40. It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs, the relief requested is essential to preserve the value of the Debtors' estates, and necessary to avoid immediate and irreparable harm to the Debtors and all stakeholders of their

estates.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will forestall such irreparable harm, thus maximizing the value of the Debtors' estates to the benefit of all stakeholders.

41.     The Debtors have an immediate need to continue the operation of their business by paying employees in the normal course of business pending the completion of their chapter 11 efforts, and making other necessary payments as set forth in the First Day Pleadings. Further, the Debtors believe that such relief will enable them to avoid a diminution of estate value.

## **CONCLUSION**

For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

*[Signature page follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: October 22, 2018

*[signature]*
Frank Pometti, Chief Restructuring Officer

01:22966211.9

*[Signature page to First Day Declaration]*