## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELDED CONSTRUCTION, L.P., *et al.*,[1] | Case No. 18-12378 (KG) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (the "**Motion**") in these cases (the "**Chapter 11 Cases**") for the entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as <u>Exhibit B</u>, and a final order (the "**Final Order**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"): (i) obtaining senior secured postpetition financing (the "**DIP Financing**") pursuant to the debtor-in-possession financing facility (the "**DIP Facility**") on the terms described herein and in that certain *Senior Secured, Super Priority Debtor in Possession Term Loan, Guaranty and Security Agreement* (the "**DIP**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Welded Construction, L.P (5008) and Welded Construction Michigan, LLC (9830). The mailing address for each of the Debtors is 26933 Eckel Road, Perrysburg, OH 43551.

**Credit Agreement**");[2] (ii) granting the DIP Lender (as defined below) allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (as defined below) for the DIP Financing and all obligations of the Debtors owing under the DIP Financing Documents (collectively, and including all "Obligations" of the Debtors as defined and described in the DIP Credit Agreement, the "**DIP Obligations**"); (iii) granting the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"); (iv) authorizing the Debtors use of any prepetition collateral, including the Cash Collateral, and provide adequate protection to the Prepetition Lien Holders that may have an interest in such prepetition collateral, including Cash Collateral, for any diminution in value of their interests therein; (v) scheduling a final hearing with respect to the relief requested herein; and (vi) granting related relief.  In support of this Motion, the Debtors incorporate the statements contained in the *Declaration of Frank A. Pometti in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "**First Day Declaration**") and the *Declaration of Frank A. Pometti in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* (the "**DIP Declaration**")  filed contemporaneously herewith and further respectfully state as follows:

---

[2]    Capitalized terms used but not otherwise defined herein shall the meaning given to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

## PRELIMINARY STATEMENT

1.    For decades, the Debtors' business has been a fundamentally strong one, providing significant value to their Customers' construction Projects.  More recently, however, the Debtors have faced a series of discrete challenges on their Projects that combined to impair the Debtors' operating cash flow and its near-term liquidity, including (i) unusual cost overruns on Projects for which the Debtors were compensated on a "lump sum" or fixed basis; (ii) weather, regulatory delays, shutdowns and other delays that in many instances were not specific to the Debtors; and (iii) significant payment delays or disputes.  The Williams/ASR Project dispute and related litigation, in particular, has brought the Debtors' liquidity and operations to an almost screeching halt.  Ultimately, these issues precipitated the Debtor's decision to commence these chapter 11 cases.

2.    With access to the DIP Facility and the protections afforded by the Bankruptcy Code, the Debtors believe this is their only chance to negotiate arrangements with their Customers so as to finalize ongoing Projects with them.  The DIP Facility will provide the Debtors with the necessary funding to allow them time and resources necessary to complete those deals.  Absent approval of the DIP Facility, the Debtors will be forced to initiate chapter 7 proceedings and liquidate all of their assets to the detriment of the Debtors, their estates, their creditors and their other stakeholders.  Such a crisis can be averted.  The Debtors believe approval of the DIP Facility is the life-line needed to restore the operations of the Company as they wind-down their Projects, thereby maximizing the value of the Debtor's assets.

3.    The DIP Facility terms are fair and reasonable under the circumstances.  Moreover, despite the efforts detailed below, the Debtors were unable to obtain alternative financing on terms more favorable than those set forth in the DIP Facility, as all five other potential lenders contacted by the Debtors declined to provide a DIP Facility.  Only North

American Pipeline Equipment Company, LLC, an entity under common ownership with the partners of Debtor Welded Construction, L.P. agreed to provide the Debtors their needed funding.

4.      The DIP Facility allows the Debtors the opportunity to finish their Projects and maximize the value of their estates.  Accordingly, the Debtors consider it in their best interest to enter into the DIP Facility, and the Debtors hereby seek its approval.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicate for the relief requested herein is sections 105(a), 3621, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and and Local Rule 4001-2.

## BACKGROUND

### A.      General

8.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

9.      Additional information regarding the Debtors' businesses, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the First Day Declaration.

**B.      Prepetition Indebtedness**

10.      As of the Petition Date, the Debtors have no outstanding secured debt obligations under any term loan or revolving credit facility, but have certain existing or potential secured obligations in connection with surety bonds, discrete equipment financings (with liens in the applicable discrete pieces of equipment), and potential miscellaneous statutory lien claims. However, as discussed below, the Debtors believe certain of these purported security interests are unperfected, and thus subject to avoidance under section 544 of the Bankruptcy Code.  The significant liabilities of the Debtors are described in more detail below.

**1. <u>Surety Bonds</u>**

11.      In the ordinary course of business, the Debtors are required to provide surety bonds (the "**Surety Bonds**") to certain third parties, including contract counterparties, governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations, including the completion of various projects within the terms of the applicable contracts, and environmental, road damage, lease, licensing and permitting, and contractor obligations.

12.      As of the Petition Date, the Debtors believe that they have four Surety Bonds on their Projects.  As set forth therein, among others, the Surety Bonds were issued by the Chubb, through Federal Insurance Company ("**Chubb**") and Berkshire Hathaway Specialty Insurance Company ("**Berkshire**," and together with Chubb, the "**Sureties**"). The Debtors have no outstanding premiums or other amounts due to the Sureties under the Surety Bonds as of the commencement of these chapter 11 cases.

13.    Chubb has issued three Surety Bonds related to the Debtors' pipeline construction Projects:  (i) an approximately $454 million bond related to the Williams/ASR Project; (ii) an approximately $56 million bond related to a project that has been completed by the Debtors for well over a year, which bond the Debtors believe should be released without liability, and (iii) a $14.5 million wage payment bond.  Finally, Berkshire has issued an approximately $60 million bond on the Consumers 2018 Project, which reached mechanical completion shortly before the Petition Date, but for which cleanup and demobilization work remains.

14.    While the Surety Bonds shift the risk of the Debtors' non-payment or nonperformance from the obligee to the Sureties, the Surety Bonds are not an insurance policy. Rather, if a Surety incurs a loss on a Surety Bond as a result of the Debtors' underlying liability, the Surety will seek repayment from the Debtors.  Toward this end, the Debtors have entered into that certain: (i) General Indemnity Agreement dated February 28, 2017 with Chubb (the "**Chubb Indemnity Agreement**"); and (ii) General Agreement of Indemnity dated May 29, 2018 with Berkshire (the "**Berkshire Indemnity Agreement**," and collectively, the "**Indemnity Agreements**").  Pursuant to these Indemnity Agreements, the Debtors have agreed to indemnify Chubb and Berkshire, respectively, on the terms set forth in the agreements in the event they are required to pay or perform under the Surety Bonds they have issued.  In addition, among other terms, the Indemnity Agreements purport to grant the Sureties certain security interests in the Debtors' assets, but as of the Petition Date, none of the Sureties have filed a UCC financing statement or otherwise perfected a security interest in the Debtors' cash.  Accordingly, at this time, the Debtors believe any security interests of the Sureties are unperfected.

**2.  Other Secured Claims**

15.     Financing statements have been filed against the Debtors asserting discrete security interests in various pieces of equipment financed by Caterpillar Financial Services Corporation (which has filed liens in over 100 pieces of equipment) and VAR Resources, LLC. As of the Petition Date, the Debtors believe approximately $26 million in total liabilities remaining in connection with these equipment financings.  Based on their prepetition dealings, the Debtors believe that Caterpillar Financial Services Corporation and VAR Resources, LLC consider the equipment subject to these financing statements to be equipment leased to the Debtors rather than equipment owned by the Debtors.  The Debtors reserve their rights with respect to the nature of their relationship with both parties.

16.     Certain third parties, including state and local taxing authorities, also may possess statutory liens in certain of the Debtors' property in accordance with applicable state law.

17.     Finally, the Debtors previously entered into a revolving credit facility with The Huntington National Bank ("**Huntington**"), pursuant to a credit agreement dated as of June 28, 2017 (the "**Revolving Credit Facility**").   Debtor Welded Construction, L.P. was the contemplated borrower under the Revolving Credit Facility, and Debtor Welded Construction Michigan, LLC was a guarantor.  As of the Petition Date, however, there are no borrowings under the Revolving Credit Facility and no amounts are due by the Debtors in connection therewith.  Moreover, the Revolving Credit Facility is no longer available to provide financing to the Debtors and, to the best of their knowledge and belief, the Debtors do not owe, and Huntington does not claim any amount is owed, with respect to the Revolving Credit Facility. The Debtors have previously requested that a UCC termination statement be filed by Huntington with respect to the Revolving Credit Facility.

18.     Similarly, the Debtors have requested that a UCC termination statement be filed with respect to a financing statement filed by BNP Paribas for a factoring agreement once used in connection with one of the Debtors' Projects, which agreement no longer secures any remaining receivables owed to the factor.

**3.  Unsecured Obligations**

19.     In the ordinary course of operating their business, the Debtors utilize certain goods and services from hundreds, if not thousands, of trade vendors and subcontractors. As of the Petition Date, the Debtors estimate that they owe approximately $212 million to trade creditors.  Debtor Welded Construction, L.P. also owes approximately $4 million to one of its general partners (or affiliates of one of its general partners).  The Debtors do not believe they owe any intercompany liabilities to each other.

**C.     The Debtor's Immediate Need for Liquidity**

20.     The Debtors are in need of an immediate capital infusion.  They currently are working on portions of five pipeline construction projects (the "**Projects**") for their customers (the "**Customers**"), almost all of which are either complete, subject to clean-up and demobilization, or nearing completion in approximately one month, with the exception of one project that has yet to begin substantive work.  One of the Projects is, the Atlantic Sunrise Pipeline Project (the "**Williams/ASR Project**") for Customer Transcontinental Gas Pipe Line Company, LLC, an affiliate of The Williams Companies, Inc. ("**Williams**"). Significantly, on October 4, 2018, Williams unexpectedly withheld $23,563,038.00 from a payment owed to the Debtors for the Williams/ASR Project, and contemporaneously therewith, filed a lawsuit against the Debtors asserting breach of contract, which created acute liquidity issues for the Debtors and concerns in the market about their viability as a going concern.

21.     In light of this unexpected event, the Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due.  As of the Petition Date, the Debtors' have approximately $0.9 million in cash on hand, which the Debtors believe is not subject to any perfected security interest, but may be subject to unperfected security interests of the Sureties, and they do not have readily available sources of additional financing.

22.     In consultation with their professionals, the Debtors' evaluated the cash requirements for their businesses and these cases.  As a result of these efforts, the Debtors have determined it is necessary and essential to their business that they enter into the DIP Facility with North American Pipeline Equipment Company, LLC (the "**DIP Lender**"), an entity under common ownership with the partners of Debtor Welded Construction, L.P.

23.     Zolfo Cooper, LLC ("**Zolfo**") worked with the Debtors' management to develop and analyze the Debtors' 13-week cash flow forecasts, which take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees, and interest expenses associated with the DIP Facility, professional fees, and required operational payments.  Absent approval of the DIP Facility, the Debtors will not have the liquidity to complete the Projects and satisfy the administrative costs of these cases, and anticipate that the Customers will make no further payments, attempt to find alternative providers to complete the Projects, and seek to setoff payments against the cost of completion and payment of claims to avoid the imposition of liens against the Projects, all to the detriment of the Debtors' estates.

24.     The DIP Facility is critical to the Debtors' ability to (a) reach acceptable agreements with their Customers on a project-by-project basis to fund ongoing construction and related costs, (b) pay operational expenses including employee wages, and (c) pay post-petition

administrative claims, including claims of trade creditors. The DIP Facility will preserve and maximize the value of the Debtors' estates and facilitate the administration of these chapter 11 cases. Without access to the DIP Facility, the Debtors have insufficient cash on hand, and based on the Debtors' liquidity forecast, the Debtors will not be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases. Consequently, the Debtors will be forced to initiate chapter 7 proceedings and liquidate all of their assets. As a result, Zolfo and the Debtors believe that the availability of the funding provided by the DIP Facility at the start of these chapter 11 cases is necessary for the Debtors to avoid immediate and irreparable harm.

**D.     The Debtor's Efforts to Obtain Financing**

25.     While negotiating the DIP Facility with the DIP Lender, Zolfo reached out to five potential third-party sources of financing to gauge their interest in providing debtor-in-possession financing to the Debtors. Those third-party sources included (i) financing firms that have an expertise in the construction industry, and (ii) firms that routinely provide debtor-in-possession financing.

26.     Zolfo provided diligence materials to those third-party sources and informed them of the term and amount of financing required by the Debtors. Zolfo indicated that the available collateral for a potential debtor-in-possession lender could be limited to the value of the Debtors' existing and after-acquired personal and real property. Despite Zolfo's marketing efforts, none of the third-party sources was able to provide financing terms that were superior to the terms of the DIP Facility or economically viable to the Debtors.

<u>**RELIEF REQUESTED**</u>

27.     For the reasons set forth herein, the Debtors seek authorization to enter into the DIP Financing Documents pursuant to the terms set forth in this Motion, the DIP Credit

Agreement, the Interim Order and the Final Order.  Specifically, by this Motion, the Debtors hereby seek, among other things: (i) to grant to the DIP Lender first priority security interests and liens on all of the Debtors' real, personal and mixed property, whether now owned or hereafter acquired (the "**DIP Collateral**"), subordinate only to the perfected and unavoidable liens and security interests of any Prepetition Lienholder (as defined below) and the Carve Out (the "**DIP Liens**"); (ii) to grant to the DIP Lender a perfected, first priority lien on the proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar actions under the Bankruptcy Code or similar state law (the "**Avoidance Actions**") whether received through judgment, avoidance or otherwise; (iii) upon the entry of the Final Order, to grant the priming of any liens on the DIP Collateral for the benefit of the DIP Lender; (iv) the DIP Liens will be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing; (v) authorizing the Debtors to use the advances under the DIP Credit Agreement and to use Cash Collateral during the period commencing immediately after the entry of the Interim Order and terminating upon the occurrence of an Event of Default (as defined the DIP Credit Agreement); (vi) that the Interim Order and Final Order will be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens; (vii) that solely in the event and to the extent that there are obligations that remain outstanding that are subject to prepetition perfected and unavoidable liens and security interests, the Debtors may grant to the parties holding such obligations (the "**Prepetition Lienholders**") continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral; (viii) the DIP Liens are subordinate only to the Carve Out (as defined in

the Interim Order) and any liens and security interests of the Prepetition Lienholders; (ix) that the

DIP Lender will not be deemed to have consented to any charge, lien, assessment or claim

against the DIP Collateral under Section 506(c) of the Bankruptcy Code; (x) the automatic stay

will become modified upon the occurrence of any Event of Default as to each of the Debtors and

counsel thereto, counsel for the Committee, if any, and the U.S. Trustee to allow the DIP Lender

to exercise its rights and remedies with respect to the Debtors in accordance with the DIP

Financing Documents, (xi) a finding that the DIP Lender has acted in good faith in connection

with negotiating the DIP Financing Documents; (xii) that, with the prior written consent of the

DIP Lender, the Debtors may enter into Customer Project Completion Agreements (a defined in

the Interim Order); (xiii) to schedule a preliminary hearing on this Motion pursuant to

Bankruptcy Rule 4001 and authority for entry of the Interim Order to obtain credit under the

terms of the DIP Facility and in accordance with the Interim Order; and (xiv) to schedule the

final hearing (the "**Final Hearing**") on the Motion as soon as practicable but in no event later

than thirty (30) days from the Petition Date.

## MATERIAL TERMS OF THE DIP FACILITY

28.     Bankruptcy Rule 4001(c)(1)(B) requires that a motion for authority to

obtain credit list or summarize, and set out the location within the relevant documents, all

material provisions of the proposed credit agreement and form of order, including interest rate,

maturity, events of default, liens, borrowing limits and borrowing conditions. Fed. R. Bankr. P.

4001(c)(1)(B).  The principal terms of the DIP Facility are as follows:[3]

| Required Disclosures | Summary of Material Terms |
|---|---|

---

[3]    This summary is qualified, in its entirety, by the provisions of the DIP Credit Agreement and the Interim Order.
Unless otherwise defined within this Motion, capitalized terms used within this summary only shall have the
meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

| | |
|---|---|
| **DIP Credit Parties**<br><br>*DIP Credit Agreement Preamble* | <u>Borrower</u>: Welded Construction, L.P. (Debtor)<br><br><u>Guarantor</u>: Welded Construction Michigan, LLC (Debtor)<br><br><u>Lender</u>: North American Pipeline Equipment Company, LLC |
| **Borrowing Limits**<br><br>*DIP Credit Agreement § 2.1*<br><br>*Interim Order at ¶ (i)–(iii) and 2(b)* | DIP Commitment for loans in an aggregate principal amount up to $20 million. During the period from entry of the Interim Order through and including the Final Order Entry Date (the "**Interim Period**"), and subject to the terms and conditions of the Interim DIP Order and the DIP Financing Documents, loans in an aggregate outstanding principal amount not to exceed $10 million. |
| **Interest Rate and Default Interest**<br><br>*DIP Credit Agreement §§ 4.1–4.2* | <u>Interest Rate</u>: 10% per annum.<br><br><u>Default Interest</u>: two (2) percentage points above the Interest Rate per annum. |
| **Borrowing Conditions and Restrictions on Use of Proceeds**<br><br>*DIP Credit Agreement §§ 2.3 and 9.1–9.2*<br><br>*Interim Order at ¶¶ G, 2(h), and 3* | Standard and customary conditions to the borrowing of funds for financings of this type, including the requirement for a Budget prior to borrowing. Additional conditions include:<br><br><u>Budget and Variance</u>: Strict compliance with the then-current Budget, subject to a percentage variance with respect to total projected disbursements in each then-current Budget that shall not exceed 15% on an aggregate basis of total actual disbursements for the thirteen (13) week period covered by such then-current Budget. *Interim Order ¶ 2(h); DIP Credit Agreement definition of "Variance"*<br><br><u>Use of Proceeds</u>: The proceeds of the DIP Advances are intended to be available to be used (i) to pay interest, fees and expenses associated with the DIP Credit Agreement, (ii) for the Debtors' working capital and general corporate purposes in accordance with the Budget (subject to the Variance) and (iii) to pay costs and expenses associated with the Chapter 11 Cases to the extent consistent with the Budget (subject to the Variance, and including professional costs incurred (including, costs incurred in respect of Case Professionals) and paid in accordance with the Budget). In no event shall the proceeds of any DIP Advance be used to bring any claim or suit against the Lender or to challenge the liens or claims of the DIP Lender. *DIP Credit Agreement §2.3*<br><br><u>Protection of the DIP Lender's Rights</u>: Subject to the Carve Out all DIP Obligations constitutes an allowed superpriority administrative expense claim with priority in these Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Debtors or their |

| | |
|---|---|
| | estates.  The DIP Superpriority Claim will be payable from prepetition and postpetition property of the Debtors and all proceeds thereof, subject to the Carve Out, provided that the DIP Superpriority Claim be payable from the proceeds of the Avoidance Actions only upon entry of the Final Order.  *Interim Order ¶ 2(h)* |
| **Fees and Credit Party Expenses**<br><br>*DIP Credit Agreement §§9.1(g), 24, and 25*<br><br>*Interim Order at ¶¶ G, 2(a)* | <u>Fees and Expenses</u>.  Whether or not the transactions contemplated by the DIP Credit Agreement are consummated, the Debtors agree to pay promptly (a) all the actual and reasonable costs and expenses of the DIP Lender incurred in connection with the negotiation, preparation and execution of the DIP Financing Documents, the Interim Order, the Final Order, the "first day orders" and any other documents in connection with the Chapter 11 Cases and any consents, amendments, waivers or other modifications thereto (whether or not any of the transactions contemplated hereby or thereby shall be consummated); (b) all the actual and reasonable fees, costs and expenses of counsel to the DIP Lender (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the DIP Financing Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Debtors; (c) all the actual and reasonable costs and expenses of creating, perfecting, recording, maintaining and preserving DIP Liens in favor of the DIP Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to the Lender; (d) all the actual and reasonable costs and expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the DIP Lender and its counsel) in connection with the custody or preservation of any of the DIP Collateral; (e) all other actual and reasonable costs and expenses incurred by the DIP Lender in connection with the transactions contemplated by the DIP Financing Documents and any consents, amendments, waivers or other modifications thereto; and (f) all the actual and reasonable costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Lender in enforcing any Obligations of or in collecting any payments due from any Debtor under the DIP Credit Agreement or under the other DIP Financing Documents, including fees and expenses incurred by such parties in connection with the monitoring and participating in the Chapter 11 Cases.  Notwithstanding the foregoing, with respect to the actual and reasonable costs and expenses of the DIP Lender incurred prior to the Closing Date in connection with the negotiation, preparation and execution of the DIP Financing Documents (including the actual and reasonable fees, costs and expenses of counsel to the DIP Lender), the Debtors shall only be required to pay an aggregate amount up to |

<table>
<tr>
<td></td>
<td>

$200,000. *DIP Credit Agreement §§ 9.1(g) and 24*

Indemnification:  In addition to the payment of the aforementioned fees and expenses, whether or not the transactions contemplated hereby are consummated, each Debtor, jointly and severally with the other Debtors, agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, the Lender and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates of the Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Debtor shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee. *DIP Credit Agreement §25*

The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, indemnities and other amounts described in the DIP Credit Agreement and all other DIP Financing Documents as such become due, including, without limitation, reasonable attorneys' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of the Court.  *Interim Order at ¶ 2(a)*

</td>
</tr>
<tr>
<td>

**Maturity**

*DIP Credit Agreement, definition of "Maturity Date"*

*Interim Order at ¶12*

</td>
<td>

Maturity Date:  The DIP Facility Maturity Date is earliest of (a) the date that is 180 days after the Petition Date, (b) the date of the consummation of the sale of all or substantially all of the Debtors' assets or the assets of any Affiliates of the Debtors and (c) the acceleration of the DIP Loans after the occurrence of an Event of Default.

</td>
</tr>
<tr>
<td>

**Prepayment of DIP Obligations**

*DIP Credit Agreement, § 6*

</td>
<td>

Optional Prepayment of DIP Obligations: the Debtors may prepay in whole or any part of the DIP Advances (together with accrued interest on the amount being repaid), without premium or penalty, at any time and from time to time after the Closing Date and up to and including the Maturity Date. *DIP Credit Agreement, § 6.1*

Mandatory Prepayments:  Except with respect to any Project Customer Payment Proceeds, if on any date any Debtor or any Subsidiary of any Debtor receive net cash proceeds from any receivables included in the Collateral from a source other than the Debtors' principal customers, then an amount equal to the lesser of (a) 100% of such net cash proceeds or (b) the aggregate outstanding amount of the DIP Advances must prepaid be within five (5) Business Days of such date to prepay the DIP Advances.  Within two (2) Business Days upon receipt of Net Asset Sale Proceeds from any Permitted Disposition by any Debtor or any Subsidiary of any Debtor, the Debtors must deliver 100% of such Net

</td>
</tr>
</table>

| | |
|---|---|
| | Asset Sale Proceeds to the DIP Lender.  If any Debtor or any Subsidiary of any Debtor suffers an Event of Loss, within two (2) Business Days upon receipt of net cash proceeds from such Event of Loss, the Debtors must deliver 100% of the received net cash proceeds to the DIP Lender to prepay the DIP Advances.   To the extent cash on hand exceeds $8,000,000 (the "**Mandatory Prepayment Amount**") for the duration of any period of fifteen (15) consecutive Business Days, the Debtors must pay any excess of cash on hand above the Mandatory Prepayment Amount to the DIP Lender within two (2) Business Days.  If at any time the aggregate outstanding amount of the DIP Advances exceeds the DIP Commitment, then within one (1) Business Day of notice thereof, the Debtors must pay to the DIP Lender the amount of such excess. *DIP Credit Agreement, § 6.2* |
| **Termination**<br><br>*DIP Credit Agreement § 12.1* | Termination: Upon the occurrence and during the continuance of any Event of Default, the DIP Commitment shall terminate and all DIP Obligations shall become immediately due and payable, and the DIP Lender may enforce any and all Liens and otherwise exercise any and all rights and remedies provided under the DIP Financing Documents and/or applicable law.   Except in respect of the bankruptcy-specific Events of Default set forth in clauses (h) through (o) of Section 12.1 of the DIP Credit Agreement, prior to exercising the rights and remedies referenced in the immediately preceding sentence, the DIP Lender shall provide five (5) days' written notice to the Debtors, the United States Trustee and the Committee (if any such committee is established). |
| **Events of Default**<br><br>*DIP Credit Agreement § 12.1*<br><br>*Interim Order at ¶14* | Standard and customary events of default for financings of this type. Additionally, the following events are Events of Default under the DIP Credit Agreement:<br><br>Bankruptcy Court Orders:  If the Debtors are unable to obtain entry of the Interim DIP Order within three (3) business days of the Petition Date, and if the Debtors are unable to obtain entry of the Final Order within twenty-one (21) days of the Petition Date.<br><br>Permits:  If a Debtor loses or receives notice of loss or termination of any Governmental Authorization of any Debtor, other than a termination of loss that is not reasonably likely to cause a Company Material Adverse Effect.<br><br>Milestones:   If the Debtors fail to agree with the DIP Lender on bankruptcy milestones provided by the DIP Lender within forty-five (45) days after the Petition Date. |
| **Priority of and Security for DIP Financing** | Security:   Effective immediately upon the entry of this Interim Order, on account of the Interim DIP Loan, except with respect to the Carve Out (as defined below) and subject to any prior valid, unavoidable, |

16

| | |
|---|---|
| **Liens**<br><br>*Interim Order at ¶¶ E(ii) and 2(d)–(f)* | perfected liens and security interests in existence as of the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by Section 546 of the Bankruptcy Code), the DIP Lender is hereby granted first-priority postpetition security interests and liens (which shall immediately be valid, binding, permanent, continuing, enforceable and non-avoidable) on all of the real, personal and mixed property, whether now owned or hereafter acquired of the Debtors, including, without limitation, any cash, any investments of such cash, deposit accounts, inventory, equipment, goods, general intangibles, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, Equity Interests (as defined in the DIP Credit Agreement), the proceeds of all of the foregoing, and, subject to entry of the Final Order, the proceeds of the Debtors' Avoidance Actions whether received through judgement, avoidance or otherwise. *Interim Order at ¶ 2(d)*<br><br>Priority:  The priority of the DIP Liens shall in each and every case be first priority senior liens, as follows:<br><br>(a) <u>364(c)(2) Liens</u>:    Pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve Out, a first priority lien on all DIP Collateral not otherwise subject to any valid, unavoidable, perfected liens and security interests. *Interim Order at ¶ 2(e)*<br><br>(b) <u>364(c)(3) Liens</u>:    Pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on the DIP Collateral subject to any valid, unavoidable, perfected liens and security interests. *Interim Order at ¶¶ E(ii) and 2(f)*<u>364(d)(1) Liens:</u> Upon the entry of the Final Order, pursuant to section 364(d)(1) of the Bankruptcy Code, a priming lien on the DIP Collateral. *Interim Order at ¶¶ E(ii) and 2(f)*<br><br>The DIP Liens securing the DIP Obligations shall be junior and subordinate to the Carve Out and pursuant to section 364(c)(3), until the entry of the Final Order (pursuant to which the DIP Obligations will be secured by a priming lien pursuant to section 364(d) of the Bankruptcy Code), any valid, unavoidable, perfected liens and security interests on the DIP Collateral, and shall otherwise be senior in  priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral. Other than as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter granted in the Chapter 11 Cases. The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of |

| | any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. *Interim Order at ¶ 2(f)* |
|---|---|
| **Superpriority Administrative Expense Claim Status**<br><br>*Interim Order at ¶2(i)* | Superpriority Administrative Claim Status. Subject to the Carve Out, all DIP Obligations shall constitute an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens, the "**DIP Protections**") with priority in each of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of a final order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code and pursuant to any other provision of the Bankruptcy Code except as otherwise set forth herein, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to the Carve Out, and subject to the rights of Prepetition Lienholders with respect to the Prepetition Lienholders' rights in prepetition property of the Debtors, provided that the DIP Superpriority Claim shall be payable from the proceeds of the Avoidance Actions only upon entry of the Final Order. |
| **Carve-Out**<br><br>*Interim Order at ¶ 6* | Carve-Out: Means, collectively:<br><br>(a) (i) all unpaid fees required to be paid to the Clerk of this Court and (ii) all quarterly unpaid fees required to be paid to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) [and 28 U.S.C. § 156(c)][4] together, in the case of clause (ii), with interest payable thereon;<br><br>The allowed and reasonable fees and expenses incurred by the professionals to the Debtors and the Committee in an aggregate amount not to exceed $300,000 (the "**Residual Carve Out**"), provided that (a) any payments made to Case Professionals for services rendered prior to the delivery of the Carve Out Notice and in accordance with the Budget and (b) any fees and expenses of Case Professionals accrued prior to the delivery of the Carve |

---

[4]    NTD: Not referenced in the DIP Order.

| | |
|---|---|
| | Out Notice in the amounts set forth in the Budget and subsequently allowed, shall not reduce the Residual Carve Out; and <br><br> (b) Notwithstanding anything set forth herein, the Carve Out shall exclude any fees and expenses incurred in connection with initiating or prosecuting any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender, including, without limitation, the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (i) invalidating, setting aside, disallowing, avoiding, challenging or subordinating, in whole or in part, (a) the DIP Obligations or (b) the DIP Liens, or (ii) preventing, hindering or delaying, whether directly or indirectly, the DIP Lender's assertion or enforcement of their liens or security interests or realization upon any DIP Collateral, or (iii) prosecuting any Avoidance Actions against the DIP Lender |
| **Adequate Protection** <br><br> *Interim Order at ¶ 5* | <u>Adequate Protection for the Prepetition Credit Parties</u>:  Solely in the event and to the extent that the Debtors have obligations to any party that remain outstanding that are subject to valid, perfected and non-avoidable prepetition liens on the Debtors' property, such parties (each a "**Prepetition Lienholder**" and collectively the "**Prepetition Lienholders**") interests shall receive the following as adequate protection against any diminution in the value of such Prepetition Lienholder's interest caused by the imposition of the automatic stay: pursuant to sections 361 and 363(e) the Prepetition Lienholders are hereby granted continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "**Adequate Protection Liens**"). The Adequate Protection Liens shall be subject to the Carve Out as set forth in this Interim Order and, except as to property subject to valid, perfected and non-avoidable prepetition liens in favor of  the Prepetition Lienholders, shall otherwise be junior to the DIP Liens.  Subject to and effective upon entry of the Final Order, the Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral, other than the DIP Liens. |
| **Acknowledgments** <br><br> *Interim Order at ¶ 2(g)* | The Debtors stipulate to the amount due under the DIP Financing Documents and the enforceability of, and liens granted under, the DIP Financing Documents and the obligations thereunder. |
| **Waivers and Consents** <br><br> *Interim Order at ¶¶ F, 4,* | (a) <u>Waiver of Automatic Stay</u>:  the automatic stay is hereby modified so that after the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of |

| | |
|---|---|
| *10, and 15*<br><br>*DIP Credit Agreement §25* | Default, upon five (5) business day's prior written notice of such occurrence (the "**Remedies Notice Period**"), in each case given to each of the Debtors and counsel thereto, counsel for the Committee, if any, and the U.S. Trustee, the DIP Lender shall be entitled to exercise its rights and remedies with respect to the Debtors in accordance with the DIP Financing Documents. Nothing in the Interim Order shall limit the ability of any party to immediately exercise rights and remedies with respect any non-Debtors. *Interim Order at ¶ 15(a)*<br><br>(b) <u>Automatic Perfection of Liens</u>:  The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases. *Interim Order at ¶ 4*<br><br>(a) <u>Waiver of Section 506(c)</u>:  Usual and customary waiver of section 506(c) of the Bankruptcy Code, upon entry of the Final Order, for any DIP Credit Party, the DIP Lender or any of the DIP Collateral.  Further, no expenses of administration of the Chapter 11 Cases or Successor Cases shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, and no consent shall be implied from any action, inaction or acquiescence by the DIP Lender. *Interim Order at ¶¶ F and 10*<br><br>(b) <u>Indemnification</u>: Standard and customary for financings of this type, including that Debtors agree that the DIP Lender or any other Indemnitee shall have no liability as a result of the DIP Financing Documents. *DIP Credit Agreement §25* |

## <u>REQUIREMENTS UNDER LOCAL RULE 4001-2</u>

29.     Rule 4001-2 of the Local Rules requires that certain provisions contained in the DIP Credit Agreement be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions.   The Debtors hereby identify and discusses the following provisions of the DIP Credit Agreement and the Interim Order:

30.     <u>Waiver of Section 506(c) of the Bankruptcy Code</u>:   Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code.   <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(C).

31.     The Interim Order provides that the waiver of any rights under section 506(c) of the Bankruptcy Code is subject to entry of the Final Order.   Because this waiver only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice," but the Debtors disclose the provision out of an abundance of caution.

32.     <u>Carve-Out</u>:   Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the Debtors and the professionals retained by the unsecured creditors' committee with respect to a professional fee carve out.   <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(F).

33.     Budgeted professional fees comprise the primary component of the Carve-Out.   The Budget provides different amounts for Committee professionals and Debtors professionals.   The Debtors submit the proposed amounts are common in cases of similar size before this Court, accurately accounts for the increased administrative tasks required of Debtors professionals, and are reasonable and appropriate under the circumstances.

34.     <u>Waiver of Section 552(b)(1)</u>:  Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).  The Interim Order provides in light of the agreement to subordinate its liens and superiority claims to the Carve Out in the case of the DIP Lender, the DIP Lender is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply with respect to proceeds, product, offspring or profits of any of the DIP Collateral.  <u>See</u> Interim Order at ¶17(f) .  The Debtors believe that such relief is often provided, and appropriate, upon entry of the Final Order.

## **REQUEST FOR APPROVAL OF THE DIP FACILITY AND RELATED ACTIONS**

### I.     **Sections 364(c) and (d) of the Bankruptcy Code**

35.     As described above, it is essential to the success of the Debtors' chapter 11 case that the Debtors immediately obtain access to sufficient postpetition financing and use of cash collateral.  The preservation of estate assets and the Debtors' ability to maximize value for stakeholders depends heavily upon the expeditious approval of the relief requested herein.

36.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. <u>See</u> 11 U.S.C. § 364.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superiority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing.  <u>See</u> 11 U.S.C. § 364(c).[5]   In addition,

---

[5]       Section 364(c) of the Bankruptcy Code provides as follows:

pursuant to section 364(d) of the Bankruptcy Code,[6] a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (i.e., a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

## II.   Approval Under Section 364(c) of the Bankruptcy Code

37.   The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); see In re Ames Dep't Stores, 115 B.R. 34, 37–38 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the

---

(c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[6]      Section 364(d) of the Bankruptcy Code provides as follows:

(d)(1)   The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)      the trustee is unable to obtain such credit otherwise; and

(B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)      In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

Bankruptcy Code); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

38.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test); In re Ames Dep't Stores, 115 B.R. at 39.

### A.    The Debtors Were Unable to Obtain Necessary Postpetition Financing from Third-Party Sources

39.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also In re Ames Dep't Stores, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to

the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

40.    As described above, the Debtors engaged in a process to secure debtor-in-possession financing.  The Debtors, with the assistance of their advisors, explored various alternative sources of capital and financing, including the DIP Facility.  The Debtors' efforts to seek the necessary postpetition financing within the Debtors' existing capital structure, as well as from other sophisticated lenders, were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.  See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); In re Ames Dep't Stores, 115 B.R. at 40 (same).

**B.    The DIP Facility is Necessary to Administer, Maximize and Preserve the Assets of the Debtor's Estate**

41.    It is essential that the Debtors immediately obtain the financing necessary to administer, maximize and preserve the assets of their estates.  If the Debtors are without sufficient funds to operate administer these chapter 11 cases, the Debtors would face a fatal interruption to their businesses and be forced to curtail their operations to the detriment of the Debtors, their estates, their creditors and their other stakeholders, which, in turn, would hinder the Debtors' ability to maximize the value of their estates.

C.      The Terms of the DIP Facility are
        Fair, Reasonable and Appropriate Under the Circumstances

42.      The terms and conditions of the DIP Facility must be judged by a bankruptcy court taking into account the debtor's financial circumstances and alternatives. In re W. Pac. Airlines, Inc., 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (although terms of financing facility fees were "onerous, costly, and tough," facility was approved because it fairly reflected the debtor's "situation and the market in which the debtor is forced to participate as a result of its financial circumstances and the deadlines it faces").

43.      Judged from that perspective, the terms of the DIP Facility are fair and reasonable under the circumstances.  The DIP Facility provides sufficient liquidity to the Debtors in their overall chapter 11 efforts because it provides the Debtors the time, breathing spell, and resources necessary to continue discussions with their Customers so as to negotiate arrangements to finalize the Debtors' ongoing Projects with them, all with the overarching goal of maximizing the value of the Debtor' estates for the benefit of the Debtor' creditors and other stakeholders. No other party approached by the Debtors and their advisors was willing to make a postpetition loan that were superior to those offered by the DIP Lender or economically viable to the Debtors. After having engaged in arm's-length negotiations with the DIP Lender through its counsel and other advisors, the Debtors believe that the DIP Facility is the best solution for the Debtors' immediate liquidity needs and their chapter 11 strategy.

44.      In addition, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which chapter 11 professionals may be paid.  See In re Tenney Vill. Co., 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees).  Instead, the proposed DIP

Facility and the proposed Interim Order provide generally that the security interests and superpriority administrative expense claims granted to the DIP Lender are subject to the Carve-Out, which provides for (a) all unpaid fees of the Clerk of the Court and the Office of the United States Trustee and (b) fees and expenses for any professional retained pursuant to sections 327, 328 or 1103 of the Bankruptcy Code of the Debtors and any statutory committee of unsecured creditors, subject to the Carve-Out Cap the Residual Carve-Out.  In Ames Department Stores, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to ensure that official committees and debtors' estates are adequately assisted by counsel and other professionals.  In re Ames Dep't Stores, 115 B.R. at 40.

45.    Likewise, the fees and charges required by the DIP Lender under the DIP Facility are well within the range of reasonableness under the circumstances.

46.    Finally, there is nothing in the DIP Facility to prevent the Debtors from considering alternative sources of financing prior to entry of the Final Order.  Should a superior alternative materialize, the Debtors, subject to repayment of all Obligations owing to the DIP Lender, may take it.

47.    For these reasons, in the Debtors' business judgment, the terms of the DIP Facility are fair and reasonable in light of the circumstances of this case.

**D.    The DIP Facility is in the Best
Interests of the Debtor's Estate and Creditors**

48.    The Debtors believes that the approval of the DIP Facility is in the best interests of the Debtors' estate and their creditors.  As stated above, without immediate access to the cash collateral and the funds available under the DIP Facility, the Debtors would quickly face a liquidity shortage and theywill be forced to initiate Chapter 7 proceedings and liquidate all of their assets.

### III.    Approval Under Section 364(d) of the Bankruptcy Code

49.    The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." See Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit without a priming lien, it had met its burden under section 364(d)); In re 495 Cent. Park, 136 B.R. at 630-31 (holding that debtor must make an effort to obtain credit without the requirement of a priming lien but is not required to seek credit from every possible lender); In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

50.    As fully described above, the Debtors conducted a robust solicitation process and no other postpetition credit was available to them.  Through the DIP Facility, the DIP Lender will receive, pursuant to section 364(d)(1) of the Bankruptcy Code, superpriority administrative expense claims in each of the chapter 11 cases and any Successor Cases, as well as automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim DIP Order), including all property constituting "cash collateral."

51.    Thus, the requirements of section 364(d)(1)(B) of the Bankruptcy Code have been fulfilled, to the extent applicable, and the proposed DIP Facility should be approved.

IV.     **Application of the Business Judgment Standard**

A.      **Entry into the DIP Credit Agreement
        is an Exercise of the Debtor's Sound Business Judgment**

52.     As described above and in the First Day Declaration, after appropriate diligence and analysis, the Debtors have concluded that the DIP Facility is the best and only option available under the circumstances.   Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); cf. In re Filene's Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating "[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or trustee.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

53.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Facility.   In light of the Debtors' overall circumstances and the fact that the Debtors could not obtain postpetition financing from another lending source, much less on terms

superior to the DIP Facility, the Debtors' decision to enter into the DIP Facility is a sound exercise of the Debtors' business judgment.  Accordingly, the Court should grant the Debtors authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

## CASH COLLATERAL, PRIMING, AND ADEQUATE PROTECTION

54.    While the Debtors entered into Indemnity Agreements with Chubb and Berkshire whichpurport to grant the Sureties certain security interests in the Debtors' assets, none of the Sureties have filed a UCC financing statement or have otherwise perfected a security interest in the Debtors' cash or assets.  Accordingly, since the Sureties' purported liens are unperfected, no adequate protection is necessary for the Debtors to utilize their cash pursuant to section 363 of the Bankruptcy Code.  Moreover, the Debtors believe any liens in connection thereto are subject to avoidance under section 544 of the Bankruptcy Code.

55.    However, in the event and to the extent that the Debtors have  obligations to any party that remain outstanding that are subject to valid, perfected and non-avoidable prepetition liens on the Debtors' property,, the Prepetition Lienholders are adequately protected. They will receive protection against any diminution in the value of such Prepetition Lienholder's interest caused by the imposition of the automatic stay by having continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral.

56.    The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition.  See In re 495 Cent. Park, 136 B.R. at 631 (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11); In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same).

57.    The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code, which sets forth three non-exclusive forms of adequate protection:

(a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property;

(b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property; and

(c) such other relief as will result in an entity realizing the indubitable equivalent of its interest in property.

11 U.S.C. § 361.  As the foregoing is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection.  MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987).  Ultimately, adequate protection is determined on a case-by-case basis in light of the particular facts and circumstances presented.  Id. (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis.") (citations omitted); In re 495 Cent. Park, 136 B.R. at 631 (stating that, "although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive" and "suggests a broad and flexible definition"); Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n.3 (Bankr. E.D. Pa. 1982) ("While adequate protection is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles." (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977)); see also 3 COLLIER ON BANKRUPTCY ¶ 363.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (stating that, although section 361 provides examples of adequate protection, "[t]hese examples are not intended to be limiting, and the circumstances of the case will dictate the necessary relief to be given").

58. In these chapter 11 cases, the Debtors will provide the Prepetition Lienholders with Adequate Protection Liens which will be subject to the Carve Out and otherwise be junior only to the DIP Liens. The Adequate Protection Liens will be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. The Debtors submit that, under the circumstances, the foregoing would suffice as adequate protection and the Prepetition Lienholders clearly are more than adequately protected under the circumstances with regard to the Debtor's proposed use of cash collateral.

59. If funds are not made available to pay essential items on an emergency basis, the value of the Debtors' assets will be eroded to the detriment of all parties in interest. On the other hand, use of limited cash collateral in accordance with the Budget, combined with the funds available under the DIP Facility, will allow the Debtors to administer, preserve and even enhance the value of the DIP Collateral. Accordingly, there is no harm done to the Prepetition Lienholders' interests (to the extent any Prepetition Lienholders exist) by the Debtors' proposed use of cash collateral and the institution of the DIP Lender's priming liens in connection therewith, and the Debtors believe that, combined with the adequate protection being provided under the Interim Order, the Prepetition Lienholders require no other or further adequate protection.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

60. The Debtors seek a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of the DIP Credit Agreement as described above.

61. Such stay modification provisions are customary features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the

circumstances.    Accordingly, the Debtors respectfully request that this Court modify the automatic stay to the extent contemplated by the DIP Facility and the proposed Interim Order.

## GOOD FAITH

62.    The terms and conditions of the DIP Facility and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR HEARING AND AUTHORITY TO MAKE INTERIM BORROWINGS UNDER THE DIP FACILITY

63.    Pursuant to Bankruptcy Rule 4001(b), the Debtors requests that the Court conduct an interim hearing and authorize the Debtors' use of the DIP Facility and cash collateral in order to (a) maintain and finance the operations of the Debtors while they negotiate arrangements with their Customers, and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estate and all parties in interest.

64.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., In re Simasko, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also In re Ames Dep't Stores, 115 B.R. at 38.

After the fourteen (14)-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., In re Simasko, 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

65.     Pursuant to Bankruptcy Rule 4001(c), the Debtors respectfully request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain access to interim borrowing under the terms contained in the DIP Facility, and to utilize cash collateral.

## SCHEDULING FINAL HEARING

66.     The Debtors respectfully requests that the Court schedule the Final Hearing for a date no later than thirty (30) days from the Petition Date, and set a deadline to object to entry of the Final Order as set forth in the proposed Interim Order.

## NOTICE

67.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (v) the Securities and Exchange Commission; (vi) counsel to the Debtors' post-petition lenders; (vii) all parties that have filed a financing statement asserting a lien in any of the Debtors' assets; and (viii) the Cash Management Banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully requests that the Court (a) enter an Interim Order substantially in the form attached hereto as Exhibit B; (b) set a date for a hearing to consider entry of the Final Order, and (c) any other relief that the Court deems just and proper.

Dated: October 22,2018
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean M. Beach*

M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Justin H. Rucki (No. 5304)
Tara C. Pakrouh (No. 6192)
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors*

**EXHIBIT A**

**Budget**



WELDED DIP BUDGET

# 13 Week DIP Cash Flow Budget
(USD, $ thousands)

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 10/22/18 | 10/29/18 | 11/5/18 | 11/12/18 | 11/19/18 | 11/26/18 | 12/3/18 | 12/10/18 | 12/17/18 | 12/24/18 | 12/31/18 | 1/7/19 | 1/14/19 | 10/22/18 |
| Week Ending | 10/28/18 | 11/4/18 | 11/11/18 | 11/18/18 | 11/25/18 | 12/2/18 | 12/9/18 | 12/16/18 | 12/23/18 | 12/30/18 | 1/6/19 | 1/13/19 | 1/20/19 | 1/20/19 |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Receipts** | | | | | | | | | | | | | | |
| Total Receipts, Gross | $ 2,771 | $ 25 | $ 25 | $ 25 | $ 25 | $ 25 | $ 7,025 | $ - | $ - | $ - | $ - | $ - | - | $ 9,921 |
| **Disbursements** | | | | | | | | | | | | | | |
| Total Operating and G&A Disbursements | 1,233 | 3,124 | 1,081 | 870 | 1,615 | 703 | 1,239 | 339 | 614 | 477 | 1,042 | 4,619 | 172 | 17,127 |
| **OPERATING CASH FLOW** | 1,539 | (3,099) | (1,056) | (845) | (1,590) | (678) | 5,786 | (339) | (614) | (477) | (1,042) | (4,619) | (172) | (7,206) |
| Restructuring Professional Fees Cash Payments | - | - | - | - | - | - | - | 275 | 107 | 345 | - | - | 1,220 | 1,947 |
| Utility Deposits | 56 | - | - | - | - | - | - | - | - | - | - | - | - | 56 |
| Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 250 | 250 |
| Total Restructuring Disbursements | 56 | - | - | - | - | - | - | 275 | 107 | 345 | - | - | 1,470 | 2,253 |
| DIP Proceeds | - | 2,823 | 1,081 | 845 | 1,590 | 678 | - | - | - | - | - | 2,358 | 1,642 | 11,016 |
| Principal Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Payments and Fees | (200) | (25) | - | - | - | (153) | - | - | - | - | (172) | - | - | (550) |
| Total Financing | (200) | 2,798 | 1,081 | 845 | 1,590 | 526 | - | - | - | - | (172) | 2,358 | 1,642 | 10,466 |
| **NET CASH FLOW** | 1,282 | (301) | 25 | - | - | (153) | 5,786 | (614) | (721) | (822) | (1,214) | (2,261) | - | 1,007 |
| Beginning Cash Balance | 993 | 2,276 | 1,975 | 2,000 | 2,000 | 2,000 | 1,847 | 7,633 | 7,019 | 6,297 | 5,475 | 4,261 | 2,000 | 993 |
| Net Cash Flow | 1,282 | (301) | 25 | - | - | (153) | 5,786 | (614) | (721) | (822) | (1,214) | (2,261) | - | 1,007 |
| Ending Cash Balance | 2,276 | 1,975 | 2,000 | 2,000 | 2,000 | 1,847 | 7,633 | 7,019 | 6,297 | 5,475 | 4,261 | 2,000 | 2,000 | 2,000 |
| Beginning DIP Balance | - | - | 2,823 | 3,904 | 4,749 | 6,338 | 7,016 | 7,016 | 7,016 | 7,016 | 7,016 | 7,016 | 9,374 | - |
| Draw / (Paydown) | - | 2,823 | 1,081 | 845 | 1,590 | 678 | - | - | - | - | - | 2,358 | 1,642 | 11,016 |
| Ending DIP Balance | - | 2,823 | 3,904 | 4,749 | 6,338 | 7,016 | 7,016 | 7,016 | 7,016 | 7,016 | 7,016 | 9,374 | 11,016 | 11,016 |

## **EXHIBIT B**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELDED CONSTRUCTION, L.P., *et al.*,[1] | Case No. 18-_____ (___) |
| Debtors. | Jointly Administered |
|  | **Ref. Docket No. _____** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

Upon the motion (the "**DIP Motion**") dated October [__], 2018 of Welded Construction, L.P. ("**Welded**" or the "**DIP Borrower**") and Welded Construction Michigan, LLC (the "**DIP Guarantor**"), as debtors and debtors in possession (together, the "**Debtors**") in the above-referenced chapter 11 cases (collectively, the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the corresponding local rules of this District (the "**Local Rules**"), for entry of an interim order (the "**Interim Order**") authorizing the Debtors to, among other things:

(i)  Obtain senior secured postpetition financing (the "**DIP Financing**") pursuant to the terms and conditions of the DIP Financing Documents (as defined below), the Interim Order, and the Final Order (as defined below);

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Welded Construction, L.P (5008) and Welded Construction Michigan, LLC (9830). The mailing address for each of the Debtors is 26933 Eckel Road, Perrysburg, OH 43551.

(ii)    Enter into (a) a $[20,000,000] Senior Secured, Superpriority Debtor in Possession Term Loan, Guaranty and Security Agreement (the "**DIP Credit Agreement**"), substantially in the form attached as **Exhibit A** hereto, by and among each of the DIP Borrower and the DIP Guarantor, and North American Pipeline Equipment Company, LLC, as Lender (the "**DIP Lender**") and (b) all other loan documents (together with the DIP Credit Agreement, the "**DIP Financing Documents**");

(iii)    Borrow, on an interim basis, pursuant to the DIP Financing Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to $[10,000,000] (the "**Interim DIP Loan**") and obtain other financial accommodations from the DIP Lender pursuant to the DIP Credit Agreement, the other DIP Financing Documents, and the Interim Order;

(iv)    Borrow, on a final basis, pursuant to the DIP Financing Documents and the Final Order (as defined below), postpetition financing in an aggregate principal amount of up to $[20,000,000] (the "**DIP Loan**", together with the Interim DIP Loan, the "**DIP Facility**") and obtain other financial accommodations from the DIP Lender pursuant to the DIP Credit Agreement, the other DIP Financing Documents, and the Final Order (as defined below);

(v)    Authorize the DIP Borrower and the DIP Guarantor to execute and deliver the DIP Credit Agreement and the other DIP Financing Documents;

(vi)    Grant to the DIP Lender allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (as defined below) for the DIP Financing and all obligations of the Debtors owing under the DIP Financing Documents (collectively, and including all "Obligations" of the Debtors as defined and described in the DIP

Credit Agreement, the "**DIP Obligations**") subject to the priorities set forth in paragraph 2(i) below;

(vii)    Grant to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), which liens shall be subject to the priorities set forth herein;

(viii)    Use the proceeds of the DIP Financing in accordance with the DIP Credit Agreement, the DIP Financing Documents and this Interim Order, in all cases in accordance with the Budget (as defined in the DIP Credit Agreement), a copy of which is attached hereto as **Exhibit B**, and as otherwise provided in the DIP Financing Documents;

(ix)    Use any prepetition collateral, including the Cash Collateral, and provide adequate protection to the parties that may have an interest in such prepetition collateral, including Cash Collateral, for any diminution in value of their interests therein; and

(x)    Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Financing Documents and this Interim Order;

(xi)    Schedule a final hearing (the "**Final Hearing**") to consider entry of an order (the "**Final Order**") granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xii)    Waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The Court having considered the DIP Motion, the Declaration of Frank Pometti in Support of Debtors' Chapter 11 Petitions and First Day Motions and Applications (the "**First**

**Day Declaration**"), the exhibits attached thereto, the DIP Credit Agreement, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "**Interim Hearing**"); and notice of the DIP Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the DIP Motion on an interim basis  is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' assets; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

      **IT IS FOUND AND DETERMINED that**[2]**:**

      A.      **Petition Date**. On October [__], 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with this Court.

      B.      **Jurisdiction and Venue**. This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution.

---

[2] The findings and conclusions set forth herein constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     **Committee Formation**. A statutory committee of unsecured creditors (the "**Committee**") has not yet been appointed in the Chapter 11 Cases.

D.     **Notice**. Notice of the Interim Hearing and notice of DIP Motion has been provided by the Debtors to (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); and (vi) counsel to the DIP Lender, by telecopy, email, overnight courier and/or hand delivery. Under the circumstances, such notice of the Interim Hearing and the DIP Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), (c), and (d), and the Local Rules.

E.     **Findings Regarding the DIP Financing**.

(i)     **Need for DIP Financing and to Use Cash Collateral**. An immediate need exists for the Debtors to obtain funds from the Interim DIP Loan and to use Cash Collateral in order to continue operations, fund payroll and operating expenses, and to administer and preserve the value of their estates pending the Final Hearing. The ability of the Debtors to finance their operations through the incurrence of the Interim DIP Loan and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors' estates, to maximize the value of the Debtors' assets for the benefit of their creditors, and to avoid immediate and irreparable harm to the Debtors, their estates and their creditors.

(ii)     **Priming of the Prepetition Liens**. Upon the entry of the Final Order, the priming of any liens on the DIP Collateral, as contemplated by the DIP Financing Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue

to operate their businesses to the benefit of their estates and creditors.  Solely in the event and to the extent that there are obligations outstanding whose interests are primed, the parties holding such obligations are each entitled to receive adequate protection as set forth in paragraph 5 below pursuant to sections 361, 363, and 364 of the Bankruptcy Code for any diminution in value of each of their respective interests.

(iii)   **No Credit Available on More Favorable Terms**. The Debtors have been unable to obtain (a) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, or (b) credit for money borrowed secured by a lien on property of the estate on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order. The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

F.   **Section 506(c) Waiver**. Subject to and effective upon entry of the Final Order, the Debtors shall be deemed to have waived the provisions of section 506(c) of the Bankruptcy Code as part of the DIP Facility. Further, subject to and effective upon entry of the Final Order, no expenses of administration of the Chapter 11 Cases or Successor Cases shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, and no consent shall be implied from any action, inaction or acquiescence by the DIP Lender.

G.   **Use of Proceeds of the DIP Facility**. Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) shall be

used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement and this Interim Order and in accordance with the Budget.

H.    **Application of Proceeds of DIP Collateral**. All proceeds of any sale or other disposition of the DIP Collateral (as defined below) shall be applied in accordance with the Budget and the terms and conditions of the DIP Financing Documents.

I.    **Effect of Reversal, Good Faith**. The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and this Interim Order, and provided that the DIP Obligations, DIP Liens and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order as provided in section 364(e) of the Bankruptcy Code. The DIP Lender has acted in  good faith in agreeing to provide the DIP Financing approved by this Interim Order.

J.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)    The terms and conditions of the DIP Facility and the DIP Financing Documents, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration;

(ii)    the DIP Financing Documents and use of Cash Collateral were negotiated in good faith and at arms' length between the Debtors and the DIP Lender; and

(iii)    the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

K.     **Relief Essential; Best Interest; Good Cause**. Good cause has been show for the relief requested in the DIP Motion (and as provided in this Interim Order) and such relief is necessary, essential, and appropriate for the preservation of the Debtors' assets, business and property. It is in the best interest of the Debtors' estates to be allowed to enter into the DIP Facility contemplated by the DIP Credit Agreement.

**NOW, THEREFORE,** based upon the foregoing findings, and upon consideration of the DIP Motion and the record made before this Court with respect to the DIP Motion, including the record created during the Interim Hearing, and with the consent of the Debtors and the DIP Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED AND DECREED:**

1.     **Motion Granted**. The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Credit Agreement. Any objections to the DIP Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.     **DIP Financing Documents**.

(a)     **Approval of Entry Into DIP Financing Documents**. The Debtors are authorized and empowered to execute and deliver the DIP Financing Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Financing Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Documents. The Debtors are hereby

authorized to use Cash Collateral. The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, indemnities and other amounts described in the DIP Credit Agreement and all other DIP Financing Documents as such become due, including, without limitation, reasonable attorneys' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court; *provided*, *however*, that prior to its receipt of any cash payment from the Debtors, the DIP Lender shall deliver copies of summary professional fee and expense invoices to the Office of the United States Trustee for the District of Delaware and the Committee (if one is appointed in these Chapter 11 Cases) on ten (10) days' notice at the same time such invoices are forwarded to the Debtors for payment.  If no objection is received by such parties during such ten (10) day period, then such amounts shall be payable by the Debtors.

(b)     **Interim Authorization to Borrow/and or Guarantee**. To enable them to continue to preserve the value of their estates during the period prior to entry of the Final Order (the "**Interim Period**") and subject to the terms and conditions of this Interim Order, upon the execution of the DIP Credit Agreement and the other DIP Financing Documents, the Debtors are hereby authorized to borrow and/or guarantee, as applicable, the Interim DIP Loan up to a total committed amount of $[10,000,000] under the DIP Financing Documents.

(c)     **Conditions Precedent**. The DIP Lender shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to making such loan under the DIP Credit Agreement have been satisfied in full or waived by the DIP Lender in its sole discretion.

(d)     **DIP Liens**. Effective immediately upon the entry of this Interim Order, on account of the Interim DIP Loan, except with respect to the Carve Out (as defined below) and

subject to any prior valid, unavoidable, perfected liens and security interests in existence as of the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by Section 546 of the Bankruptcy Code), the DIP Lender is hereby granted first-priority postpetition security interests and liens (which shall immediately be valid, binding, permanent, continuing, enforceable and non-avoidable) on all of the real, personal and mixed property, whether now owned or hereafter acquired of the Debtors, including, without limitation, any cash, any investments of such cash, deposit accounts, inventory, equipment, goods, general intangibles, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, Equity Interests (as defined in the DIP Credit Agreement), the proceeds of all of the foregoing, and, subject to entry of the Final Order, the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544-549, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**") whether received through judgement, avoidance or otherwise (collectively, the "**DIP Collateral**," and all such liens and security interests granted on or in the DIP Collateral pursuant to this Interim Order and the DIP Financing Documents, the "**DIP Liens**"):

   (e) Subject to the Carve Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted a perfected, first priority lien on all DIP Collateral not otherwise subject to any valid, unavoidable, perfected liens and security interests.

   (f) **DIP Lien Priority**. The DIP Liens securing the DIP Obligations shall be junior and subordinate to the Carve Out (as defined below) and pursuant to section 364(c)(3),

until the entry of the Final Order (pursuant to which the DIP Obligations will be secured by a priming lien pursuant to section 364(d) of the Bankruptcy Code), any valid, unavoidable, perfected liens and security interests on the DIP Collateral, and shall otherwise be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral. Other than as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter granted in the Chapter 11 Cases. The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.

(g)     **Enforceable Obligations**. The DIP Financing Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors or representatives thereof, in accordance with their terms.

(h)     **Protection of DIP Lender's and Other Rights**. From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Interim Order and in strict compliance with the Budget (subject to any variances thereto permitted by the DIP Credit Agreement).

(i)     **Superpriority Administrative Claim Status**. Subject to the Carve Out (as defined below), all DIP Obligations shall constitute an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens, the "**DIP**

**Protections**") with priority in each of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of a final order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code and pursuant to any other provision of the Bankruptcy Code except as otherwise set forth herein, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to the Carve Out (as defined below) and subject to the rights of Prepetition Lienholders (as defined below) with respect to the Prepetition Lienholders' rights in prepetition property of the Debtors, provided that the DIP Superpriority Claim shall be payable from the proceeds of the Avoidance Actions only upon entry of the Final Order.

      3.      **Authorization to Use Proceeds of DIP Facility and Cash Collateral**. Pursuant to the terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents, and in accordance with the Budget and the variances thereto set forth in the DIP Credit Agreement, the Debtors are authorized to use the advances under the DIP Credit Agreement and to use Cash Collateral during the period commencing immediately after the entry of the Interim Order and terminating upon the occurrence of an Event of Default (as defined below) and the termination of the DIP Credit Agreement in accordance with its terms and subject

to the provisions hereof. The Debtors and the DIP Lender may agree in writing to modify the Budget in their discretion at any time that the DIP Financing remains outstanding.

4.     **Postpetition Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

The Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file or record financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the recording officer shall be authorized to file or record such copy of this Interim Order.

5.      **Adequate Protection Liens**.   Solely in the event and to the extent that the Debtors have obligations to any party that remain outstanding that are subject to valid, perfected and non-avoidable prepetition liens on the Debtors' property, such parties (each a "**Prepetition Lienholder**" and collectively the "**Prepetition Lienholders**") interests shall receive the following as adequate protection against any diminution in the value of such Prepetition Lienholder's interest caused by the imposition of the automatic stay: pursuant to sections 361 and 363(e) the Prepetition Lienholders are hereby granted continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "**Adequate Protection Liens**"). The Adequate Protection Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior to the DIP Liens.  Subject to and effective upon entry of the Final Order, the Adequate Protection Liens shall be senior to all security interests in, liens on, or claims against any of the DIP Collateral other than the DIP Liens.

6.      **Carve Out**. The DIP Liens are subordinate only to the following (the "**Carve Out**"): (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the "**U.S. Trustee Fees**"), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; (ii) until the issuance of a Carve Out Notice (as defined in the DIP Credit Agreement) (which the DIP Lender may only issue upon an Event of Default), the allowed and reasonable fees and expenses of professionals employed by the Debtors and the Committee pursuant to Sections 327 and 1103 of the Bankruptcy Code (the "**Case Professionals**") in the amounts set forth in the Budget (inclusive of any permitted variances); and (iii) following delivery of a Carve Out Notice, an aggregate amount (the "**Residual Carve Out**") not to exceed $[300,000], provided that (a) any payments made to Case

Professionals for services rendered prior to the delivery of the Carve Out Notice and in accordance with the Budget and (b) any fees and expenses of Case Professionals accrued prior to the delivery of the Carve Out Notice in the amounts set forth in the Budget and subsequently allowed, shall not reduce the Residual Carve Out.

7.      Notwithstanding anything set forth herein, the Carve Out shall exclude any fees and expenses incurred in connection with initiating or prosecuting any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender, including, without limitation, the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (i) invalidating, setting aside, disallowing, avoiding, challenging or subordinating, in whole or in part, (a) the DIP Obligations or (b) the DIP Liens, or (ii) preventing, hindering or delaying, whether directly or indirectly, the DIP Lender's assertion or enforcement of their liens or security interests or realization upon any DIP Collateral, or (iii) prosecuting any Avoidance Actions against the DIP Lender.

8.      Nothing herein shall be construed to obligate the DIP Lender to pay any professional fees, or to assure that a Debtor has sufficient funds on hand to pay any professional fees.

9.      **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors or the Committee or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget.

10.      **Section 506(c) Claims**. Nothing contained in this Interim Order shall be deemed a consent by the DIP Lender to any charge, lien, assessment or claim against the DIP Collateral

under Section 506(c) of the Bankruptcy Code or otherwise. Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time may be charged against the DIP Lender or any of its claims or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

11.   **Collateral Rights**. Unless the DIP Lender has provided its prior written consent or all DIP Obligations have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), and all commitments to lend have terminated:

(a)   The Debtors shall not seek entry, in these cases or proceedings, or in any Successor Case, of any order which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is senior or *pari passu* to those granted to the DIP Lender pursuant to this Interim Order, unless such credit or indebtedness is sufficient to pay all of the DIP Obligations in full in cash; and

(b)   The Debtors shall not consent to relief from the automatic stay by any person other than the DIP Lender with respect to all or any portion of the DIP Collateral with a value greater than $100,000 without the express written consent of the DIP Lender.

12.   **Commitment Termination Date**. All DIP Obligations of the Debtors to the DIP Lender shall be immediately due and payable, and the Debtors' authority to use the proceeds of the DIP Facility shall cease, both on the date that is the earliest to occur of: (i) the date that is one hundred and eighty (180) days after the Petition Date, (ii) the date on which the maturity of the DIP Obligations is accelerated and the commitments under the DIP Facility are irrevocably terminated in accordance with the DIP Credit Agreement, and (iii) the date that is twenty-one

(21) days after the Petition Date if the Debtors have not obtained entry of a Final Order on or before such date (the "**Commitment Termination Date**").

13.    **Disposition of Collateral**. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender or an order of this Court), except as provided in the DIP Credit Agreement and this Interim Order and approved by the Bankruptcy Court to the extent required under applicable bankruptcy law; provided, however, that nothing herein shall prevent the Debtors from making sales in the ordinary course of business to the extent consistent with their prior practice and the Budget.

14.    **Events of Default**. The occurrence of an "Event of Default" pursuant to Section 12.1 the DIP Credit Agreement shall constitute an event of default under this Interim Order, unless expressly waived in writing in accordance with the consents required in the DIP Financing Documents (collectively, the "**Events of Default**"). As set forth in section 12.1 of the DIP Credit Agreement, the following specific bankruptcy-related events (the "**Bankruptcy Milestones**") shall constitute an Event of Default:

(a)    The failure of the Debtors to obtain entry of this Interim Order by the Bankruptcy Court in form and substance mutually acceptable to the DIP Lender in its sole discretion and the Debtors within three (3) business days of the Petition Date;

(b)    The failure of the Debtors to obtain entry of the Final Order by the Bankruptcy Court in form and substance acceptable to the DIP Lender in its sole discretion within twenty-one (21) days of the Petition Date; and

(c)     The failure of the DIP Borrower to agree with the DIP Lender on bankruptcy milestones provided by the Lender on a good faith basis and consistent with the Budget to be incorporated into Section 11.1(k) of the DIP Credit Agreement within forty-five (45) days after the Petition Date.

15.     **Rights and Remedies Upon Event of Default**.

(a)     Any otherwise applicable automatic stay is hereby modified so that after the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, upon five (5) business day's prior written notice of such occurrence (the "**Remedies Notice Period**"), in each case given to each of the Debtors and counsel thereto, counsel for the Committee, if any, and the U.S. Trustee, the DIP Lender shall be entitled to exercise its rights and remedies with respect to the Debtors in accordance with the DIP Financing Documents. Nothing in this Interim Order shall limit the ability of any party to immediately exercise rights and remedies with respect any non-Debtors.

(b)     Notwithstanding the preceding paragraph, immediately following the giving of notice by the DIP Lender of the occurrence of an Event of Default: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Lender as provided in the DIP Credit Agreement and this Interim Order; (ii) the DIP Lender shall continue to apply such proceeds in accordance with the provisions of this Interim Order and of the DIP Credit Agreement; (iii) the Debtors shall have no right to use any of such proceeds other than towards the satisfaction of the DIP Obligations and the Carve Out; and (iv) any obligation otherwise imposed on the DIP Lender to provide any loan or advance to the Debtors pursuant to the DIP Financing Documents shall immediately be suspended. Following the giving of notice by the DIP Lender of the occurrence of an Event of Default, the Debtors shall be entitled to an

emergency hearing before this Court. If the Debtors do not contest the right of the DIP Lender to exercise its remedies within such five (5) day period, or if an emergency hearing is held that does not result in the Court preventing the DIP Lender from exercising its rights and remedies, then the automatic stay, as to the DIP Lender, shall automatically terminate at the end of the Remedies Notice Period.

(c)     Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's rights to seek any other or supplemental relief in respect of the DIP Lenders' rights, as provided in the DIP Credit Agreement.

16.     **Proofs of Claim**. The DIP Lender will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case.

17.     **Other Rights and Obligations**.

(a)     <u>Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Interim Order</u>. The DIP Lender has acted in good faith in connection with negotiating the DIP Financing Documents, and extending credit under the DIP Facility, and its reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified amended or vacated by a subsequent order of this or any other Court, the DIP Lender is entitled to all the benefits and protections provided in section 364(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity and enforceability of any advances made pursuant to this Interim Order or the liens or priority authorized or created hereby. Any claims, liens or DIP Protections granted to the DIP Lender hereunder arising prior to the effective date of such reversal, modification, amendment or vacatur

shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Interim Order, the obligations owed to the DIP Lender prior to the effective date of any reversal or modification of this Interim Order cannot, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Interim Order and/or the DIP Financing Documents.

(b)    <u>Binding Effect</u>. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors and each of their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 Case.

(c)    <u>No Waiver</u>. The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under the DIP Financing Documents, the DIP Facility, this Interim Order or otherwise, as applicable, shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lender to (i) request conversion of the Chapter 11 Cases to cases under Chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a

trustee in the Chapter 11 Cases, or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan of reorganization or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Lender may have pursuant to this Interim Order, the DIP Financing Documents, or applicable law. Nothing in this Interim Order shall interfere with the rights of any party with respect to any non-Debtors.

(d)     No Third Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(e)     No Marshaling. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(f)     Section 552(b). In light of the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve Out, and subject to entry of the Final Order, the DIP Lender is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

(g)     Amendment. The Debtors and the DIP Lender may amend or waive any provision of the DIP Financing Documents, provided that, to the extent such amendment or waiver impairs the Debtors or DIP Collateral or otherwise constitutes a material modification of the DIP Financing Documents, such amendment or waiver must be on notice to the Office of the United States Trustee for the District of Delaware and the Committee (if appointed), each of whom shall have five (5) business days from the date of such notice within which to object in writing to such amendment or waiver. If the Office of the United States Trustee for the District of Delaware or the Committee timely objects to any such amendment or waiver to the DIP

Financing Documents, such amendment or waiver shall only be permitted pursuant to an order of this Court.

18.    **Customer Project Completion Agreements**. Notwithstanding anything to the contrary contained in this Interim Order, with the prior written consent of the DIP Lender, a Court-approved order in connection with a Customer Project Completion Agreement (as such term is defined in *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a), 363(b), 503(b)(1), 1107(a) and 1108 of the Bankruptcy Code, Authorizing, but Not Directing, (I) the Debtors to Pay Certain Prepetition Claims, Conditioned upon Prior Customer Payment, (II) the Debtors to Honor Customer Obligations, (III) the Debtors to Implement Control Procedures for Customer Project Funding and Completion, and (IV) Granting Related Relief* [D.I. ___]) can amend provisions of this Interim Order, the Final Order, and any DIP Financing Document, if and as applicable, that would require amendment to implement such Customer Project Completion Agreement.

19.    **Survival of Interim Order and Other Matters**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any Successor Cases, (iii) to the extent authorized by applicable law, dismissing any of the Chapter 11 Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court. The terms and provisions of this Interim Order, including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Documents, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as

provided by this Interim Order until all the obligations of the Debtors to the DIP Lender pursuant to the DIP Financing Documents have been indefeasibly paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Financing Documents which survive such discharge by their terms).

(a)     <u>Inconsistency</u>. In the event of any inconsistency between the terms and conditions of the DIP Financing Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(b)     <u>Enforceability</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order. The rights of all parties in interest to object to the terms of the Final Order, the DIP Credit Agreement and any other DIP Financing Document at the Final Hearing are expressly reserved.

(c)     <u>Objections Overruled</u>. All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled on an interim basis.

(d)     <u>No Waivers or Modification of Interim Order</u>. The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

20.  **Governmental Consents**. Except as otherwise provided herein, the execution, delivery and performance by the Debtors of the DIP Financing Documents and the consummation of the transactions contemplated by the DIP Financing Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority (as defined in the DIP Credit Agreement).

21.  **Final Hearing**.

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [_____], 2018 at [__]:[__] [_].m. prevailing Eastern time at the United States Bankruptcy Court for the District of Delaware. If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)     Within two (2) business days following entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order, the proposed Final Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for the Committee, if any; (d) the Office of the United States Trustee for the District of Delaware, (e) the Internal Revenue Service, (f) counsel to the DIP Lender, and (g) the Securities and Exchange Commission. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than [_____], 2018 at 4:00 p.m. prevailing Eastern time which objections shall be served so that the same are received on or

before such date by: (a) bankruptcy counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael R. Nestor, Esq. and Sean M. Beach, Esq.; (b) counsel for the DIP Lender, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Michael A. Rosenthal, Esq. and Matthew K. Kelsey, Esq.; (c) counsel to the Committee; and (d) the Office of the United States Trustee for the District of Delaware, Attn: [_____], Esq. and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case to allow actual receipt of the foregoing no later than [_____], 2018, at 4:00 p.m. prevailing Eastern time. Notwithstanding the terms of this Interim Order, this Court is not precluded from entering a Final Order containing provisions that are inconsistent with, or contrary to any of the terms in this Interim Order, subject to the protections under Section 364(e) and the rights of the DIP Lender to terminate the DIP Credit Agreement if such Final Order is not acceptable to them. In the event this Court modifies any of the provisions of this Interim Order or the DIP Financing Documents following such further hearing, such modifications shall not affect the rights and priorities of DIP Lender pursuant to this Interim Order with respect to the DIP Collateral, and any portion of the DIP Obligations which arises or is incurred, advanced or paid prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

        (c)   <u>Retention of Jurisdiction</u>. The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order.

Dated: _____ , 2018    _____
        Wilmington, Delaware          United States Bankruptcy Judge

## Exhibit A

**DIP Credit Agreement**

**<u>Exhibit B</u>**

**Budget**

## **EXHIBIT C**

**DIP Credit Agreement**

**$20,000,000 SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION
TERM LOAN, GUARANTY AND SECURITY AGREEMENT**

**among**

**WELDED CONSTRUCTION, L.P.,**
**as Borrower,**

**WELDED CONSTRUCTION MICHIGAN, LLC,**
**as Guarantor,**

**and**

**NORTH AMERICAN PIPELINE EQUIPMENT COMPANY, LLC,**
**as Lender**

**CONTENTS**

1.      Defined Terms; Interpretation ................................................................ 1

2.      Multi-Draw Term Loan Facility ............................................................ 13

3.      Note ...................................................................................................... 14

4.      Payment of Interest on the DIP Advances; Payment Terms ................. 14

5.      Maturity and Repayment ...................................................................... 15

6.      Optional and Mandatory Prepayments of the DIP Advances .............. 15

7.      Taxes and Other Deductions ................................................................ 17

8.      Payments and Evidence of Debt .......................................................... 17

9.      Conditions Precedent ........................................................................... 17

10.     Representations and Warranties ........................................................... 20

11.     Covenants ............................................................................................ 29

12.     Events of Default ................................................................................. 38

13.     Creation of Security Interest; Guaranty .............................................. 41

14.     Set-off .................................................................................................. 47

15.     Notices ................................................................................................. 47

16.     Time is of the Essence ......................................................................... 49

17.     Severability of Provisions .................................................................... 49

18.     Waivers and Amendments; Integration ................................................ 49

19.     Counterparts ......................................................................................... 49

20.     Survival ................................................................................................ 49

21.     Construction of Agreement .................................................................. 49

22.     Relationship ......................................................................................... 49

23.     Third Parties ........................................................................................ 50

24.     Expenses .............................................................................................. 50

25.     Indemnification .................................................................................... 51

26.      Release .................................................................................................... 51

27.      Specific Performance ............................................................................... 52

28.      No Marshalling; Payments Set Aside ...................................................... 52

29.      Parties Including Trustees; Bankruptcy Court Proceedings ..................... 52

30.      CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER ..................... 53

31.      Successors and Assigns............................................................................ 54

32.      Financing Order ....................................................................................... 54

**SCHEDULES**

| | |
|---|---|
| Schedule 10(t) | Subsidiaries |
| Schedule 10(z) | Bonding |
| Schedule 10(aa) | Mortgaged Properties |
| Schedule 11.1(d) | Insurance |
| Schedule 11.1(m) | Post-Closing Matters |
| Schedule 11.2(a) | Permitted Indebtedness |
| Schedule 11.2(b) | Permitted Liens |
| Schedule 11.2(c) | Permitted Leases |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Note |
| Exhibit B | Security Agreement |
| Exhibit C | Initial Budget |
| Exhibit D | Interim Order |
| Exhibit E | Closing Date Certificate |

**THIS $20,000,000 SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION TERM LOAN, GUARANTY AND SECURITY AGREEMENT**, dated as of October [__], 2018 (as amended, restated, supplemented, amended and restated, replaced, renewed and/or otherwise modified from time to time, this "**Agreement**"), is made by and among **WELDED CONSTRUCTION, L.P.**, a Delaware limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), **WELDED CONSTRUCTION MICHIGAN, LLC**, a Michigan limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "**Guarantor**" and together with the Borrower, the "**Debtors**"), and **NORTH AMERICAN PIPELINE EQUIPMENT COMPANY, LLC**, a Delaware limited liability company (the "**Lender**"; each of the Lender, the Borrower and the Guarantor a "**Party**" and, together, the "**Parties**"), provides the terms on which the Lender shall lend to the Borrower and the Borrower shall repay the Lender.

W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:

WHEREAS, on October [22], 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Cases**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors have requested that the Lender provide up to an aggregate amount of $20,000,000 in a multiple draw, non-amortizing term loan pursuant to a senior secured, super priority, debtor in possession term loan agreement;

WHEREAS, the Lender has agreed to provide such loans on the terms and the conditions contained in this Agreement;

WHEREAS, the Borrower and the Guarantor have each agreed to secure all of their Obligations under the Loan Documents by granting to the Lender a security interest in and lien upon all of their existing and after-acquired personal and real property (subject to the limitations contained in the Loan Documents and the Financing Order);

WHEREAS, each of the Borrower and the Guarantor acknowledge that it will receive substantial direct and indirect benefits by reason of the making of such loans to the Borrower as provided in this Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants contained herein and for other good and valuable consideration, the Parties hereto hereby agree as stated above and as follows:

## 1.    Defined Terms; Interpretation

1.1    The following terms have the following meanings:

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether

1

or not purportedly on behalf of any Debtor or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Debtor or any of its Subsidiaries, threatened against or affecting any Debtor or any of its Subsidiaries or any property of any Debtor or any of its Subsidiaries.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" has the meaning assigned to such term in the Preamble hereto.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), chief financial officer or treasurer of such Person; provided that the secretary or assistant secretary of such Person shall have delivered an incumbency certificate to the Lender as to the authority of such Authorized Officer.

"**Bankruptcy Cases**" has the meaning assigned to such term in the Recitals hereto.

"**Bankruptcy Court**" has the meaning assigned to such term in the Recitals hereto.

"**Borrower**" has the meaning given to it in the Preamble hereto.

"**Budget**" means the Initial Budget or the Supplemental Budget, as applicable.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Carve-Out**" has the meaning assigned to such term in Section 10(u)(i)(I).

"**Carve-Out Notice**" means written notice from the Lender to the Debtors, their counsel, counsel to any Committee and the United States Trustee (i) of the occurrence of an Event of Default and (ii) of the termination of the Pre-Default Carve-Out.

"**Cash Management Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Lender in its sole discretion, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements or such other arrangements as shall be reasonably acceptable to the Lender in all material respects.

"**Case Professionals**" has the meaning assigned to such term in Section 10(u)(i)(I).

"**Closing Date**" shall have the meaning set forth in Section 9.1.

"**Closing Date Certificate**" means a Closing Date Certificate, dated as of the Closing Date and in substantially the form of Exhibit E hereto.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests), whether existing on the Petition Date or thereafter acquired, in which Liens are purported to be granted pursuant to the Security Documents, and subject to the Financing Order, as security for the Obligations.

"**Committee**" means, to the extent formed, appointed, or approved in the Bankruptcy Cases, any official committee of unsecured creditors appointed pursuant to Section 1102 of the Bankruptcy Code.

"**Company Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business, assets, properties, liabilities, or condition (financial or otherwise) of a Debtor; (ii) the ability of any Debtor to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against a Debtor of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, the Lender under any Loan Document, all other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Bankruptcy Cases.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security Agreement issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Debtors**" has the meaning assigned to such term in the Preamble hereto.

"**Default**" means a condition or event that, after notice or lapse of time (or both), would give rise to an Event of Default.

"**Default Rate**" has the meaning assigned to such term in Section 4.2.

"**DIP Advance**" has the meaning assigned to such term in Section 2.1.

"**DIP Commitment**" means an aggregate principal amount up to twenty million Dollars ($20,000,000).

"**DIP Loan**" has the meaning given to it in Section 2.1.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be

contributed to by, the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, complaint, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of any of them) statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities, including common law, relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to the Borrower, the Guarantor or any of their respective Subsidiaries or facilities.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including any and all limited, limited liability and general partnership interests and limited liability company interests of any type or nature, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member.  Any former ERISA Affiliate of the Borrower, the Guarantor or any of their respective Subsidiaries shall continue to be considered an ERISA Affiliate of the Borrower, the Guarantor or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Borrower, the Guarantor or such Subsidiary and with respect to liabilities arising after such period for which the Borrower, the Guarantor or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

4

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"**Event of Default**" means any event or circumstance listed in Section 12.1.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any material loss, destruction or damage of such Property; (b) any pending proceedings for the

condemnation or seizure of such material Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such material Property, or confiscation of such material Property or the requisition of the use of such material Property.  For purposes of this definition, "material" shall mean having a value, individually or in the aggregate, in excess of $200,000.

"**Final Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Lender in its sole discretion, approving this Agreement and the DIP Loans and the other Loan Documents and the Liens and Guaranties granted hereunder and thereunder and the other transactions contemplated hereby and thereby on a final basis as contemplated by the Interim Order, following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure or such other procedures so approved by the Bankruptcy Court that are acceptable to the Lender in its sole discretion, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion).

"**Final Order Entry Date**" means the date of entry on the docket of the Bankruptcy Court of the Final Order.

"**Financing Order**" means the Interim Order or, when applicable, the Final Order.

"**First Priority**" means, with respect to any security interest or other Lien on assets or other property, that such security interest or other Lien is superior to all other security interests and other Liens on such assets or other property, subject to Permitted Liens.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Funding Date**" means any date prior to the Maturity Date as designated by the Borrower on at least three (3) Business Days' prior written notice to the Lender.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, registration, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

6

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 13.2(a).

"**Guarantor**" has the meaning given to it in the Preamble hereto.

"**Guaranty**" means the guaranty made by the Guarantor set forth in Section 13.2.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Indebtedness**" means any obligation to pay or repay money, present or future, whether actual or contingent, sole or joint.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lender's agreement to make DIP Advances or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)) or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Debtors.

"**Initial Budget**" means the cash flow budget of the Borrower (on a consolidated basis with the Guarantor), depicting on a weekly basis, line-items for projected (i) receipts, (ii) disbursements (including ordinary course operating expenses, bankruptcy related expenses,

capital expenditures, asset sales and fees and expenses of the Lender and any other fees and expenses relating to the transactions contemplated hereby, including in connection with the Financing Order) and (iii) liquidity consisting of unrestricted and available cash on hand, in each case for each week beginning with the Petition Date through the last day of the week that is thirteen (13) weeks thereafter, which is attached hereto as Exhibit C.

"**Interest Payment Date**" means the last day of each calendar month while the DIP Loans are outstanding, or, if such day is not a Business Day, the immediately preceding Business Day.

"**Interest Rate**" has the meaning assigned to such term in Section 4.1.

"**Interim Order**" means the order of the Bankruptcy Court, in the form attached hereto as Exhibit D, entered at the initial emergency hearing in the Bankruptcy Cases, approving this Agreement, the DIP Loans (up to $20,000,000), the Loan Documents and the Liens and Guaranties granted thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement and the full amount of the DIP Loans, the Loan Documents and the Liens and Guaranties granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion).

"**Lender**" has the meaning given to it in the Preamble hereto.

"**Lien**" means (i) any lien, mortgage, deed of trust, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan Documents**" means this Agreement, the Financing Order, the Note, the Security Documents, the Budget and any other agreements, pledges, instruments, guarantees, certificates or other documents executed and delivered in connection with any of the foregoing.

"**Loan to Collateral Value Ratio**" means, as of any date, the ratio of (a) the outstanding aggregate principal amount of the DIP Loans on such date, plus any accrued but not yet paid interest and fees owing pursuant to the terms of this Agreement, to (b) the aggregate fair market value of the machinery and equipment of the Debtors that constitute a portion of the Collateral as set forth in that certain Appraisal of Machinery & Equipment for the Assets of Welded Construction, L.P., dated as of October 1, 2018 and prepared by Irontrax LLC, (i) giving *pro forma* effect to all asset sales and other dispositions of the Collateral and all Events of Loss that shall have occurred subsequent to the delivery of such appraisal report and on or prior to the relevant test date and (ii) excluding the portion of the fair market value of any and all machinery and/or equipment of the Debtors that constitute a portion of the Collateral and which are subject to a Lien granted in favor of any third party (other than the Lender).

"**Mandatory Prepayment Amount**" has the meaning assigned to such term in Section 6.2(d).

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the ability of any Debtor to fully and timely perform its Obligations; (ii) the legality, validity, binding effect or enforceability against a Debtor of a Loan Document to which it is a party; or (iii) the rights, remedies and benefits available to, or conferred upon, the Lender under any Loan Document, all other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Bankruptcy Cases.

"**Material Contract**" means any contract to which any Debtor or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Material Indebtedness**" means Indebtedness (other than pursuant to this Agreement and the Note) having an aggregate outstanding principal amount in excess of $1,000,000.

"**Maturity Date**" means the earliest of (a) the date that is one hundred eighty (180) days after the Petition Date, (b) the date of the consummation of the sale of all or substantially all of the Debtors' assets or the assets of any Affiliates of the Debtors and (c) the acceleration of the DIP Loans hereunder after the occurrence of an Event of Default.

"**Mortgage**" means a mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any Mortgaged Property for the benefit of the Lender (including any Mortgage to secure the Obligations). Each Mortgage shall be in form and substance reasonably satisfactory to the Lender.

"**Mortgaged Property**" means (a) each parcel of a Real Estate Asset owned in fee by a Debtor as of the Closing Date, and the improvements thereto, that (together with such improvements) has either a book value or market valuation (when including such improvements) of $250,000 or more as of the Closing Date and set forth on Schedule 10(aa) and (b) each other parcel of a Real Estate Asset owned in fee by a Debtor after the Closing Date, and the improvements thereto, that (together with such improvements) has either a book value or market valuation (when including such improvements) of $250,000 or more.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Asset Sale Proceeds**" means, with respect to any Permitted Disposition, an amount equal to (but specifically excluding any Project Customer Payment Proceeds): (i) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a

note receivable or otherwise, but only as and when so received) received by any Debtor from such Permitted Disposition, minus (ii) any bona fide direct costs incurred in connection with such Permitted Disposition satisfied with cash payments, including income, sales, gains, or other taxes payable as a result of a Permitted Disposition.

"**Note**" means a promissory note of the Borrower payable to the order of the Lender, in substantially the form of Exhibit A hereto, evidencing the Indebtedness of the Borrower to the Lender resulting from the DIP Loan made to the Borrower by the Lender.

"**Obligations**" means the DIP Advances, the DIP Commitment and any obligation of any nature of each Debtor and any other obligations from time to time owed to the Lender under this Agreement or any other Loan Document, whether for principal, interest, payments for fees, expenses, indemnification or otherwise, whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Obligee Guarantor**" has the meaning assigned to such term in Section 13.2(f).

"**Organizational Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Equity Interests of a Person.

"**Party**" and "**Parties**" has the meaning given to it in the Preamble hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means an Employee Benefit Plan that is subject to Title IV of ERISA.

"**Permitted Disposition**" means, subject to Bankruptcy Court approval, (a) sales or other dispositions of worn, damaged or obsolete equipment in the ordinary course of business, (b) sales of inventory to buyers in the ordinary course of business and (c) Permitted Sales.

"**Permitted Indebtedness**" has the meaning assigned to such term in Section 11.2(a).

"**Permitted Leases**" has the meaning assigned to such term in Section 11.2(c).

"**Permitted Liens**" has the meaning assigned to such term in Section 11.2(b).

"**Permitted Sales**" means (a) the sale of all or substantially all of the Debtors' assets as a going concern as approved by the Bankruptcy Court pursuant to applicable provisions of the Bankruptcy Code; provided that such sale shall be for cash consideration in an amount in excess

of all outstanding Obligations and shall not be subject to any financing contingencies, (b) a transaction or transactions combining the sale of all the Debtors' assets and the sale of all Collateral through the retention by the Debtors of one or more nationally recognized, independent, professional liquidation firms reasonably acceptable to the Lender and approved by the Bankruptcy Court pursuant to applicable provisions of the Bankruptcy Code, which shall include a payment at closing of an amount in excess of all the outstanding Obligations, such portion of such amount as is equal to all the outstanding Obligations to be paid to the Lender, (c) other sales and dispositions in connection with Collateral liquidation on terms reasonably satisfactory to the Lender, and (d) any other transaction approved by the Bankruptcy Court and in form and substance satisfactory to the Lender in its sole and absolute discretion pursuant to which a sale of all or substantially all of the assets of the Debtors is consummated, whether pursuant to (i) Section 363 of the Bankruptcy Code or (ii) any other foreclosure sale or other exercise of remedies under the Uniform Commercial Code or otherwise is consummated, in each case, in which the outstanding Obligations are paid in whole or in part with the proceeds thereof.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Petition Date**" has the meaning assigned to such term in the Recitals hereto.

"**Pre-Default Carve-Out**" has the meaning assigned to such term in Section 10(u)(i)(I).

"**Project Customer Payment Proceeds**" means the proceeds of any payment made by any of the following customers to any Debtor in connection with any of the following pipeline construction projects: (a) the Atlantic Sunrise Pipeline project for customer Transcontinental Gas Pipe Line Company, LLC, an affiliate of The Williams Companies, Inc., (b) the Saginaw Trail Pipeline project for customer Consumers Energy Company, (c) a pipeline project (other than the project referenced in clause (b)) that, as of the Closing Date, has not yet commenced for Consumers Energy Company, (d) the Mariner East Pipelines project for Energy Transfer Partners, L.P., as successor to Sunoco Logistics Partners, and (e) the Leach Xpress and Mountaineer Xpress Pipelines for affiliates of TransCanada, as successor to NiSource Corporate Services Company / Columbia Pipeline Group and Columbia Gas Transmission, LLC.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Debtor in any real property.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Released Parties**" has the meaning assigned to such term in Section 26.

"**Releasing Parties**" has the meaning assigned to such term in Section 26.

"**Residual Carve-Out**" has the meaning assigned to such term in Section 10(u)(i)(I).

"**Restricted Payment**" has the meaning assigned to such term in Section 11.2(f).

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement**" means a Security Agreement in favor of the Lender, dated as of the Closing Date and in substantially the form of Exhibit B hereto, as the same may be amended, restated, supplemented, amended and restated, replaced, renewed and/or otherwise modified from time to time.

"**Security Documents**" means, collectively, the Security Agreement, each Mortgage, the Interim Order, the Final Order, and all other security agreements, pledge agreements, mortgages, deeds of trust, control agreements, copyright, patent and trademark security agreements, lease assignments, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Debtor, or any other Person pledging or granting a Lien on Collateral or guarantying the payment and performance of the Obligations, and the Lender or any agent thereof now or hereafter delivered to the Lender or such agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the Uniform Commercial Code or comparable law) against any such Person as debtor in favor of the Lender or such agent, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding, provided that in the event that a

foreign insolvency proceeding is commenced as to any Subsidiary, such entity shall no longer be considered a Subsidiary for purposes of this Agreement.

"**Super-Priority Claims**" has the meaning assigned to such term in Section 10(u)(i)(I).

"**Supplemental Budget**" means each supplemental or replacement budget to the Initial Budget, in each case in form and substance satisfactory to the Lender in its sole discretion, and in each case delivered in accordance with Section 11.1(a)(i) (covering any time period covered by a prior budget or covering additional time periods).

"**United States Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Variance**" means, with respect to the Budget, a percentage variance with respect to total projected disbursements in each then-current Budget; provided that the Variance shall not exceed 15% on an aggregate basis of total actual disbursements for the thirteen (13) week period covered by such then-current Budget.

1.2     The words "Borrower", "Guarantor" and "Lender" shall include their respective successors and assigns, and any persons deriving title under them.

1.3     Words in the singular shall include the plural and vice versa.

1.4     A reference to one gender includes a reference to the other genders.

1.5     All reference to "Debtor's knowledge", "to the best of Debtor's knowledge", "to the best knowledge of such Debtor", or language of similar import, shall mean: the actual knowledge of Stephen D. Hawkins, President and CEO, Dean McDowell, CFO, and Andrew Mack, Vice President, without any duty of inquiry.

## 2.     Multi-Draw Term Loan Facility

2.1     <u>The DIP Loans</u>.  The Lender agrees, upon the terms and subject to the conditions set forth in this Agreement and to the extent consistent with the Budget (subject to the Variance), to make available to the Borrower term loans (collectively, the "**DIP Loan**") in multiple borrowings (the "**DIP Advances**") as follows:

(a)     during the period commencing on the Closing Date and continuing through the date prior to the Final Order Entry Date, one or more DIP Advances in an aggregate principal amount not to exceed $10,000,000; and

(b)     on and as of the Final Order Entry Date, in an aggregate principal amount not to exceed $20,000,000, inclusive of the aggregate principal amount of any DIP Advances made during the period commencing on the Closing Date and continuing through the date prior to the Final Order Entry Date.

The DIP Commitment shall be permanently reduced and availability terminated to the extent of the amount funded, immediately and without further action, on each Funding

Date.  Principal amounts of the DIP Advances that have been repaid or prepaid may not be reborrowed.

2.2    <u>Borrowing Requests</u>.  Upon and subject to the entry of the Interim Order and the Final Order, as applicable, each DIP Advance shall be made upon the Borrower's (i) delivery to the Lender of a notice of borrowing executed by an Authorized Officer of the Borrower or (ii) having provided telephonic notice in lieu of such written notice; provided that the Lender may, in its sole discretion, waive the requirement that the Borrower deliver a written, and/or provide telephonic, notice of borrowing and, in the event that such requirement is so waived by the Lender, the occurrence of the funding of the applicable DIP Advance shall serve as conclusive evidence of such waiver.  Each such notice must be received by the Lender no later than 1:00 p.m. (New York City time) at least three (3) Business Days prior to the requested date of any borrowing.  Each notice of borrowing (whether written or telephonic) shall specify (i) the requested funding date of the DIP Advance (which shall be a Business Day) and (ii) the principal amount of the DIP Advance to be borrowed.

2.3    <u>Use of Proceeds</u>.  The proceeds of the DIP Advances shall be used (i) to pay interest, fees and expenses associated with this Agreement, (ii) for Debtors' working capital and general corporate purposes in accordance with the Budget (subject to the Variance) and (iii) to pay costs and expenses associated with the Bankruptcy Cases to the extent consistent with the Budget (subject to the Variance, and including professional costs incurred (including, costs incurred in respect of Case Professionals) and paid in accordance with the Budget).  In no event shall the proceeds of any DIP Advance be used to bring any claim or suit against the Lender or to challenge the liens or claims of the Lender.

**3.    Note**

The Borrower's obligation to repay the DIP Advances to the Lender will be evidenced by the Note.  The Lender is hereby irrevocably authorized to record on the schedule attached to the Note the information contemplated by such schedule, including prepayments of the DIP Advances.  The failure to record, or any error in recording, any such information shall not, however, affect the actual obligations, subject to the correction of any errors, of the Borrower hereunder or under the Note.

**4.    Payment of Interest on the DIP Advances; Payment Terms**

4.1    <u>Interest Rate</u>.  The principal amount outstanding for the DIP Advances shall accrue interest, which interest shall be payable as provided in Section 4.3 below, calculated daily at a per annum rate equal to 10% (the "**Interest Rate**").  All computations of interest shall be made on the basis of a 360-day year and actual days elapsed (including the first day but excluding the last day).

4.2    <u>Default Rate</u>.  Immediately upon the occurrence and during the continuance of an Event of Default under Section 12 hereof, the DIP Advances shall bear interest at a rate per annum which is two (2) percentage points above the Interest Rate (the "**Default Rate**").

14

Payment or acceptance of the increased interest rate provided in this Section 4.2 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lender.

4.3     Payments.  The accrued and unpaid interest due under this Agreement shall be payable in arrears, (i) simultaneously with the repayment or prepayment of any DIP Advances (on the principal amount of DIP Advances so repaid or prepaid), (ii) on each Interest Payment Date and (iii) the Maturity Date.  All payments of interest shall be made in United States dollars in immediately available funds on the date payable.  Payments of principal and/or interest and/or other amounts owing hereunder or under any other Loan Document to the Lender received after 12:00 p.m. (New York City time) are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional fees or interest, as applicable, shall continue to accrue.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any bankruptcy, insolvency or other similar proceeding.

## 5.     Maturity and Repayment

The Borrower hereby unconditionally promises to repay the full outstanding and unpaid amounts of the Obligations (including, without limitation, the DIP Advances (including interest thereon)) no later than the Maturity Date.  All amounts (including, without limitation, the DIP Advances (including interest thereon)) outstanding under this Agreement, the Note and the Security Agreement shall become due and payable on the Maturity Date.

## 6.     Optional and Mandatory Prepayments of the DIP Advances

6.1     Optional Prepayments.  Subject in all respects to the Interim Order or the Final Order, as applicable, the Borrower may, at its option, prepay the whole or any part of the DIP Advances (together with accrued interest on the amount being repaid), without premium or penalty, at any time and from time to time after the Closing Date and up to and including the Maturity Date.  All such prepayments shall be made upon not less than two (2) Business Days' (or such other period as the Lender may agree in its sole discretion) prior written notice given to the Lender by 12:00 p.m. (New York City time) on the required date.  Each notice of prepayment shall specify the intended date and amount of the prepayment.

6.2     Mandatory Prepayments.  Subject in all respects to the Interim Order or the Final Order, as applicable:

(a)     Except with respect to any Project Customer Payment Proceeds, if on any date any Debtor or any Subsidiary of a Debtor receives net cash proceeds from any receivables included in the Collateral, then an amount equal to the lesser of (a) 100% of such net cash proceeds or (b) the aggregate outstanding amount of the DIP Advances shall be applied within five (5) Business Days of such date to prepay the DIP Advances;

15

(b)     Within two (2) Business Days upon receipt of Net Asset Sale Proceeds from any Permitted Disposition by any Debtor or any Subsidiary of a Debtor, the Borrower shall deliver, or cause to be delivered, 100% of such Net Asset Sale Proceeds to the Lender to prepay the DIP Advances;

(c)     If any Debtor or any Subsidiary of a Debtor shall at any time or from time to time suffer an Event of Loss, within two (2) Business Days upon receipt of net cash proceeds from such Event of Loss, the Borrower shall deliver, or cause to be delivered, 100% of the received net cash proceeds to the Lender to prepay the DIP Advances;

(d)     To the extent cash on hand exceeds $8,000,000 (the "**Mandatory Prepayment Amount**") for the duration of any period of fifteen (15) consecutive Business Days, pay to the Lender within two (2) Business Days, the amount of any excess cash on hand above such Mandatory Prepayment Amount at the end of such fifteen (15) consecutive Business Day period (or such lesser amount agreed to by the Lender in its sole and absolute discretion); and

(e)     If at any time the aggregate outstanding amount of the DIP Advances exceeds the DIP Commitment, within one (1) Business Day of notice thereof, pay to the Lender the amount of such excess.

6.3     Application of Prepayments.

(a)     Application of Optional Prepayments of DIP Advances.    Any voluntary prepayment of any DIP Advance pursuant to Section 6.1 shall be applied to repay all outstanding DIP Advances on a *pro rata* basis (in accordance with the respective outstanding principal amounts thereof).

(b)     Application of Mandatory Prepayments of DIP Advances.    Any mandatory prepayment of any DIP Advance pursuant to Section 6.2 shall be applied as follows:

*first*, to the payment of all indemnities, expenses and fees then due and payable under any Loan Document until paid in full;

*second*, to the payment of any accrued interest thereon at the Default Rate, if any, until paid in full;

*third*, to the payment of any accrued and unpaid interest thereon (other than that calculated at the Default Rate and paid in clause "*second*" above, if any) until paid in full;

*fourth*, to prepay the principal amount of the DIP Advances on a *pro rata* basis (in accordance with the respective outstanding principal amounts thereof) until paid in full;

*fifth*, to the payment of any other outstanding Obligations; and

*sixth*, any remainder shall be for the account of and paid to the Borrower or whoever else may be lawfully entitled thereto.

**7.      Taxes and Other Deductions**

7.1      All sums payable by the Borrower under this Agreement shall be paid in full, without set-off or counterclaim or any restriction or condition and free of any tax or other deductions or withholdings of any nature.

7.2      If the Borrower is required to make any deduction or withholding (on account of such tax or otherwise) from any payment by any law or regulation, the Borrower shall, together with such payment, pay such additional amount as will ensure that the Lender receives (free of any such tax or other deductions or withholdings) the full amount which it would have received if no such deduction or withholding had been required.

**8.      Payments and Evidence of Debt**

All payments by the Borrower under this Agreement shall be made to the Lender in United States dollars in immediately available funds to the Lender's account, or to such other account as the Lender shall notify in writing to the Borrower, in the case of any change, at least two (2) days prior to the due date, on the relevant due date together with advice of such payment to the Lender which may be delivered to the Lender by facsimile or e-mail as set out in Section 15.

**9.      Conditions Precedent**

9.1      <u>Conditions Precedent to Effectiveness</u>.  This Agreement shall become effective upon the date (the "**Closing Date**") of the satisfaction of, and the Lender's obligation to make the initial DIP Advance is subject to, the condition precedent that the Lender shall have received, in form and substance satisfactory to the Lender in its sole and absolute discretion evidence of satisfaction of the following conditions, any of which may be deemed satisfied or waived in whole or in part by the Lender:

(a)      <u>Loan Documents</u>.  The Lender shall have received executed counterparts of this Agreement, the Security Agreement and the Note, which shall be originals or pdf copies or other facsimiles unless otherwise specified, properly executed by an officer of the Borrower in form and substance reasonably satisfactory to the Lender.

(b)      <u>Representations and Warranties</u>.  The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date or the initial Funding Date, as applicable, to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

17

(c)     <u>No Event of Default</u>.  No event shall have occurred and be continuing or would result from the consummation of the transactions contemplated herein that would constitute an Event of Default or a Default.

(d)     <u>Secretary's Certificate</u>.  The Secretary of each Debtor shall have delivered to the Lender a certificate certifying (i) the bylaws or other applicable Organizational Document of each Debtor, (ii) the certificate of incorporation or other applicable formation document of each Debtor, (iii) resolutions of the governing body of each Debtor authorizing the execution and delivery of the Loan Documents to which it is a party and authorizing the transactions contemplated herein and in each other Loan Document, (iv) the signature and incumbency certificates of the officers of each Debtor executing each Loan Document to which it is a party, and (v) a good standing certificate from the applicable Governmental Authority of each Debtor's jurisdiction of incorporation, organization or formation, and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date on or prior to the Closing Date.

(e)     <u>Budget</u>.  The Lender shall have received the approved Initial Budget in form and substance satisfactory to the Lender in its sole discretion.

(f)     <u>Governmental Authority and Consents</u>.  There shall be no pending or threatened in writing action by any Governmental Authority which would restrain, prevent or otherwise impose material adverse conditions on the transactions contemplated by the Loan Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending.

(g)     <u>Fees and Expenses</u>.  Subject to Section 24, the Borrower shall have paid to the Lender the reasonable fees, expenses and disbursements of the Lender (including, without limitation, fees, costs and expenses of Gibson, Dunn & Crutcher LLP, counsel to the Lender, in connection with the negotiation, preparation, execution and administration of the Loan Documents).

(h)     <u>No Litigation</u>.  The Lender shall have received a certificate from the Debtors listing (in sufficient detail) all litigation currently pending or threatened in writing where the claimant has alleged damages in excess of $100,000.  There are no judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i)     <u>No Material Adverse Change</u>.  Since the Petition Date, there shall not have occurred any change, development, or event that has or, individually or in the aggregate, could reasonably be expected to have a Company Material Adverse Effect.

(j)     <u>Financing Statements</u>.    All Uniform Commercial Code financing statements required or reasonably requested by the Lender to be filed to create the liens intended to be created by the Security Documents and perfect such liens to the extent required by, and with the priority required by, the Security Documents, shall have been filed, registered or recorded or delivered to the Lender for filing with the applicable Governmental Authority concurrently with the occurrence of the Closing Date.

(k)     <u>Closing Date Certificate</u>.    The Debtors shall have delivered to the Lender an executed Closing Date Certificate.

(l)     <u>Chapter 11 Cases</u>.

    (i)     <u>Entry of Interim Order</u>.    Entry by the Bankruptcy Court of the Interim Order, by no later than three (3) Business Days after the Petition Date, substantially in the form attached hereto as Exhibit D and otherwise in form and substance satisfactory to the Lender, which Interim Order shall not have been reversed, modified, amended or stayed (other than with the written consent of the Lender in its sole discretion).

    (ii)    <u>Cash Management</u>.    The Debtors shall have established or shall maintain the cash management systems described in the Cash Management Order and shall have taken all steps necessary to comply with the Cash Management Order.

    (iii)   <u>First Day Pleadings</u>.    The Lender shall have received drafts of the "first day" pleadings to be filed with and submitted to the Bankruptcy Court on the Petition Date, in each case, in form and substance reasonably satisfactory to the Lender not later than a reasonable time in advance of the Petition Date in order for the Lender's counsel to review and analyze the same.

    (iv)    <u>First Day Orders</u>.    All motions, orders (including the "first day" orders) and other documents to be filed with and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Lender.

(m)     <u>Additional Documents</u>.    The Lender shall have received such additional documents and instruments as it may reasonably request.

9.2    <u>Conditions Precedent to all DIP Advances</u>.    The obligations of the Lender to make any DIP Advance, including the initial DIP Advance, are subject to the satisfaction, or waiver in whole or in part by the Lender, of the following conditions precedent:

(a)     <u>Borrowing Notice</u>.    The Borrower shall have delivered the required notice of borrowing pursuant to Section 2.2 in accordance with the terms thereof.

(b)     <u>Grant of Security Interest</u>.  Subject to the Financing Order, the grant of security interest herein shall remain in full force and effect and continue to create a valid First Priority security interest in, and Lien on, the personal property Collateral of each Debtor.

(c)     <u>Financing Order</u>.  The Financing Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of the Lender in its sole discretion); provided, however, only the Interim Order shall be required for the making of any DIP Advance that is requested by the Borrower prior to the Final Order Entry Date.

(d)     <u>Representations and Warranties</u>.  The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of each Funding Date, to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

(e)     <u>No Event of Default</u>.  At the time of and immediately after giving effect to the making of such DIP Advance, no Event of Default or Default shall exist.

(f)     <u>Loan to Collateral Value Ratio</u>.  Immediately after giving effect to the making of such DIP Advance, the Loan to Collateral Value Ratio shall not be greater than 75%.

(g)     <u>Compliance with the Budget</u>.  At the time of and immediately after giving effect to the making of such DIP Advance, the Debtors shall be in compliance with the then-current Budget subject to the Variance.

**10.     Representations and Warranties**

In order to induce the Lender to enter into this Agreement and to make each DIP Advance to be made hereunder, each Debtor represents and warrants to the Lender, on the Closing Date and on each Funding Date, that the following statements are true and correct:

(a)     <u>Organization; Requisite Power and Authority; Qualification</u>.  Each Debtor (i) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (ii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and subject to the entry of the Financing Order, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby and hereby, and (iii) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to

be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

(b)    <u>Equity Interests and Ownership</u>.  The Equity Interests of each Debtor have been duly authorized and validly issued and is fully paid and non-assessable.  As of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which any Debtor is a party requiring, and there is no membership interest or other Equity Interests of any Debtor outstanding which upon conversion or exchange would require, the issuance by any Debtor of any additional membership interests or other Equity Interests of any Debtor or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of any Debtor. The list of equity security-holders of the Debtors filed with the Bankruptcy Court correctly sets forth the ownership interest of each Debtor.

(c)    <u>Due Authorization</u>.  The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action on the part of each Debtor that is a party thereto, subject to the entry of the Financing Order.

(d)    <u>No Conflict</u>.  Upon entry by the Bankruptcy Court of the Financing Order, the execution, delivery and performance by the Debtors of the Loan Documents to which they are parties and the consummation of the transactions contemplated by the Loan Documents do not and will not (i) violate (w) any provision of any law or any governmental rule or regulation applicable to any Debtor, (x) any of the Organizational Documents of any Debtor, or (y) any order, judgment or decree of any court or other agency of government binding on any Debtor; (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of any Debtor other than with respect to the Debtors, conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Bankruptcy Cases; (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Debtor (other than any Liens created under any of the Loan Documents in favor of the Lender); or (iv) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of any Debtor, except for such approvals or consents which will be obtained on or before the Closing Date.

(e)    <u>Governmental Consents</u>.  Subject to the entry of the Financing Order, the execution, delivery and performance by the Debtors of the Loan Documents to which they are parties and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Lender for filing and/or recordation, as of the Closing Date or such as have been obtained or made and are in full force in effect prior to the Closing Date.

(f)     Binding Obligation.    Subject to the entry of the Financing Order, each Loan Document has been duly executed and delivered by each Debtor that is a party thereto and is the legally valid and binding obligation of such Debtor, enforceable against such Debtor in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (including, without limitation, the terms of the Financing Order).

(g)     Financial Statements.    The Financial Statements were prepared in conformity with GAAP (subject, in the case of the unaudited financials, to the absence of footnotes and to normal year-end adjustments) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to the absence of footnotes and to changes resulting from audit and normal year-end adjustments.

(h)     Adverse Proceedings, Etc.    There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.    No Debtor (i) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i)     Payment of Taxes; Pension Contributions.    All tax returns and reports of the Debtors required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon any Debtor and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable, except to the extent such failure to file and/or pay could not reasonably be expected to have a Material Adverse Effect.    No Debtor knows to the best of its knowledge of any proposed tax assessment against any Debtor which is not being actively contested by such Debtor in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.    To the best of its knowledge, each Debtor has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and no Debtor has withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of such Debtor, including

any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

(j) <u>Environmental Matters</u>.  Neither any Debtor nor any of their respective properties or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Company Material Adverse Effect.  Neither any Debtor nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law.  There are and, to each Debtor's knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against any Debtor that, individually or in the aggregate, could reasonably be expected to have a Company Material Adverse Effect.  Neither any Debtor nor, to any Debtor's knowledge, any predecessor of any Debtor treated Hazardous Materials at any property of the Debtors other than legally, and none of Debtors' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, other than legally under Environmental Laws or any state equivalent.  Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Company Material Adverse Effect.  No event or condition has occurred or is occurring with respect to Debtor relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Company Material Adverse Effect.

(k) <u>No Defaults</u>.  Other than as a result of the Bankruptcy Cases, no Debtor is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not be reasonably expected to have a Material Adverse Effect.

(l) <u>Material Contracts</u>.  There are no Material Contracts in effect on the Closing Date.

(m) <u>Regulatory Compliance</u>.  No Debtor is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended.  No Debtor is engaged as one of its important activities in extending credit for margin stock (under Regulations T and U of the Federal Reserve Board of Governors).  Each Debtor has complied in all material respects with the Federal Fair Labor Standards Act.  No Debtor has violated any laws, ordinances or rules, the violation of which could reasonably be expected to have a Material Adverse Effect.

(n)     <u>Margin Stock</u>.  No Debtor owns any Margin Stock.

(o)     <u>Employee Matters</u>.  No Debtor is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against any Debtor, or to the best knowledge of such Debtor, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Debtor or to the best knowledge of such Debtor, threatened against any of them, (ii) no strike or work stoppage in existence or threatened involving any Debtor, and (iii) to the best knowledge of such Debtor, no union representation question existing with respect to the employees of any Debtor and, to the best knowledge of such Debtor, no union organization activity that is taking place, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as is not reasonably expected to have a Material Adverse Effect.

(p)     <u>Employee Benefit Plans</u>.  Each Debtor and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, except to the extent such non-compliance or non-conformance could not reasonably be expected to have a Material Adverse Effect.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by any Debtor or any of their ERISA Affiliates.  No ERISA Event has occurred or is reasonably expected to occur.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Debtor or any of their respective ERISA Affiliates.  The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by any Debtor or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan.  No Debtor has a Multiemployer Plan.

(q)     <u>Compliance with Statutes, Etc</u>.  Each Debtor is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable

24

Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of any Debtor), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(r)     Disclosure.   No written representation, warranty or other statement of any Debtor in any certificate or written statement given to the Lender, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to the Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading (it being recognized that the projections and forecasts provided by any Debtor in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

(s)     Financial Condition.   Since the Petition Date, there have been no changes in the assets, liabilities, financial condition or business of any Debtor other than changes in the ordinary course of business or those which have not had, and would not reasonably be expected to have, a Material Adverse Effect.

(t)     Subsidiaries.   Except for such assets and liabilities set forth on Schedule 10(t), the Borrower confirms that Welded Construction Michigan, LLC is a non-operating Subsidiary and has no assets or liabilities.

(u)     Super-Priority Nature of Debtors' Obligations and Lender's Liens.

(i)     Subject to the terms of the Financing Order, all Obligations of the Debtors hereunder and under the other Loan Documents, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall be:

I     Claims, entitled to the benefits of Bankruptcy Code § 364(c)(1), having a super-priority over any and all administrative expenses of the kind specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 ("**Super-Priority Claims**"), subject only to a carve-out (the "**Carve-Out**") for (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; and (ii) the allowed and reasonable fees and expenses of professionals employed by the Debtors and the Committee pursuant to Sections 327 and 1103 of the Bankruptcy Code (the "**Case Professionals**") (x) until the issuance of a Carve-Out Notice, in the amounts set forth in the

Budget (the "**Pre-Default Carve-Out**"), and (y) from and after delivery of a Carve-Out Notice, in an aggregate amount (the "**Residual Carve-Out**") not to exceed $300,000; provided that (A) any payments made to Case Professionals for services rendered prior to the delivery of the Carve-Out Notice and in accordance with the Budget and (B) any fees and expenses of Case Professionals accrued prior to the delivery of the Carve-Out Notice in the amounts set forth in the Budget and properly included in the Pre-Default Carve-Out and subsequently allowed, shall not reduce the Residual Carve-Out. The Lender may conclusively rely upon the Borrower's certification of the Carve-Out and the Lender shall have no liability for any errors in the Borrower's calculation of the Carve-Out.

II      Secured, pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out, by a perfected First Priority Lien on all Collateral of the Debtors that is not otherwise subject to a Lien, until the entry of the Final Order, pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out, secured by a junior lien on property of the estate that is subject to a valid, unavoidable, perfected Lien on the Collateral of the Debtors, and following entry of the Final Order, pursuant to Bankruptcy Code § 364(d), subject to the Carve-Out, a perfected First Priority Lien on all Collateral of the Debtors.

III     Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 364(c)(1), 503(b), 506(c), 507(b) or otherwise, and those resulting from the conversion of the Bankruptcy Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or *pari passu* with, the Super-Priority Claims of the Lender arising out of the DIP Advances. Upon written notice by the Lender to the Borrower, the Borrower shall be deemed to have authorized the Lender to fund the Carve-Out in a segregated account, which account shall be maintained for the benefit of the professionals (and any such amounts funded shall be Obligations hereunder).

(ii)    Upon the entry by the Bankruptcy Court of the Interim Order and subject to the terms thereof, the perfected, First Priority Lien on, and security interest in, the Collateral described in the Loan Documents in favor of the Lender shall continue to be a valid and enforceable perfected First Priority Lien on, and security interest in, all right, title and interest of the Debtors in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person.

(v)     <u>Reorganization Matters</u>.

(i)     The Bankruptcy Cases were commenced on the Petition Date and proper notice was given of (i) the motion seeking approval of the Loan Documents and the Interim Order, and (ii) the hearing for the approval of the Interim Order.  The Debtors shall give, on a timely basis as specified in the Interim Order all notices required to be given to all parties specified in the Interim Order.

(ii)    In accordance with the terms of the Financing Order, the Obligations will constitute allowed administrative expense claims in the Bankruptcy Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out and any valid, unavoidable, perfected liens and security interests on the Collateral.

(iii)   From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order, the Liens securing the Obligations will continue to be valid and enforceable perfected Liens on all of the Collateral of the Debtors in the priorities described therein and in Section 10(u), except as otherwise expressly provided in Section 10(u).

(iv)    The Interim Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Lender in its sole discretion).

(w)    <u>Payment of Obligations</u>.    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lender shall be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

(x)    <u>No Discharge; Survival of Claims</u>.  To the extent that any Obligations (other than inchoate indemnity obligations) are then outstanding or the Lender then has any commitment to make DIP Advances hereunder, each Debtor agrees that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming the sale of all or substantially all of the assets of the Debtors in the Bankruptcy Cases (and each Debtor pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Liens and priority granted to the Lender pursuant to the Financing Order shall not be affected in any manner by the entry of an order confirming such sale in the Bankruptcy Cases.

(y)    <u>Waiver of any Priming Rights</u>.  Upon the Closing Date and subject to the entry of the Final Order, and on behalf of themselves and their estates, and for so long as

27

any Obligations shall be outstanding, other than as expressly set forth in the Financing Order each Debtor hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal priority to, or greater priority than, that of the Obligations.

(z)     Bonding.  Except as set forth in Schedule 10(z), no Debtor is a party to or bound by any surety bond agreement, indemnification agreement therefor or bonding requirement with respect to products or services sold by it.

(aa)    Title to Properties; Mortgaged Property.

(i)     Each Debtor has good and valid title to or a valid leasehold interest in or right to use to all of the real and personal property material to its business owned or leased by it, as the case may be, in each case, free and clear of Liens other than Permitted Liens and minor defects in title that do not materially interfere with its ability to conduct its business or to utilize its assets for their intended purposes.

(ii)    As of the Closing Date, Schedule 10(aa) sets forth a complete and accurate list of all Mortgaged Property (which does not include any rights of way or easements appurtenant thereto, or mineral rights and fixtures therein or thereon) owned in fee simple by the Debtors, showing the street address, county or other relevant jurisdiction and state thereof.

(iii)   As of the Closing Date, neither Debtor has received written notice, or has knowledge, of any pending or contemplated condemnation proceeding affecting any Mortgaged Property or any sale or disposition thereof in lieu of condemnation.

(iv)    Subject to the entry of the Financing Order, each Mortgage, upon execution and delivery thereof (or the filing or recording of any Financing Order in lieu thereof) by the party or parties thereto, will create in favor of the Lender a valid and enforceable First Priority Lien on all the applicable mortgagor's right, title and interest in and to the applicable Mortgaged Property covered thereby and the proceeds thereof, and when such Mortgage has been filed in the jurisdiction(s) specified therein, such Mortgage will constitute a perfected Lien on all right, title and interest of the mortgagors in the Mortgaged Property covered thereby and the proceeds thereof, prior and superior to any other Liens except in the case of Permitted Liens.

(bb)    Maximum Loan to Collateral Value Ratio.  Immediately after giving effect to the borrowing of the applicable DIP Advance, the Loan to Collateral Value Ratio shall not be greater than 75%.

(cc)    Compliance with the Budget.  The Debtors are in compliance with the current Budget subject to the Variance.

28

**11.     Covenants**

11.1    <u>Affirmative Covenants</u>.   Each Debtor covenants and agrees, so long as any DIP Commitment is in effect and until payment in full of all Obligations, each Debtor shall, and shall cause its Subsidiaries to, perform all covenants in this Section 11.

    (a)     <u>Financial Statements and Other Reports</u>.  The Debtors will deliver to the Lender:

        (i)     <u>Budget</u>.  Not later than the first Business Day of each week commencing after the delivery of the Initial Budget, (a) a Supplemental Budget extending the Initial Budget for an additional week and (b) a comparison of each line item set forth in the most recent Budget for the week most recently ended against the actual performance for such week with respect to each line item (and on a cumulative basis from the Petition Date to the date of such report), in each case in form and substance reasonably satisfactory to the Lender and certified as complete and accurate by the chief financial officer of the Borrower.  The Debtors shall not be permitted to change the Budget in any manner inconsistent with the Variance without the written consent of the Lender in its sole and absolute discretion.

        (ii)     <u>Notice of Default</u>.  Promptly upon any officer of any Debtor obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Debtor with respect thereto or (b) the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Debtors have taken, is taking and proposes to take with respect thereto;

        (iii)     <u>Notice of Litigation</u>.  Promptly upon any officer of any Debtor obtaining knowledge of (a) any Adverse Proceeding not previously disclosed in writing by the Debtors to the Lender, or (b) any development in any Adverse Proceeding that, in the case of either clause (a) or (b), if adversely determined could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Debtors to enable the Lender and its counsel to evaluate such matters;

        (iv)     <u>ERISA</u>.  (A) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action the Debtors or any of their respective

ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (B) with reasonable promptness, copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Debtor or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Lender shall reasonably request;

(v)     Notice Regarding Material Contracts.  Promptly, and in any event within three (3) Business Days (i) after any Material Contract of any Debtor or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to such Debtor or its Subsidiary, as applicable, or (ii) any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to the Lender (to the extent such delivery is permitted by the terms of any such Material Contract, provided, no such prohibition on delivery shall be effective if it were bargained for by the applicable Debtor with the intent of avoiding compliance with this Section 11.1(a)(v)), and an explanation of any actions being taken with respect thereto;

(vi)    Information Regarding Collateral.  Each Debtor agrees promptly to notify the Lender if any portion of the Collateral is damaged, destroyed or impaired;

(vii)   Other Information.  (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by any Debtor to its security holders acting in such capacity, (ii) all regular and periodic reports, if any, filed by any Debtor with any securities exchange or any governmental or private regulatory authority, (iii) all press releases and other statements made available generally by any Debtor to the public concerning material developments in the business of any Debtor, and (B) such other information and data with respect to any Debtor as from time to time may be reasonably requested by the Lender.

(b)     Existence.  Each Debtor will at all times preserve and keep in full force and effect its existence and the existence of its Subsidiaries, and all of its and their rights and franchises, licenses and permits material to its business, unless such failure could not reasonably be expected to have a Material Adverse Effect.

(c)     Maintenance of Properties.   Each Debtor will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order

and condition, ordinary wear and tear excepted, all vessels and all other material properties used or useful in the business of such Debtor and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, overhauls, renewals and replacements thereof, unless such failure could not reasonably be expected to have a Material Adverse Effect..

(d)     <u>Insurance</u>.  Each Debtor will, and will cause each of its Subsidiaries to, maintain or cause to be maintained, with financially sound and reputable insurers, the same insurance that it has in effect on the date immediately prior to the Petition Date as set forth on Schedule 11.1(d).  If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable law, the applicable Debtor shall (i) maintain with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Lender and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Lender evidence of such compliance in form and substance reasonably acceptable to the Lender.

(e)     <u>Books and Records; Inspections</u>.  Each Debtor will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities.  Each Debtor will permit any authorized representatives designated by the Lender to visit and inspect any of the properties of any Debtor and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.

(f)     <u>Compliance with Laws</u>.  Each Debtor will, and will cause each of its Subsidiaries to, comply, and shall cause all other Persons, if any, on or occupying any properties to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)     <u>Environmental</u>.

        (i)     <u>Environmental Disclosure</u>. The Borrower will deliver to the Lender:

                I       as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of any Debtor (or

Subsidiary of such Debtor) or by independent consultants, governmental authorities or any other Persons, with respect to environmental matters at any property of the Debtors or with respect to any Environmental Claims that could reasonably be expected to have a Company Material Adverse Effect;

II      promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by any Debtor (or Subsidiary of such Debtor) or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Company Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Company Material Adverse Effect, and (3) any Debtor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any property of any Debtor (or Subsidiary of such Debtor) that could cause such property or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

III     as soon as practicable following the sending or receipt thereof by any Debtor, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, that could reasonably be expected to give rise to a Company Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether any Debtor (or Subsidiary of such Debtor) may be potentially responsible for any Hazardous Materials Activity that could reasonably be expected to have a Company Material Adverse Effect;

IV     prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by any Debtor (or Subsidiary of such Debtor) that could reasonably be expected to (A) expose any Debtor (or Subsidiary of such Debtor) to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect or (B) affect the ability of any Debtor (or Subsidiary of such Debtor) to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations other than any

32

loss not reasonably likely to cause a Company Material Adverse Effect and (2) any proposed action to be taken by any Debtor (or Subsidiary of such Debtor) to modify current operations in a manner that could reasonably be expected to subject any Debtor to any additional material obligations or requirements under any Environmental Laws other than any additional obligations not reasonably likely to cause a Company Material Adverse Effect; and

V     with reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Lender in relation to any matters disclosed pursuant to this Section 11.1(g).

(h)     <u>Hazardous Materials Activities, Etc</u>.  Each Debtor shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Debtor that could reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Debtor and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(i)     <u>Material Contracts</u>.  Each Debtor will comply, and shall cause each of its Subsidiaries to comply, with each of their obligations and requirements under their Material Contracts, unless such failure could not reasonably be expected to have a Material Adverse Effect.

(j)     <u>Further Assurances</u>.  At any time or from time to time upon the request of the Lender, each Debtor will, at its sole expense, promptly execute, acknowledge and deliver such further agreements, documents, financing statements and instruments and do such other acts and things (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents) as the Lender may reasonably request in order to effect fully the purposes of the Loan Documents.  In furtherance and not in limitation of the foregoing, each Debtor shall take such actions as the Lender may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantor and are secured by substantially all of the assets and other property of the Debtors and all of the outstanding Equity Interests of each Debtor in accordance with the Financing Order.

(k)     <u>Bankruptcy Milestones</u>.

(i)     No later than twenty-one (21) days after the Petition Date or such greater period agreed to by the Lender in its sole discretion, the Bankruptcy Court shall have entered the Final Order, and such Final Order shall be in effect

and shall not have been reversed, modified, amended or stayed (other than with the written consent of the Lender in its sole discretion);

(ii)    No later than forty-five (45) days after the Petition Date or such greater period agreed to by the Lender in its sole discretion, the Borrower shall have agreed with the Lender on bankruptcy milestones provided by the Lender on a good faith basis and consistent with Budget to be incorporated into this Section 11.1(k).

(l)    <u>Cash Management Systems</u>.

(i)    The Financing Order shall grant the Lender a validly perfected First Priority Lien on each deposit account and securities account of the Debtors.

(ii)    The Debtors shall establish and maintain cash management arrangements and procedures satisfactory to the Lender.  Promptly upon request by the Lender, the Debtors shall deliver to the Lender a schedule setting forth all deposit accounts and securities accounts that are maintained by the Debtors as of such date, which schedule shall include, the names and addresses of all financial institutions at which the Debtors maintain their deposit accounts and securities accounts and the account numbers and account names of such deposit accounts and securities accounts.

(m)    <u>Post-Closing Matters</u>.  The Debtors shall satisfy the requirements set forth on Schedule 11.1(m) on or before the date specified for such requirement on Schedule 11.1(m).

11.2    <u>Negative Covenants</u>.  Each Debtor covenants and agrees that until the date all DIP Advances are paid in full and the DIP Commitment has terminated:

(a)    <u>Indebtedness</u>.  The Debtors shall not, and shall not agree to incur and shall not permit their Subsidiaries to, or agree to, create, guarantee, assume, permit to exist or otherwise become liable for any Indebtedness (including any Indebtedness under Section 364 of the Bankruptcy Code), except any Indebtedness listed on Schedule 11.2(a), any Indebtedness paid in accordance with the Budget, or any Indebtedness used to fully satisfy the Obligations (collectively, the "**Permitted Indebtedness**").

(b)    <u>Liens</u>.  The Debtors shall not, and shall not agree to, and shall not permit their Subsidiaries to or to agree to, create, assume or otherwise permit to exist any Lien upon any of the Collateral or any of its other property, whether now owned or hereafter acquired, or in any proceeds or income therefrom, other than the Liens listed on Schedule 11.2(b), which Liens may be prior to the Liens securing the Obligations until the entry of the Final Order, or the Liens created in connection with any Indebtedness used to fully satisfy the Obligations (collectively, the "**Permitted Liens**").

(c)    <u>Leases</u>.  The Debtors shall not, and shall not permit their Subsidiaries to, enter into any agreement or arrangement to acquire by lease the use of any property or equipment of any kind, except for the leases listed on Schedule 11.2(c) or specifically permitted by the Financing Order or that could not reasonably be expected to result in a Company Material Adverse Effect (collectively, the "**Permitted Leases**").

(d)    <u>Loans, Advances, Investments</u>.  The Debtors shall not make or permit, and shall not permit their Subsidiaries to make or permit, to remain outstanding any loans, extensions of credit or advances by the Debtor or such Subsidiary to or investments by the Debtor or such Subsidiary in any Person (whether by acquisition of any stocks, notes or other securities or obligations), except for those specifically provided for in the Budget, subject to the Variance, and permitted by the Financing Order, or those that could not reasonably be expected to result in a Company Material Adverse Effect.

(e)    <u>Fundamental Changes; Dispositions of Assets; Acquisitions</u>.  Except to the extent that it could not reasonably be expected to result in a Company Material Adverse Effect, no Debtor shall, nor shall it permit any of its Subsidiaries to:

(i)    enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution) except pursuant to approval of the Bankruptcy Court and with the consent of the Lender;

(ii)    convey, sell, lease or license, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever except for Permitted Dispositions; or

(iii)    acquire by purchase or otherwise the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person.

(f)    <u>Restricted Payments</u>.  The Debtors shall not and shall not permit their Subsidiaries to (i) reduce its capital or (ii) declare or make or authorize any dividend or any other payment or distribution of cash or property to its equity security-holders on account of any Equity Interest or (iii) make any payment in respect of any other indebtedness existing on or prior to the Petition Date (each a "**Restricted Payment**").

(g)    <u>Redemption or Issuance of Stock</u>.  The Debtors shall not and shall not permit their Subsidiaries to redeem, retire, purchase or otherwise acquire, directly or indirectly, any of its Equity Interests now or hereafter outstanding (or any options or warrants issued by any Debtor with respect to its Equity Interests) or set aside any funds for any of the foregoing or issue any Equity Interests to any other Person.

(h)    Corporate Existence.  No Debtor shall change its (i) corporate name or corporate structure, (ii) jurisdiction of organization or (iii) Federal Taxpayer Identification Number or state organizational identification number.

(i)    Margin Regulations.  Neither the Debtors nor any of their Subsidiaries shall directly or indirectly apply any part of the proceeds of any DIP Advance or other revenues to the purchasing or carrying of any margin stock within the meaning of Regulation T, U or X of the Board of Governors of the Federal Reserve of the United States, or any regulations, interpretations or rulings thereunder.

(j)    Environmental Laws.  Neither the Debtors nor any of their Subsidiaries shall undertake any action or Release any Hazardous Materials in violation of any Environmental Law and shall ensure that each of its properties shall be operated in compliance with all Environmental Laws and that the properties of the Debtors shall not be operated in any manner that would pose a hazard to public health or safety or to the environment, in each case unless such action could not reasonably be expected to have a Company Material Adverse Effect.

(k)    ERISA.  Neither the Debtors nor any ERISA Affiliate shall adopt, establish, participate in, or incur any obligation to contribute to, any Employee Benefit Plan or incur any liability to provide post-retirement welfare benefits in violation of any rule of any Governmental Authority.

(l)    Investment Company Act.  The Debtors shall not take any action that would result in any Debtors being required to register as an "investment company" under the Investment Company Act.

(m)    Approved Budget.  No Debtor shall use the proceeds of any Collateral or the DIP Advances other than in accordance with the Budget, subject to the Variance.  The Debtors shall not make any material change to the amounts indicated in the Budget (other than the Variance) without the prior written consent of the Lender in its sole discretion.  In no case shall the Debtor use any proceeds of Collateral or any DIP Advance to bring any claim or suit against the Lender or any of its Affiliates.

(n)    Return of Inventory.  No Debtor shall enter into any agreement to return any of its inventory outside the ordinary course of business to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(h) of the Bankruptcy Code, except to the extent that it could not reasonably be expected to result in a Company Material Adverse Effect.

(o)    Critical Vendor and Other Payments; Certain Receipts.  No Debtor shall make (i) any payments on account of any creditor's claims against the Debtors, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or

expenses arising under Section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by the Lender in writing.

(p)    Exercise of Remedies.  No Debtor shall obtain, or seek to obtain, any stay on the exercise of the remedies of the Lender hereunder, under any other Loan Document or the Financing Order.

(q)    Bankruptcy Related Negative Covenants.  The Debtors and their Subsidiaries will not seek, consent to, or permit to exist any of the following:

    (i)    any modification, stay, vacation or amendment to the Financing Order or any "first day order" as to which the Lender has not consented in writing;

    (ii)    a priority claim or administrative expense claim or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve-Out and any valid, unavoidable, perfected liens and security interests on the Collateral;

    (iii)    any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Carve-Out, Permitted Liens, or Liens otherwise permitted in the Financing Order;

    (iv)    any order that authorizes the return of any of the Debtors' property, which is not in the ordinary course of business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the Lender's consent;

    (v)    any order which authorizes the payment of any Indebtedness (other than adequate protection payments on account of the DIP Advances or Permitted Indebtedness) incurred prior to the Petition Date, unless such payments are in compliance with the Budget;

    (vi)    any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

    (vii)    any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Financing Order or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Financing Order.

(r)     <u>Financial Covenant</u>.  The Debtors shall not permit the Loan to Collateral Value Ratio to be greater than 75% at any time.

## 12.    **Events of Default**

12.1    <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Debtor, if any one or more of the following conditions or events shall occur:

(a)     <u>Failure to Make Payments When Due</u>.  Failure by the Borrower to pay (i) when due any installment of principal of any DIP Advance, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any DIP Advance or any fee or any other amount due hereunder within five (5) days after the date due; or

(b)     <u>Breach of Certain Covenants</u>.  Failure of any Debtor to perform or comply with any term or condition contained in Section 10, any of subsections 11.1(a)(i), 11.1(a)(ii), 11.1(b) (solely with respect to the Borrower), 11.1(d), 11.1(e), 11.1(k), 11.1(l) and 11.1(m) and Section 11.2; or

(c)     <u>Breach of Representations, Etc</u>.  Any representation, warranty, certification or other statement made or deemed made by any Debtor in any Loan Document or in any statement or certificate at any time given by any Debtor or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(d)     <u>Other Defaults Under Loan Documents</u>.  Any Debtor shall default in the performance of or compliance with any term contained herein or any of the other Loan Documents or the Cash Management Order, other than any such term referred to in any other clause of this Section 12.1, and such default shall not have been remedied or waived within five (5) days after the earlier of (i) any Authorized Officer of any Debtor becoming aware of such default or (ii) receipt by any Borrower of notice from the Lender of such default; or

(e)     <u>Dissolution</u>.  Any order, judgment or decree shall be entered against any Debtor decreeing the dissolution or split up of such Debtor and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(f)     <u>Employee Benefit Plans</u>.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective ERISA Affiliates in excess of $10,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code; or

(g)     <u>Guarantees, Security Interest and other Loan Documents</u>.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or the Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the grant of security interest contained herein with the priority required in the Financing Order, for any reason other than the failure of the Lender to take any action within its control, or (ii) any Debtor shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lender, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered herein or in the Financing Order; or

(h)     <u>Failure to Obtain Final Order</u>.  The failure of the Debtors to obtain the entry of the Final Order by the Bankruptcy Court in form and substance acceptable to the Lender in its sole discretion within twenty-one (21) days of the Petition Date or such greater period agreed by the Lender in its sole discretion; or

(i)     <u>Challenge to Liens</u>.  The Debtors shall institute any proceeding or investigation or support same by any other person who may challenge the status and/or validity, and/or perfection and/or priority of the Liens on the Collateral created by the Loan Documents, or the Financing Order securing the Obligations; or

(j)     <u>Certain Debtor Filings</u>.  The Debtors (or any of them) without the consent of the Lender, file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of the obligations under this Agreement upon, and as a condition to, consummation of such plan of reorganization or liquidation; or

(k)     <u>Enlarged Powers</u>.  The entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); or

(l)     <u>Dismissal or Conversion</u>.  The entry of an order dismissing any Bankruptcy Case or converting any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; or

(m)     <u>Superior Claims</u>.  The entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to the Lender, other than the Carve-Out, without the Lender's prior written consent; or

39

(n)  <u>Relief from Automatic Stay</u>.  The entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset of any Debtor having a fair market value in excess of $500,000 in the aggregate; or

(o)  <u>Financing Order; Cash Management Order</u>.  The entry of an order staying, reversing, vacating or otherwise modifying the DIP Advances, any Liens securing the Obligations (or the validity or First Priority status thereof) or the Financing Order or the Cash Management Order; or

(p)  <u>Sale of Assets</u>.  The entry of an order pursuant to Section 363 of the Bankruptcy Code approving the sale of substantially all of the Debtors' assets, if the net cash consideration for such sales are not immediately applied to, payment in whole or in part in cash of the Obligations; or

(q)  <u>Material Indebtedness</u>.  The Borrower (whether as primary obligor or as guarantor or other surety) shall fail to pay any principal of, or premium or interest on, any Material Indebtedness that is outstanding, when and as the same shall become due and payable (whether at scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument evidencing or governing such Indebtedness; or any other event shall occur or condition shall exist under any agreement or instrument relating to any Material Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Indebtedness; or any Material Indebtedness shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or any offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof; or

(r)  <u>Judgements</u>.  Any judgment, writ, warrant of attachment or similar process involving an uninsured amount in excess of $1,000,000 in the aggregate shall be rendered against the Borrower, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(s)  <u>Permits</u>.  At any time there shall have occurred the loss or termination of, or the receipt by any Debtor of notice of the loss or termination of any Governmental Authorization of any Debtor other than any loss or termination not reasonably likely to cause a Company Material Adverse Effect.

Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before or order from, the Bankruptcy Court,

(1) upon the occurrence of any Event of Default described in Section 12.1(h) through (o), automatically (x) the DIP Commitment shall terminate and (y) all Obligations shall become immediately due and payable, and the Lender may enforce any and all Liens created pursuant to Security Documents and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law, all without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by any Debtor, and

(2) upon the occurrence and during the continuance of any other Event of Default, the Lender shall, after five (5) days' written notice to the Debtors, the United States Trustee and the Committee:

(A) declare the DIP Commitment, if any, immediately terminated; and

(B) declare all of the Obligations to be immediately due and payable; and

(C) enforce any and all Liens created pursuant to Security Documents and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law,

in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Debtor.

Upon the occurrence of an Event of Default and the exercise by the Lender of its rights and remedies under this Agreement and the other Loan Documents and applicable law, the Debtors shall assist the Lender in effecting a disposition of the Collateral upon such terms as are reasonably acceptable to the Lender. The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## 13.    Creation of Security Interest; Guaranty

13.1    Security Agreement.

(a)    Grant of Security Interest.    Subject to the entry of the Financing Order, each Debtor hereby grants the Lender, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to the Lender, all of such Debtor's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. Each Debtor represents, warrants, and covenants that, subject to the entry of the Financing Order, the security interest granted herein is and shall at all times continue to be a First Priority perfected security interest in the Collateral. If any Debtor shall acquire a commercial tort claim (as defined in the Uniform Commercial Code as in effect in the State of New York), such Debtor shall promptly notify the Lender in a writing signed by such Debtor of the general details thereof  (and further details as may be required by the Lender) and grant to the Lender in such writing a security interest therein and in

the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Lender.

If this Agreement is terminated, the Lender's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid in full in cash.  Upon payment in full in cash of the Obligations (other than inchoate indemnity obligations) and at such time as the Lender's obligation to make DIP Advances has terminated, the Lender shall, at Borrower's sole cost and expense, release its Lien in the Collateral and all rights therein shall revert to the applicable Debtor.  The Lender shall take any action reasonably requested by the Borrower having the effect of releasing any Collateral to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document.

(b)      Authorization to File Financing Statements.  Each Debtor hereby authorizes the Lender to file financing statements, without notice to such Debtor, with all appropriate jurisdictions to perfect or protect the Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either a Debtor or any other Person, other than in accordance with this Agreement shall be deemed to violate the rights of the Lender under the Code.

13.2   Guaranty.

(a)      Guaranty of the Obligations.   The Guarantor hereby irrevocably and unconditionally guarantees to the Lender for the benefit of the Lender the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise  (collectively, the "**Guaranteed Obligations**").

(b)      Payment by Guarantor.   The Guarantor hereby agrees, in furtherance of the foregoing and not in limitation of any other right which the Lender may have at law or in equity against the Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantor will upon demand pay, or cause to be paid, in cash, to the Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations  and all other Guaranteed Obligations then owed to the Lender as aforesaid.

(c)      Liability of Guarantor Absolute.   The Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, the Guarantor agrees as follows:

(i)     this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of the Guarantor and not merely a contract of surety;

(ii)    the Lender may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and the Lender with respect to the existence of such Event of Default;

(iii)   the obligations of the Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against the Guarantor whether or not any action is brought against the Borrower or any of such other Guarantor and whether or not the Borrower is joined in any such action or actions;

(iv)    payment by the Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge the Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Lender is awarded a judgment in any suit brought to enforce the Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release the Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by the Guarantor, limit, affect, modify or abridge the Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(v)     Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of the Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the

benefit of the Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that the Lender may have against any such security, in each case as the Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(vi)    this Guaranty and the obligations of the Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not the Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though the Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the Lender's consent to the change, reorganization or termination of the corporate structure or existence of the Debtors or any of their Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which any Borrower may allege or assert against the Lender in respect of

the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of the Guarantor as an obligor in respect of the Guaranteed Obligations.

(d)     Waivers by Guarantor.   The Guarantor hereby waives, for the benefit of the Lender:   (a) any right to require the Lender, as a condition of payment or performance by the Guarantor, to (i) proceed against the Borrower, any other guarantor of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of the Lender in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of the Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon the Lender's errors or omissions in the administration of the Guaranteed Obligations; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to herein and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

(e)     Guarantor's Rights of Subrogation, Contribution, Etc.   Until the Guaranteed Obligations shall have been indefeasibly paid in full and the DIP Commitment shall have terminated, the Guarantor hereby waives any claim, right or remedy, direct or indirect, that the Guarantor now has or may hereafter have against the Borrower or any of its assets or other property in connection with this Guaranty or the performance by the Guarantor of its obligations hereunder, in each case

45

whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that the Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Lender now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Lender.   In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the DIP Commitment shall have terminated, the Guarantor shall withhold exercise of any right of contribution the Guarantor may have against any other guarantor of the Guaranteed Obligations, including any such right of contribution as contemplated herein.   The Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification the Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution the Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights the Lender may have against the Borrower, to all right, title and interest the Lender may have in any such collateral or security, and to any right the Lender may have against such other guarantor.  If any amount shall be paid to the Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for the Lender and shall forthwith be paid over to the Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

(f)     Subordination of Other Obligations.  Upon the entry of  and subject to the terms of the Financing Order, any Indebtedness of the Borrower or the Guarantor now or hereafter held by the Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Lender and shall forthwith be paid over to the Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

(g)     Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the DIP Commitment shall have terminated.   The Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

(h)     Authority of Guarantor or Borrower.  It is not necessary for the Lender to inquire into the capacity or powers of the Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

46

(i)    <u>Financial Condition of Borrower</u>.  Any DIP Advance may be made to the Borrower without notice to or authorization from the Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant.  The Lender shall have no obligation to disclose or discuss with the Guarantor its assessment, or the Guarantor's assessment, of the financial condition of the Borrower.  The Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and their ability to perform its obligations under the Loan Documents, and the Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  The Guarantor hereby waives and relinquishes any duty on the part of the Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by the Lender.

**14.**    **Set-off**

14.1    The Lender may apply any credit (whether or not then due) to which the Borrower is at any time beneficially entitled on any account with the Lender in (or towards) satisfaction of any sum then due and payable (but unpaid) by the Borrower to the Lender under this Agreement. If such balances are in different currencies, the Lender may convert either balance at a market rate of exchange for the purpose of the set-off.

14.2    The Lender is not obliged to exercise any of its rights under Section 14.1, but if any such rights are exercised, the Lender shall promptly notify the Borrower of the set-off that has been made.

**15.**    **Notices**

15.1    Any notice under this Agreement may be sent by first class registered or prepaid post, facsimile or e-mail:

(a)    in the case of the Borrower and the Guarantor:

Welded Construction, L.P.
26933 Eckel Road
Perrysburg, Ohio 43551
Attn: Stephen D. Hawkins
Facsimile: [_____][1]
E-mail: sdhawkins@welded.com

With a copy to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square

---

[1]  Borrower to provide fax number.

1000 North King Street
Wilmington, Delaware 19801
Attn: Sean M. Beach, Esq.
Facsimile: (302) 576-3281
E-mail: sbeach@ycst.com

(b)     in the case of the Lender:

North American Pipeline Equipment Company, LLC
c/o Ohio Welded Company LLC
26933 Eckel Road
Perrysburg OH 43551
Attn: Glen Brock, Manager of Legal Department
Telephone: (713) 235-6979
E-mail: gpbrock@bechtel.com

With a copy to:

North American Pipeline Equipment Company, LLC
c/o Bechtel Global Energy, Inc.
3000 Post Oak Blvd.
Houston, TX 77056
Attn: Glen Brock, Manager of Legal Department
Telephone: (713) 235-6979
E-mail: gpbrock@bechtel.com

And, with a copy to:

Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, New York 10166-0193
Attn: Michael A. Rosenthal, Esq.
    Matthew K. Kelsey, Esq.
Facsimile: (212) 351-6258 (M. Rosenthal)
        (212) 351-6351 (M. Kelsey)
E-mail: mrosenthal@gibsondunn.com
      mkelsey@gibsondunn.com

or such other address, facsimile number or e-mail address as may from time to time be notified in writing by the relevant Party to the other Party.

15.2    Any notice or other communication required to be given under this Agreement shall be deemed to have been delivered:

(a)     if given by letter, when delivered to the relevant address; or

(b)     if given by facsimile, when the sender receives confirmation of delivery; or

(c)    if given by e-mail, when the sender receives an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment).

## 16.    Time is of the Essence

Time shall be of the essence with respect to the performance by any Party of each and every duty, obligation, and covenant and the fulfillment of each and every term and condition contained herein and in the Note.

## 17.    Severability of Provisions

Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

## 18.    Waivers and Amendments; Integration

Any provision of this Agreement may be amended, waived or modified only upon the written consent of the Borrower and the Lender, including, without limitation, any provisions related to the Maturity Date

## 19.    Counterparts

19.1    This Agreement may be executed in any number of counterparts.  If the parties execute this Agreement on separate counterparts, it shall not be effective until each Party has executed at least one counterpart.

19.2    Each counterpart shall be deemed to constitute the original of this Agreement, but all the counterparts shall together constitute one and the same instrument.

19.3    Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

## 20.    Survival

All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms.

## 21.    Construction of Agreement

The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement.  In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

## 22.    Relationship

The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint

venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

## 23.    Third Parties

Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

## 24.    Expenses

Whether or not the transactions contemplated hereby are consummated, the Debtors agree to pay promptly (a) all the actual and reasonable costs and expenses of the Lender incurred in connection with the negotiation, preparation and execution of the Loan Documents, the Interim Order, the Final Order, the "first day orders" and any other documents in connection with the Bankruptcy Cases and any consents, amendments, waivers or other modifications thereto (whether or not any of the transactions contemplated hereby or thereby shall be consummated); (b) all the actual and reasonable fees, costs and expenses of counsel to the Lender (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Debtors; (c) all the actual and reasonable costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to the Lender; (d) all the actual and reasonable costs and expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Lender and its counsel) in connection with the custody or preservation of any of the Collateral; (e) all other actual and reasonable costs and expenses incurred by the Lender in connection with the transactions contemplated by the Loan Documents and any consents, amendments, waivers or other modifications thereto; and (f) all the actual and reasonable costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Lender in enforcing any Obligations of or in collecting any payments due from any Debtor hereunder or under the other Loan Documents, including fees and expenses incurred by such parties in connection with the monitoring and participating in the Bankruptcy Cases.  Notwithstanding the foregoing, with respect to the actual and reasonable costs and expenses of the Lender incurred prior to the Closing Date in connection with the negotiation, preparation and execution of the Loan Documents (including the actual and reasonable fees, costs and expenses of counsel to the Lender), the Debtors shall only be required to pay an aggregate amount up to $200,000.

25.    **Indemnification**

In addition to the payment of expenses pursuant to Section 24, whether or not the transactions contemplated hereby are consummated, each Debtor, jointly and severally with the other Debtors, agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, the Lender and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates of the Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Debtor shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 25 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Debtor shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

26.    **Release**

No Debtor has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Debtors' liability to repay the Lender as provided in this Agreement, or to seek affirmative relief or damages of any kind or nature from the Lender relating to this Agreement.  Subject to entry of the Financing Order, the Debtors, each in their own right and with respect to the Debtors, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever release and discharge the Lender and all of the Lender's past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the other Loan Documents, the Financing Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral)

related to any of the foregoing, provided that solely in the case of attorneys, the provisions of this Section 26 shall be limited to the extent that any such release would violate any professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct, to the extent applicable.

27.    **Specific Performance**

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at law or in equity.

28.    **No Marshalling; Payments Set Aside**

The Lender shall not be under any obligation to marshal any assets in favor of any Debtor or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Debtor makes a payment or payments to the Lender, or the Lender enforces any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

29.    **Parties Including Trustees; Bankruptcy Court Proceedings**

This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Bankruptcy Case or any case under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender and its respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Bankruptcy Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Bankruptcy Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect its Liens under applicable law.  No Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by any Debtor without the prior

express written consent of the Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Debtor and the Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

**30.    CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER**

30.1    <u>APPLICABLE LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

30.2    <u>CONSENT TO JURISDICTION</u>.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE DEBTORS AND THE LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE LENDER AND THE DEBTORS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  EACH PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

30.3    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL

OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 30.3 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE DIP ADVANCES MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**31.** **Successors and Assigns**

This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  The Debtors may not assign this Agreement or any rights or obligations under it without the prior written consent of the Lender (which may be granted or withheld in the Lender's sole and absolute discretion).  The Lender has the right, without the Debtors' consent, to sell, convey, transfer or assign all or any part of, or any interest in, the Lender's obligations, rights, and benefits under this Agreement or any other Loan Document to any other Person.  Any assignment of this Agreement or any other Loan Document or any of the rights, interests or obligations hereunder or thereunder not in accordance with this Section 31 shall be null and void.

**32.** **Financing Order**

In the event of any conflict between the terms of this Agreement or any other Loan Document and any applicable Financing Order, the terms of the applicable Financing Order shall govern and control.   Notwithstanding anything to the contrary herein, the security interests granted herein and pursuant to the other Loan Documents, shall be subordinate in all respects (including, without limitation, payment, priority, and performance) to any security interests with priority pursuant to the applicable Financing Order.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Closing Date.

BORROWER:

WELDED CONSTRUCTION, L.P.

By its General Partners:

    OHIO WELDED COMPANY LLC

    By: BECHTEL GLOBAL ENERGY,
       INC., its Managing Member

    By: _____
    Name:  Alasdair I. Cathcart
    Title:   President

    MCCAIG WELDED GP, LLC

    By: _____
    Name: Jeffrey J. McCaig
    Title:   President

GUARANTOR:

WELDED CONSTRUCTION MICHIGAN, LLC

By:_____
    Name:
    Title:

LENDER:

NORTH AMERICAN PIPELINE
EQUIPMENT COMPANY, LLC


By:_____
     Name:
     Title:

**SCHEDULE 10(t)**

**SUBSIDIARIES**

None.

**SCHEDULE 10(z)**

**BONDING**

| BOND NUMBER | SURETY | PRINCIPAL | OBLIGEE; DESCRIPTION | BOND AMOUNT |
|---|---|---|---|---|
| 82192456 | Chubb (Federal Insurance Company) | Welded Construction Michigan, LLC | Consumers Energy Company; project related | $55,897,580 |
| 82192458 | Chubb (Federal Insurance Company) | Welded Construction, L.P. | Transcontinental Gas Pipeline Company, LLC; projected related | $454,471,254 |
| 47SUR300093010001 | Berkshire Hathaway Specialty Insurance Company | Welded Construction, L.P. | Consumers Energy Company; project related | $ 59,555,408 |
| 82444393 | Chubb (Federal Insurance Company) | Welded Construction, L.P. | West Virginia; wage payment bond | $14,500,000 |
| 117379 | Berkshire Hathaway Specialty Insurance Company | Welded Construction, L.P. | Pennsylvania; contractor license bond | $5,000 |
| 916869 | AIG | Welded Construction, L.P. | City of Detroit; road damage bond | $2,500 |

**SCHEDULE 10(aa)**

**MORTGAGED PROPERTIES**

1.  26933 Eckel Road, Perrysburg, Ohio, and any improvements thereto.

**SCHEDULE 11.1(d)**

**INSURANCE**

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED |
|---|---|---|---|
| Navigators Insurance Company | D&O, Employment Practices and Fiduciary Liability | GA17DOL324874IV | Aug 1, 2018; 12 |
| Zurich American Insurance Company | General Liability | GLO 9482433-06 | May 1, 2018; 12 |
| Zurich American Insurance Company | Automobile | BAP 9482441-06 | May 1, 2018; 12 |
| Indian Harbor Insurance Company | Pollution | CPL742027504 | May 1, 2018; 12 |
| The Charter Oak Fire Insurance Company | Inland Marine | QT-660-8733M872-C0F-18 | May 1, 2018; 12 |
| Travelers Casualty and Surety Company of America | Crime | 105588490 | May 1, 2018; 12 |
| Westchester Fire Insurance Company | Umbrella and Excess | G24380506 006 | May 1, 2018; 12 |
| Gemini Insurance Company | Umbrella and Excess | CEX09602680-00 I | May 1, 2018; 12 |

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED |
|---|---|---|---|
| Great American Assurance Company | Umbrella and Excess | EXC2275155 | May 1, 2018; 12 |
| Liberty Mutual Insurance Company | Umbrella and Excess | ECO (18) 56 01 03 58 | May 1, 2018; 12 |
| Westchester Fire Insurance Company | Umbrella and Excess | G27978289 003 | May 1, 2018; 12 |

## SCHEDULE 11.1(m)

## POST-CLOSING MATTERS

The obligation of the Lender to continue to make DIP Loans under the Agreement is subject to the fulfillment, on or before the date applicable thereto, of the following conditions subsequent (the failure by the Debtors to so perform or cause to be performed such conditions subsequent as and when required by the terms below (unless such date is extended, in writing, by the Lender in its sole discretion), shall constitute an Event of Default):

1. Within twenty (20) days after the Closing Date (or such other period agreed by the Lender in its sole discretion), the Lender shall have received (i) insurance certificates in form and substance satisfactory to the Lender demonstrating that the insurance policies required by Section 11.1(d) of the Agreement are in full force and effect and (ii) insurance endorsements reflecting the addition of the Lender as an additional insured and loss payee on such insurance policies (provided that the Debtors shall only be required to use their commercially reasonable efforts to obtain the insurance endorsements referenced in clause (ii)).

## SCHEDULE 11.2(a)

## PERMITTED INDEBTEDNESS

1.      Indebtedness associated with those Permitted Leases listed on Schedule 11.2(c).

2.      The following letters of credit for which Borrower is an applicant.

| Issuing Bank | LC No. | Issue Date | Amount | Beneficiary |
|---|---|---|---|---|
| Bank of America, N.A. | 3116662 | 4/12/11 | $4,746,500 | Zurich American Insurance Company |
| Bank of America, N.A. | 3116610 | 4/5/11 | $109,000 | Continental Insurance Company |
| Bank of America, N.A. | 3116609 | 4/5/11 | $50,000 | Hartford Fire Insurance Company |

## SCHEDULE 11.2(b)

## PERMITTED LIENS

1.      Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable party.  For these purposes, "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

2.      Any Liens in connection with the UCC-1 financing statements noted in the attached chart.

## WELDED CONSTRUCTION, L.P.

### Delaware, Secretary of State

**Listings:**

**UCC LIEN SEARCH**

| File Type | File Number | File Date | Expiration Date | Debtor | Secured Party | Collateral |
|---|---|---|---|---|---|---|
| INITIAL FINANCING STATEMENT | 20141603273 | 4/24/2014 | 4/24/2019 | WELDED CONSTRUCTION, L.P.<br><br>26933 ECKEL RD, PERRYSBURG, OH US 43551 | CATERPILLAR FINANCIAL SERVICES CORPORATION<br><br>2120 WEST END AVE, NASHVILLE, TN US 37203 | ONE (1) CATERPILLAR PL61 PIPELAYER S/N: WGS00566 |
| INITIAL FINANCING STATEMENT | 20141603356 | 4/24/2014 | 4/24/2019 | WELDED CONSTRUCTION, L.P.<br><br>26933 ECKEL RD, PERRYSBURG, OH US 43551 | CATERPILLAR FINANCIAL SERVICES CORPORATION<br><br>2120 WEST END AVE, NASHVILLE, TN US 37203 | ONE (1) CATERPILLAR PL61 PIPELAYER S/N: WGS00562 |
| INITIAL FINANCING STATEMENT | 20141603398 | 4/24/2014 | 4/24/2019 | WELDED CONSTRUCTION, L.P.<br><br>26933 ECKEL RD, PERRYSBURG, OH US 43551 | CATERPILLAR FINANCIAL SERVICES CORPORATION<br><br>2120 WEST END AVE, NASHVILLE, TN US 37203 | ONE (1) CATERPILLAR PL61 PIPELAYER S/N: WGS00563 |
| INITIAL FINANCING STATEMENT | 20141603497 | 4/24/2014 | 4/24/2019 | WELDED CONSTRUCTION, L.P.<br><br>26933 ECKEL RD, PERRYSBURG, OH US 43551 | CATERPILLAR FINANCIAL SERVICES CORPORATION<br><br>2120 WEST END AVE, NASHVILLE, TN US 37203 | ONE (1) CATERPILLAR PL61 PIPELAYER S/N: WGS00564 |

| | | | | | | ONE (1) CATERPILLAR PL61 PIPELAYER S/N: WGS00565 |
|---|---|---|---|---|---|---|
| INITIAL FINANCING STATEMENT | 20141604180 | 4/24/2014 | 4/24/2019 | WELDED CONSTRUCTION, L.P.<br><br>26933 ECKEL RD, PERRYSBURG, OH US 43551 | CATERPILLAR FINANCIAL SERVICES CORPORATION<br><br>2120 WEST END AVE, NASHVILLE, TN US 37203 | |
| INITIAL FINANCING STATEMENT | 20175519803 | 8/18/2017 | 8/18/2022 | WELDED CONSTRUCTION, L.P.<br><br>26933 ECKEL, PERRYSBURG, OH US 43552 | VAR RESOURCES, LLC<br><br>2330 INTERSTATE 30, MESQUITE, TX US 75150 | 2 - NIMBLE CS1000, 2x10G BASE T, 21TB HDD, 3x480GB SSD 2 - NIMBLE 4HR PARTS DELIVERY, SW SUPPORT / INFOSIGHT, 3 YEAR ; 2 - NIMBLE ARRAY ONSITE INSTALL |

**SCHEDULE 11.2(c)**

**PERMITTED LEASES**

Attached

Equipment Leases

Case 13-12878-KG    Doc 316    Filed 02/21/18    Page 639 of 175

| Serial | Current Location | | Start | Duration | 1/22/2017 | 2/21/2017 | 3/23/2017 | 4/23/2017 | 5/23/2017 | 6/22/2017 | 7/23/2017 | 8/23/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MPZ00723** | Cat 349 w/ Hammer | | 2016-04 | | $ 7,812.16 | $ 7,812.16 | $ 7,812.16 | $ 7,812.16 | $ 7,812.16 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 |
| **DGE00333** | Cat 349 | | 2016-04 | 5/30/2014 | 36 | $ 10,392.78 | $ 10,392.78 | $ 10,392.78 | $ 10,392.78 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| **DGE00334** | Cat 349 | | 2016-04 | 5/30/2014 | 36 | $ 10,392.78 | $ 10,392.78 | $ 10,392.78 | $ 10,392.78 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| **DGE00336** | Cat 349 | | 2016-04 | 5/30/2014 | 36 | $ 10,392.78 | $ 10,392.78 | $ 10,392.78 | $ 10,392.78 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| **DGE00337** | Cat 349 | | 2016-04 | 7/28/2014 | 36 | $ 10,195.72 | $ 10,195.72 | $ 10,195.72 | $ 10,195.72 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| **FJH01056** | Cat 336 | | 2016-04 | 5/30/2014 | 36 | $ 6,309.82 | $ 6,309.82 | $ 6,309.82 | $ 6,309.82 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **FJH01258** | Cat 336 w/ Thumb | | 2017-09 | 5/20/2014 | 36 | $ 12,083.97 | $ 12,083.97 | $ 12,083.97 | $ 12,083.97 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 |
| **FJH01361** | Cat 336 | | 2016-01 | 5/30/2014 | 36 | $ 7,160.80 | $ 7,160.80 | $ 7,160.80 | $ 7,160.80 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 |
| **FJH01401** | Cat 336 | | 50-00 | 6/10/2014 | 36 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 |
| **FJH01407** | Cat 336 | | 2017-03 | 6/10/2014 | 36 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01413** | Cat 336 | | 2016-01 | 6/10/2014 | 36 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01417** | Cat 336 | | 2016-01 | 6/10/2014 | 36 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 6,690.61 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01461** | Cat 336 | | 2016-04 | 5/30/2014 | 36 | $ 7,160.80 | $ 7,160.80 | $ 7,160.80 | $ 7,160.80 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 |
| **FJH01506** | Cat 336 w/ Hammer | | 2016-04 | 5/22/2014 | 36 | $ 7,454.59 | $ 7,454.59 | $ 7,454.59 | $ 7,454.59 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01508** | Cat 336 w/ Hammer | | 2016-01 | 5/22/2014 | 36 | $ 7,454.59 | $ 7,454.59 | $ 7,454.59 | $ 7,454.59 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01510** | Cat 336 | | 2016-01 | 5/22/2014 | 36 | $ 7,454.59 | $ 7,454.59 | $ 7,454.59 | $ 7,454.59 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01578** | Cat 336 w/ Thumb | | 2016-22 | 6/5/2014 | 36 | $ 7,588.90 | $ 7,588.90 | $ 7,588.90 | $ 7,588.90 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01580** | Cat 336 w/ Thumb | | | 6/6/2014 | 36 | $ 7,588.90 | $ 7,588.90 | $ 7,588.90 | $ 7,588.90 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 |
| **FJH01584** | Cat 336 w/ Hammer | | 2016-04 | 5/30/2014 | 36 | $ 6,772.66 | $ 6,772.66 | $ 6,772.66 | $ 6,772.66 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 |
| **FJH01590** | Cat 336 w/ Hammer | | 2016-01 | 5/30/2014 | 36 | $ 6,810.52 | $ 6,810.52 | $ 6,810.52 | $ 6,810.52 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 |
| **FJH01628** | Cat 336 | | 2016-01 | 5/30/2014 | 36 | $ 6,529.71 | $ 6,529.71 | $ 6,529.71 | $ 6,529.71 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **FJH01662** | Cat 336 | | 2016-01 | 6/9/2014 | 36 | $ 6,416.33 | $ 6,416.33 | $ 6,416.33 | $ 6,416.33 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 |
| **FJH01664** | Cat 336 | | 2016-01 | 5/30/2014 | 36 | $ 6,309.82 | $ 6,309.82 | $ 6,309.82 | $ 6,309.82 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **FJH01758** | Cat 336 w/ Hammer | | 2016-01 | 6/3/2014 | 36 | $ 6,715.27 | $ 6,715.27 | $ 6,715.27 | $ 6,715.27 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **FJH01761** | Cat 336 w/ Hammer | | 2016-04 | 5/20/2014 | 36 | $ 6,865.93 | $ 6,865.93 | $ 6,865.93 | $ 6,865.93 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **FJH01763** | Cat 336 w/ Thumb | | 2016-33 | 5/23/2014 | 36 | $ 6,865.93 | $ 6,865.93 | $ 6,865.93 | $ 6,865.93 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **FJH01819** | Cat 336 | | 50-00 | 6/2/2014 | 36 | $ 6,461.73 | $ 6,461.73 | $ 6,461.73 | $ 6,461.73 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 |
| **KSB00452** | D6T Dozer | | 2016-04 | 9/1/2016 | 18 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 |
| **KSB01300** | D6T Dozer | | 2016-04 | 9/1/2016 | 18 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 |
| **KSB01360** | D6T Dozer | | 2016-01 | 9/1/2016 | 18 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 |
| **KSB01364** | D6T Dozer | | 2016-04 | 9/1/2016 | 18 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 |
| **KSB01425** | D6T Dozer | | 2017-01 | 9/1/2016 | 18 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 |
| **KSB01426** | D6T Dozer | | 2016-04 | 9/1/2016 | 18 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 |
| **KSB01629** | D6T Dozer | | 2016-01 | 5/20/2014 | 36 | $ 7,820.76 | $ 7,820.76 | $ 7,820.76 | $ 7,820.76 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01631** | D6T Dozer | | 2016-04 | 5/20/2014 | 36 | $ 7,820.76 | $ 7,820.76 | $ 7,820.76 | $ 7,820.76 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01655** | D6T Dozer | | 2016-03 | 5/20/2014 | 36 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01682** | D6T Dozer | | 2016-06 | 5/20/2014 | 36 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01705** | D6T Dozer | | 50-00 | 5/20/2014 | 36 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01711** | D6T Dozer | | 2016-22 | 5/20/2014 | 36 | $ 7,820.76 | $ 7,820.76 | $ 7,820.76 | $ 7,820.76 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01717** | D6T Dozer | | 2016-22 | 5/20/2014 | 36 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 6,612.44 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| **KSB01755** | D6T Dozer | | 2016-01 | 6/2/2014 | 36 | $ 7,445.06 | $ 7,445.06 | $ 7,445.06 | $ 7,445.06 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| **KSB01759** | D6T Dozer | | 2016-01 | 6/2/2014 | 36 | $ 7,445.06 | $ 7,445.06 | $ 7,445.06 | $ 7,445.06 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| **KSB01769** | D6T Dozer | | 2017-09 | 6/6/2014 | 36 | $ 6,168.43 | $ 6,168.43 | $ 6,168.43 | $ 6,168.43 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 |
| **KSB01831** | D6T Dozer | | 2016-04 | 6/2/2014 | 36 | $ 7,350.28 | $ 7,350.28 | $ 7,126.89 | $ 7,350.28 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| **KSB01835** | D6T Dozer | | 2016-33 | 6/2/2014 | 36 | $ 7,350.28 | $ 7,350.28 | $ 7,350.28 | $ 7,350.28 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| **KSB01841** | D6T Dozer | | 2016-01 | 6/2/2014 | 36 | $ 7,321.66 | $ 7,321.66 | $ 7,321.66 | $ 7,321.66 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| **KSB01842** | D6T Dozer | | 2016-04 | 6/2/2014 | 36 | $ 7,321.66 | $ 7,321.66 | $ 7,321.66 | $ 7,321.66 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| **KSB01881** | D6T Dozer | | 2016-01 | 6/12/2014 | 36 | $ 7,357.11 | $ 7,357.11 | $ 7,357.11 | $ 7,357.11 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |

| Serial | Current Location | | Start | Duration | 1/22/2017 | 2/21/2017 | 3/23/2017 | 4/22/2017 | 5/23/2017 | 6/22/2017 | 7/23/2017 | 8/23/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **KSB01900** | D6T Dozer | 2016-01 | 5/20/2014 | 36 | $ 8,238.29 | $ 8,238.29 | $ 8,238.29 | $ 8,238.29 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |
| **KSB01901** | D6T Dozer | 2016-01 | 5/20/2014 | 36 | $ 8,238.29 | $ 8,238.29 | $ 8,238.29 | $ 8,238.29 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |
| **KSB01902** | D6T Dozer | 2016-01 | 5/20/2014 | 36 | $ 8,238.29 | $ 8,238.29 | $ 8,238.29 | $ 8,238.29 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |
| **KSB01974** | D6T Dozer | 2016-04 | 5/30/2014 | 36 | $ 8,180.41 | $ 8,180.41 | $ 8,180.41 | $ 8,180.41 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 |
| **KSB01975** | D6T Dozer | 2016-04 | 5/30/2014 | 36 | $ 8,180.41 | $ 8,180.41 | $ 8,180.41 | $ 8,180.41 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 |
| **MPZ00719** | Cat 349 w/ Hammer | 2016-04 | 5/20/2014 | 36 | $ 10,633.02 | $ 10,633.02 | $ 10,633.02 | $ 10,633.02 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 |
| **MPZ00819** | Cat 349 w/ Hammer | 2016-04 | 5/30/2014 | 36 | $ 9,716.14 | $ 9,716.14 | $ 9,716.14 | $ 9,716.14 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 |
| **MPZ00820** | Cat 349 w/ Hammer | 2016-04 | 5/30/2014 | 36 | $ 9,784.88 | $ 9,784.88 | $ 9,784.88 | $ 9,784.88 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 |
| **MPZ00821** | Cat 349 w/ Hammer | 2016-04 | 5/30/2014 | 36 | $ 9,716.14 | $ 9,716.14 | $ 9,716.14 | $ 9,716.14 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 |
| KKJ00229 | Pipelayer PL87 | 2017-05 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00251 | Pipelayer PL87 | 2017-05 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00242 | Pipelayer PL87 | 2017-05 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00241 | Pipelayer PL87 | 2017-05 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00233 | Pipelayer PL87 | 2017-09 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00234 | Pipelayer PL87 | 2017-09 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00220 | Pipelayer PL87 | 2017-05 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00243 | Pipelayer PL87 | 2017-09 | 9/1/2016 | 36 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| TEC00221 | Pipelayer PL87 | 2017-05 | 9/1/2017 | 36 | | | | | | | | |
| TEC00222 | Pipelayer PL87 | 2017-05 | 9/1/2017 | 36 | | | | | | | | |
| TEC00223 | Pipelayer PL87 | 2017-05 | 9/1/2017 | 36 | | | | | | | | |
| TEC00236 | Pipelayer PL87 | | 12/1/2017 | 36 | | | | | | | | |
| TEC00237 | Pipelayer PL87 | | 12/1/2017 | 36 | | | | | | | | |
| TEC00238 | Pipelayer PL87 | | 12/1/2017 | 36 | | | | | | | | |
| TEC00239 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00240 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00241 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00242 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00243 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00244 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00245 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00246 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00247 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00249 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TBD | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TEC00250 | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TBD | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TBD | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TBD | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TBD | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| TBD | Pipelayer PL87 | In Route | | 36 | | | | | | | | |
| FMC1108 | D8T Dozer | 2017-09 | 10/1/2017 | 36 | | | | | | | | |
| FMC1109 | D8T Dozer | 2017-01 | 10/1/2017 | 36 | | | | | | | | |
| FMC1111 | D8T Dozer | 2017-01 | 10/1/2017 | 36 | | | | | | | | |
| FMC1113 | D8T Dozer | 2017-05 | 10/1/2017 | 36 | | | | | | | | |
| FMC1114 | D8T Dozer | 2017-05 | 10/1/2017 | 36 | | | | | | | | |
| FMC1116 | D8T Dozer | 2017-05 | 10/1/2017 | 36 | | | | | | | | |
| FMC1117 | D8T Dozer | 2017-09 | 10/1/2017 | 36 | | | | | | | | |
| FMC1118 | D8T Dozer | 2017-05 | 10/1/2017 | 36 | | | | | | | | |
| FMC1119 | D8T Dozer | 2017-09 | 10/1/2017 | 36 | | | | | | | | |
| FMC1128 | D8T Dozer | 2017-09 | 10/1/2017 | 36 | | | | | | | | |
| CB200148 | Pipelayer PL83 | 2016-04 | 5/1/2017 | 36 | | | | | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200157 | Pipelayer PL83 | 2016-04 | 2/1/2017 | 36 | | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200158 | Pipelayer PL83 | 2016-04 | 2/1/2017 | 36 | | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200159 | Pipelayer PL83 | 2016-04 | 2/1/2017 | 36 | | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |

Case 13-12878-KG    Doc 17    Filed 10/22/18    Page 141 of 175

| Serial | Current Location | Start | Duration | 1/22/2017 | 2/21/2017 | 3/23/2017 | 4/22/2017 | 5/23/2017 | 6/22/2017 | 7/23/2017 | 8/23/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CB200162 | Pipelayer PL83 | 2016-04 | 36 |  |  | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200173 | Pipelayer PL83 | 2016-04 | 36 |  |  | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200175 | Pipelayer PL83 | 2016-04 | 36 |  |  | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200183 | Pipelayer PL83 | 2017-05 | 36 |  |  |  |  | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200184 | Pipelayer PL83 | 2017-09 | 36 |  |  |  |  | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200185 | Pipelayer PL83 | 2017-05 | 36 |  |  |  |  | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200187 | Pipelayer PL83 | 2016-06 | 36 |  |  |  |  | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200197 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200198 | Pipelayer PL83 | 2016-06 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200199 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200200 | Pipelayer PL83 | 2017-05 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200201 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200202 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200203 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200204 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200205 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200206 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200207 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200208 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200209 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200210 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200211 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200212 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200213 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200214 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| CB200215 | Pipelayer PL83 | 2016-04 | 36 |  |  |  |  |  |  |  | $ 15,131.45 |
| PLR00697 | Pipelayer 72H | 2017-01 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00698 | Pipelayer 72H | 2016-02 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00699 | Pipelayer 72H | 2017-01 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00700 | Pipelayer 72H | 2017-05 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00701 | Pipelayer 72H | 2016-33 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00702 | Pipelayer 72H | 2016-33 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00703 | Pipelayer 72H | 2016-33 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00704 | Pipelayer 72H | 2016-33 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00705 | Pipelayer 72H | 2016-03 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00706 | Pipelayer 72H | 2016-03 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00707 | Pipelayer 72H | 2016-03 | 36 |  |  |  | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| CMX00464 | Pipelayer 583T (Sheehan) | 2016-04 | 36 | 10/1/2016 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 |
| CMX00229 | Pipelayer 583T (Sheehan) | 2016-04 | 36 | 10/1/2016 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00191 | Pipelayer 583T (Sheehan) | 2016-04 | 36 | 10/1/2016 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00228 | Pipelayer 583T (Sheehan) | 2016-04 | 36 | 10/1/2016 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00235 | Pipelayer 583T (Sheehan) | 2016-04 | 36 | 10/1/2016 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00234 | Pipelayer 583T (Sheehan) | 2016-04 | 36 | 10/1/2016 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| 935200578 | Panther T8 Tac Rigs | 2016-33 | 36 |  |  |  | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 935200574 | Panther T8 Tac Rigs | 2016-33 | 36 |  |  |  | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200566 | Panther T8 Tac Rigs | 2016-04 | 36 |  |  |  | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200573 | Panther T8 Tac Rigs | 2016-04 | 36 |  |  |  | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 2NP2HJ7X7GM339323 | 2016 Peterbilt 337 |  | 6/1/2017 | 36 |  |  |  |  |  | $ 4,694.32 | $ 4,694.32 |
| 2NP2HJ7X1GM340290 | 2016 Peterbilt 337 |  | 8/1/2017 | 36 |  |  |  |  |  |  | $ 4,694.32 |
| 2NP2HJ7X3GM340291 | 2016 Peterbilt 337 |  | 8/1/2017 | 36 |  |  |  |  |  |  | $ 4,694.32 |
|  |  |  |  | $ 522,471.84 | $ 590,516.84 | $ 623,304.43 | $ 810,715.04 | $ 598,255.93 | $ 644,217.42 | $ 644,217.42 | $ 941,103.61 |

PACCAR Leases

| Serial | | Current Location | | Start | Duration | 1/22/2017 | 2/21/2017 | 3/23/2017 | 4/22/2017 | 5/23/2017 | 6/22/2017 | 7/23/2017 | 8/23/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1XPXP4EX0FD270286 | Peterbilt | | | 4/17/2017 | 36 | | | | 2,438.32 | 2,438.32 | 2,438.32 | 2,438.32 | 2,438.32 |
| 1XPXD49X4HD391313 | Peterbilt | | | 4/17/2017 | 36 | | | | | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 |
| 1XPXD49X0JD433188 | Peterbilt | | | 4/17/2017 | 36 | | | | | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 |
| 1XPXD49X7JD433186 | Peterbilt | | | 4/17/2017 | 36 | | | | | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 |
| 1XPXD49X8JD433245 | Peterbilt | | | 4/17/2017 | 36 | | | | | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 |
| 1XPXD49XXJD433246 | Peterbilt | | | 4/17/2017 | 36 | | | | | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 |
| 1XPTD40X1FD270294 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40X3FD270295 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40X4FD270290 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40X5FD270296 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40X6FD270291 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40X8FD270289 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40X8FD270292 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPTD40XXFD270293 | Peterbilt | | | 6/1/2014 | 60 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 |
| 1XPXP4EX1FD270281 | Peterbilt | | | 4/28/2014 | 60 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 |
| 1XPXP4EX3FD270282 | Peterbilt | | | 4/28/2014 | 60 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 |
| 1XPXP4EX5FD270283 | Peterbilt | | | 4/28/2014 | 60 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 |
| 1XPXP4EX7FD270284 | Peterbilt | | | 4/28/2014 | 60 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 |
| 1XPXP4EXXFD270280 | Peterbilt | | | 4/28/2014 | 60 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 |
| 1XPXP4EX5JD433183 | Peterbilt | | | 3/29/2017 | 36 | | | | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 |
| 1XPXP4EX7JD433184 | Peterbilt | | | 3/29/2017 | 36 | | | | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 |
| 1XPCP4EX7GD345890 | Peterbilt | | | 4/17/2017 | 36 | | | | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1XPCP4EX9GD345891 | Peterbilt | | | 4/17/2017 | 36 | | | | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1XPCP4EX7HD409010 | Peterbilt | | | 4/17/2017 | 36 | | | | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1M2BD02Y7GM001760 | Mack | | | 3/28/2017 | 36 | | | | | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y9GM001761 | Mack | | | 3/28/2017 | 36 | | | | | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M1BD02Y8HM002003 | Mack | | | 3/28/2017 | 36 | | | | | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y8HM001749 | Mack | | | 3/28/2017 | 36 | | | | | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y4HM001779 | Mack | | | 3/28/2017 | 36 | | | | | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| | | | | | | 29,472.87 | 29,472.87 | 29,472.87 | 46,519.14 | 80,381.86 | 80,381.86 | 80,381.86 | 80,381.86 |

| Serial | 9/22/2017 | 10/23/2017 | 11/22/2017 | 12/23/2017 | 1/23/2018 | 2/20/2018 | 3/23/2018 | 4/22/2018 | 5/23/2018 | 6/22/2018 | 7/23/2018 | 8/23/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MPZ00723 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 | $ 3,684.98 |
| DGE00333 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| DGE00334 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| DGE00336 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| DGE00337 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 |
| FJH01056 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | | |
| FJH01258 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | | | |
| FJH01361 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | | | |
| FJH01401 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | $ 3,015.00 | | |
| FJH01407 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | |
| FJH01413 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | |
| FJH01417 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | | |
| FJH01461 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | $ 3,025.75 | | | |
| FJH01506 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | | |
| FJH01508 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | | |
| FJH01510 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | | |
| FJH01578 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | |
| FJH01580 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | $ 3,015.75 | | |
| FJH01584 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | | | |
| FJH01590 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | | | |
| FJH01628 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | | |
| FJH01662 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | $ 3,241.50 | | |
| FJH01664 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | | |
| FJH01758 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | |
| FJH01761 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | | |
| FJH01763 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | | |
| FJH01819 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | $ 3,196.70 | | | |
| KSB00452 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | $ 2,825.51 | | | | | | |
| KSB01300 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | | | | | | |
| KSB01360 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | | | | | | |
| KSB01364 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | | | | | | |
| KSB01425 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | | | | | | |
| KSB01426 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | $ 3,852.34 | | | | | | |
| KSB01629 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01631 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01655 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01682 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01705 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01711 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01717 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 |
| KSB01755 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| KSB01759 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| KSB01769 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 |
| KSB01831 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| KSB01835 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| KSB01841 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| KSB01842 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 |
| KSB01881 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |

| Serial | 9/22/2017 | 10/23/2017 | 11/22/2017 | 12/23/2017 | 1/23/2018 | 2/20/2018 | 3/23/2018 | 4/22/2018 | 5/23/2018 | 6/22/2018 | 7/23/2018 | 8/23/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KSB01900 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |
| KSB01901 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |
| KSB01902 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 |
| KSB01974 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 |
| KSB01975 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 |
| MPZ00719 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 |
| MPZ00819 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 |
| MPZ00820 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 |
| MPZ00821 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 |
| KKJ00229 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00251 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00242 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00241 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00233 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00234 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00220 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00243 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| TEC00221 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 |
| TEC00222 | $ 19,441.69 | $ 19,441.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 |
| TEC00223 | $ 19,441.69 | $ 19,441.69 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 |
| TEC00236 |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00237 |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00238 |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00239 |  |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00240 |  |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00241 |  |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00242 |  |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00243 |  |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00244 |  |  |  |  | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00245 |  |  |  |  |  |  |  |  |  |  |  |  |
| TEC00246 |  |  |  |  |  |  |  |  |  |  |  |  |
| TEC00247 |  |  |  |  |  |  |  |  |  |  |  |  |
| TEC00249 |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD |  |  |  |  |  |  |  |  |  |  |  |  |
| TEC00250 |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD |  |  |  |  |  |  |  |  |  |  |  |  |
| TBD |  |  |  |  |  |  |  |  |  |  |  |  |
| FMC1108 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1109 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1111 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1113 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1114 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1116 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1117 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1118 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1119 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1128 |  | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| CB200148 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200157 | $ 15,131.45 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200158 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200159 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |

| Serial | 9/22/2017 | 10/23/2017 | 11/22/2017 | 12/23/2017 | 1/23/2018 | 2/20/2018 | 3/23/2018 | 4/22/2018 | 5/23/2018 | 6/22/2018 | 7/23/2018 | 8/23/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CB200162 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200173 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200175 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200183 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200184 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200185 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200187 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200197 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200198 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200199 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200200 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200201 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200202 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200203 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200204 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200205 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200206 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200207 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200208 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200209 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200210 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200211 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200212 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200213 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200214 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200215 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| PLR00697 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00698 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00699 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00700 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00701 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00702 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00703 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00704 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00705 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00706 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00707 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| CMX00464 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 |
| CMX00229 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00191 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00228 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00235 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00234 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| 935200578 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 935200574 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200566 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200573 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 2NP2HJ7X7GM339323 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 |
| 2NP2HJ7X1GM340290 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 |
| 2NP2HJ7X3GM340291 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 |
| | $ 999,428.68 | $ 1,148,395.88 | $ 1,148,365.19 | $ 1,203,388.85 | $ 1,313,436.17 | $ 1,313,436.17 | $ 1,291,348.96 | $ 1,291,348.96 | $ 1,291,348.96 | $ 1,250,542.21 | $ 1,222,813.56 | $ 1,222,813.56 |

**PACCAR Leases**

| Serial | 9/22/2017 | 10/23/2017 | 11/22/2017 | 12/23/2017 | 1/23/2018 | 2/20/2018 | 3/23/2018 | 4/22/2018 | 5/23/2018 | 6/22/2018 | 7/23/2018 | 8/23/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1XPXP4EX0FD270286 | 2,438.32 | 2,438.32 | 2,438.32 | 2,438.32 | | | | | | | | |
| 1XPXD49X4HD391313 | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 | | | | | | | | |
| 1XPXD49X0JD433188 | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 | | | | | | | | |
| 1XPXD49X7JD433186 | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 | | | | | | | | |
| 1XPXD49X8JD433245 | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 | | | | | | | | |
| 1XPXD49XXJD433246 | 2,695.22 | 2,695.22 | 2,695.22 | 2,695.22 | | | | | | | | |
| 1XPTD40X1FD270294 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40X3FD270295 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40X4FD270290 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40X5FD270296 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40X6FD270291 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40X8FD270289 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40X8FD270292 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPTD40XXFD270293 | 1,918.18 | 1,918.18 | 1,918.18 | 1,918.18 | | | | | | | | |
| 1XPXP4EX1FD270281 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | | | | | | | | |
| 1XPXP4EX3FD270282 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | | | | | | | | |
| 1XPXP4EX5FD270283 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | | | | | | | | |
| 1XPXP4EX7FD270284 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | | | | | | | | |
| 1XPXP4EXXFD270280 | 2,337.83 | 2,337.83 | 2,337.83 | 2,337.83 | | | | | | | | |
| 1XPXP4EX5JD433183 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 |
| 1XPXP4EX7JD433184 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 |
| 1XPCP4EX7GD345890 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1XPCP4EX9GD345891 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1XPCP4EX7HD409010 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1M2BD02Y7GM001760 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y9GM001761 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M1BD02Y8HM002003 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y8GM001749 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y4HM001779 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| | | | | | | | | | | | | |
| | 80,381.86 | 80,381.86 | 80,381.86 | 80,381.86 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 |

| Serial | 9/22/2018 | 10/23/2018 | 11/22/2018 | 12/23/2018 | 1/23/2019 | 2/20/2019 | 3/23/2019 | 4/22/2019 | 5/23/2019 | 6/22/2019 | 7/23/2019 | 8/23/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MPZ00723 | $ 3,684.98 | $ 3,684.98 | | | | | | | | | | |
| DGE00333 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | | | | | | | | | |
| DGE00334 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | | | | | | | | | |
| DGE00336 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | | | | | | | | | |
| DGE00337 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | $ 3,539.18 | | | | | | | |
| FJH01056 | | | | | | | | | | | | |
| FJH01258 | | | | | | | | | | | | |
| FJH01361 | | | | | | | | | | | | |
| FJH01401 | | | | | | | | | | | | |
| FJH01407 | | | | | | | | | | | | |
| FJH01413 | | | | | | | | | | | | |
| FJH01417 | | | | | | | | | | | | |
| FJH01461 | | | | | | | | | | | | |
| FJH01506 | | | | | | | | | | | | |
| FJH01508 | | | | | | | | | | | | |
| FJH01510 | | | | | | | | | | | | |
| FJH01578 | | | | | | | | | | | | |
| FJH01580 | | | | | | | | | | | | |
| FJH01584 | | | | | | | | | | | | |
| FJH01590 | | | | | | | | | | | | |
| FJH01628 | | | | | | | | | | | | |
| FJH01662 | | | | | | | | | | | | |
| FJH01664 | | | | | | | | | | | | |
| FJH01758 | | | | | | | | | | | | |
| FJH01761 | | | | | | | | | | | | |
| FJH01763 | | | | | | | | | | | | |
| FJH01819 | | | | | | | | | | | | |
| KSB00452 | | | | | | | | | | | | |
| KSB01300 | | | | | | | | | | | | |
| KSB01360 | | | | | | | | | | | | |
| KSB01364 | | | | | | | | | | | | |
| KSB01425 | | | | | | | | | | | | |
| KSB01426 | | | | | | | | | | | | |
| KSB01629 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01631 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01655 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01682 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01705 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01711 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01717 | $ 2,127.11 | $ 2,127.11 | $ 2,127.11 | | | | | | | | | |
| KSB01755 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | | | | | | | | |
| KSB01759 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | | | | | | | | |
| KSB01769 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | | | | | | | | |
| KSB01831 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | | | | | | | | |
| KSB01835 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | | | | | | | | |
| KSB01841 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | | | | | | | | |
| KSB01842 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | $ 2,288.64 | | | | | | | | |
| KSB01881 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | | | | | | | | |

| Serial | 9/22/2018 | 10/23/2018 | 11/22/2018 | 12/23/2018 | 1/23/2019 | 2/20/2019 | 3/23/2019 | 4/22/2019 | 5/23/2019 | 6/22/2019 | 7/23/2019 | 8/23/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KSB01900 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | | | | | | | | | |
| KSB01901 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | | | | | | | | | |
| KSB01902 | $ 2,288.69 | $ 2,288.69 | $ 2,288.69 | | | | | | | | | |
| KSB01974 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | | | | | | | | | |
| KSB01975 | $ 2,254.74 | $ 2,254.74 | $ 2,254.74 | | | | | | | | | |
| MPZ00719 | $ 3,906.08 | $ 3,906.08 | $ 3,906.08 | | | | | | | | | |
| MPZ00819 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | | | | | | | | | |
| MPZ00820 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | | | | | | | | | |
| MPZ00821 | $ 4,292.67 | $ 4,292.67 | $ 4,292.67 | | | | | | | | | |
| KKJ00229 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00251 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00242 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00241 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00233 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00234 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00220 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| KKJ00243 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 | $ 5,332.23 |
| TEC00221 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 |
| TEC00222 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 |
| TEC00223 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 |
| TEC00236 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00237 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00238 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00239 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00240 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00241 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00242 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00243 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00244 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00245 | | | | | | | | | | | | |
| TEC00246 | | | | | | | | | | | | |
| TEC00247 | | | | | | | | | | | | |
| TEC00249 | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TEC00250 | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| FMC1108 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1109 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1111 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1113 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1114 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1116 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1117 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1118 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1119 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1128 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| CB200148 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200157 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200158 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200159 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |

| Serial | 9/22/2018 | 10/23/2018 | 11/22/2018 | 12/23/2018 | 1/23/2019 | 2/20/2019 | 3/23/2019 | 4/22/2019 | 5/23/2019 | 6/22/2019 | 7/23/2019 | 8/23/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CB200162 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200173 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200175 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200183 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200184 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200185 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200187 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200197 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200198 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200199 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200200 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200201 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200202 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200203 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200204 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200205 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200206 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200207 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200208 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200209 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200210 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200211 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200212 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200213 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200214 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200215 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| PLR00697 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00698 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00699 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00700 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00701 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00702 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00703 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00704 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00705 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00706 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00707 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| CMX00464 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 | $ 9,078.22 |
| CMX00229 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00191 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00228 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00235 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| CMX00234 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 | $ 10,129.32 |
| 935200578 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 935200574 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200566 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200573 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 2NP2HJ7X7GM339323 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 |
| 2NP2HJ7X1GM340290 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 |
| 2NP2HJ7X3GM340291 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 |
| | $ 1,222,813.56 | $ 1,222,813.56 | $ 1,219,128.58 | $ 1,165,461.63 | $ 1,147,186.36 | $ 1,143,647.18 | $ 1,143,647.18 | $ 1,143,647.18 | $ 1,143,647.18 | $ 1,143,647.18 | $ 1,143,647.18 | $ 1,143,647.18 |

**PACCAR Leases**

| Serial | 9/22/2018 | 10/23/2018 | 11/22/2018 | 12/23/2018 | 1/23/2019 | 2/20/2019 | 3/23/2019 | 4/22/2019 | 5/23/2019 | 6/22/2019 | 7/23/2019 | 8/23/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1XPXP4EX0FD270286 | | | | | | | | | | | | |
| 1XPXD49X4HD391313 | | | | | | | | | | | | |
| 1XPXD49X0JD433188 | | | | | | | | | | | | |
| 1XPXD49X7JD433186 | | | | | | | | | | | | |
| 1XPXD49X8JD433245 | | | | | | | | | | | | |
| 1XPXD49XXJD433246 | | | | | | | | | | | | |
| 1XPTD40X1FD270294 | | | | | | | | | | | | |
| 1XPTD40X3FD270295 | | | | | | | | | | | | |
| 1XPTD40X4FD270290 | | | | | | | | | | | | |
| 1XPTD40X5FD270296 | | | | | | | | | | | | |
| 1XPTD40X6FD270291 | | | | | | | | | | | | |
| 1XPTD40X8FD270289 | | | | | | | | | | | | |
| 1XPTD40X8FD270292 | | | | | | | | | | | | |
| 1XPTD40XXFD270293 | | | | | | | | | | | | |
| 1XPXP4EX1FD270281 | | | | | | | | | | | | |
| 1XPXP4EX3FD270282 | | | | | | | | | | | | |
| 1XPXP4EX5FD270283 | | | | | | | | | | | | |
| 1XPXP4EX7FD270284 | | | | | | | | | | | | |
| 1XPXP4EXXFD270280 | | | | | | | | | | | | |
| 1XPXP4EX5JD433183 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 |
| 1XPXP4EX7JD433184 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 |
| 1XPCP4EX7GD345890 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1XPCP4EX9GD345891 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1XPCP4EX7HD409010 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 |
| 1M2BD02Y7GM001760 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y9GM001761 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M1BD02Y8HM002003 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y8HM001749 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| 1M2BD02Y4HM001779 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 |
| | | | | | | | | | | | | |
| | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 |

| Serial | 9/22/2019 | 10/23/2019 | 11/22/2019 | 12/23/2019 | 1/23/2020 | 2/20/2020 | 3/22/2020 | 4/21/2020 | 5/22/2020 | 6/21/2020 | 7/22/2020 | 8/22/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MPZ00723 | | | | | | | | | | | | |
| DGE00333 | | | | | | | | | | | | |
| DGE00334 | | | | | | | | | | | | |
| DGE00336 | | | | | | | | | | | | |
| DGE00337 | | | | | | | | | | | | |
| FJH01056 | | | | | | | | | | | | |
| FJH01258 | | | | | | | | | | | | |
| FJH01361 | | | | | | | | | | | | |
| FJH01401 | | | | | | | | | | | | |
| FJH01407 | | | | | | | | | | | | |
| FJH01413 | | | | | | | | | | | | |
| FJH01417 | | | | | | | | | | | | |
| FJH01461 | | | | | | | | | | | | |
| FJH01506 | | | | | | | | | | | | |
| FJH01508 | | | | | | | | | | | | |
| FJH01510 | | | | | | | | | | | | |
| FJH01578 | | | | | | | | | | | | |
| FJH01580 | | | | | | | | | | | | |
| FJH01584 | | | | | | | | | | | | |
| FJH01590 | | | | | | | | | | | | |
| FJH01628 | | | | | | | | | | | | |
| FJH01662 | | | | | | | | | | | | |
| FJH01664 | | | | | | | | | | | | |
| FJH01758 | | | | | | | | | | | | |
| FJH01761 | | | | | | | | | | | | |
| FJH01763 | | | | | | | | | | | | |
| FJH01819 | | | | | | | | | | | | |
| KSB00452 | | | | | | | | | | | | |
| KSB01300 | | | | | | | | | | | | |
| KSB01360 | | | | | | | | | | | | |
| KSB01364 | | | | | | | | | | | | |
| KSB01425 | | | | | | | | | | | | |
| KSB01426 | | | | | | | | | | | | |
| KSB01629 | | | | | | | | | | | | |
| KSB01631 | | | | | | | | | | | | |
| KSB01655 | | | | | | | | | | | | |
| KSB01682 | | | | | | | | | | | | |
| KSB01705 | | | | | | | | | | | | |
| KSB01711 | | | | | | | | | | | | |
| KSB01717 | | | | | | | | | | | | |
| KSB01755 | | | | | | | | | | | | |
| KSB01759 | | | | | | | | | | | | |
| KSB01769 | | | | | | | | | | | | |
| KSB01831 | | | | | | | | | | | | |
| KSB01835 | | | | | | | | | | | | |
| KSB01841 | | | | | | | | | | | | |
| KSB01842 | | | | | | | | | | | | |
| KSB01881 | | | | | | | | | | | | |

| Serial | 9/22/2019 | 10/23/2019 | 11/22/2019 | 12/23/2019 | 1/23/2020 | 2/20/2020 | 3/22/2020 | 4/21/2020 | 5/22/2020 | 6/21/2020 | 7/22/2020 | 8/22/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **KSB01900** | | | | | | | | | | | | |
| **KSB01901** | | | | | | | | | | | | |
| **KSB01902** | | | | | | | | | | | | |
| **KSB01974** | | | | | | | | | | | | |
| **KSB01975** | | | | | | | | | | | | |
| **MPZ00719** | | | | | | | | | | | | |
| **MPZ00819** | | | | | | | | | | | | |
| **MPZ00820** | | | | | | | | | | | | |
| **MPZ00821** | | | | | | | | | | | | |
| KKJ00229 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00251 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00242 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00241 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00233 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00234 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00220 | $ 5,332.23 | | | | | | | | | | | |
| KKJ00243 | $ 5,332.23 | | | | | | | | | | | |
| TEC00221 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 | $ 19,441.69 |
| TEC00222 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 | $ 19,411.69 |
| TEC00223 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 | $ 19,441.00 |
| TEC00236 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00237 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00238 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00239 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00240 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00241 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00242 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00243 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00244 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 | $ 18,341.22 |
| TEC00245 | | | | | | | | | | | | |
| TEC00246 | | | | | | | | | | | | |
| TEC00247 | | | | | | | | | | | | |
| TEC00249 | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TEC00250 | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| TBD | | | | | | | | | | | | |
| FMC1108 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1109 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1111 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1113 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1114 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1116 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1117 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1118 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1119 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| FMC1128 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 | $ 14,896.72 |
| CB200148 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200157 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200158 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200159 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |

| Serial | 9/22/2019 | 10/23/2019 | 11/22/2019 | 12/23/2019 | 1/23/2020 | 2/20/2020 | 3/22/2020 | 4/21/2020 | 5/22/2020 | 6/21/2020 | 7/22/2020 | 8/22/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CB200162 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 | $ 17,011.25 |
| CB200173 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200175 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 | $ 16,505.49 |
| CB200183 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200184 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200185 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200187 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200197 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200198 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200199 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200200 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200201 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200202 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200203 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200204 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200205 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200206 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200207 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200208 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200209 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200210 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200211 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200212 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200213 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200214 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| CB200215 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 | $ 15,131.45 |
| PLR00697 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00698 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00699 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00700 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00701 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00702 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00703 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00704 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00705 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00706 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| PLR00707 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 | $ 12,833.70 |
| CMX00464 | $ 9,078.22 | $ 9,078.22 | | | | | | | | | | |
| CMX00229 | $ 10,129.32 | $ 10,129.32 | | | | | | | | | | |
| CMX00191 | $ 10,129.32 | $ 10,129.32 | | | | | | | | | | |
| CMX00228 | $ 10,129.32 | $ 10,129.32 | | | | | | | | | | |
| CMX00235 | $ 10,129.32 | $ 10,129.32 | | | | | | | | | | |
| CMX00234 | $ 10,129.32 | $ 10,129.32 | | | | | | | | | | |
| 935200578 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 935200574 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200566 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 | $ 12,365.38 |
| 935200573 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 | $ 12,368.38 |
| 2NP2HJ7X7GM339323 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | | | |
| 2NP2HJ7X1GM340290 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | |
| 2NP2HJ7X3GM340291 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | $ 4,694.32 | |
| | $ 1,143,647.18 | $ 1,100,989.34 | $ 1,041,264.52 | $ 1,041,264.52 | $ 1,041,264.52 | $ 1,041,264.52 | $ 1,041,264.52 | $ 1,041,264.52 | $ 1,041,264.52 | $ 1,036,570.20 | $ 1,036,570.20 | $ 1,027,181.56 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **PACCAR Leases** | | | | | | | | | | | | |

| Serial | 9/22/2019 | 10/23/2019 | 11/22/2019 | 12/23/2019 | 1/23/2020 | 2/20/2020 | 3/22/2020 | 4/21/2020 | 5/22/2020 | 6/21/2020 | 7/22/2020 | 8/22/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1XPXP4EX0FD270286 | | | | | | | | | | | | |
| 1XPXD49X4HD391313 | | | | | | | | | | | | |
| 1XPXD49X0JD433188 | | | | | | | | | | | | |
| 1XPXD49X7JD433186 | | | | | | | | | | | | |
| 1XPXD49X8JD433245 | | | | | | | | | | | | |
| 1XPXD49XXJD433246 | | | | | | | | | | | | |
| 1XPTD40X1FD270294 | | | | | | | | | | | | |
| 1XPTD40X3FD270295 | | | | | | | | | | | | |
| 1XPTD40X4FD270290 | | | | | | | | | | | | |
| 1XPTD40X5FD270296 | | | | | | | | | | | | |
| 1XPTD40X6FD270291 | | | | | | | | | | | | |
| 1XPTD40X8FD270289 | | | | | | | | | | | | |
| 1XPTD40X8FD270292 | | | | | | | | | | | | |
| 1XPTD40XXFD270293 | | | | | | | | | | | | |
| 1XPXP4EX1FD270281 | | | | | | | | | | | | |
| 1XPXP4EX3FD270282 | | | | | | | | | | | | |
| 1XPXP4EX5FD270283 | | | | | | | | | | | | |
| 1XPXP4EX7FD270284 | | | | | | | | | | | | |
| 1XPXP4EXXFD270280 | | | | | | | | | | | | |
| 1XPXP4EX5JD433183 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | | | | | |
| 1XPXP4EX7JD433184 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | 3,266.70 | | | | | |
| 1XPCP4EX7GD345890 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | | | | | |
| 1XPCP4EX9GD345891 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | | | | | |
| 1XPCP4EX7HD409010 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | 3,504.29 | | | | | |
| 1M2BD02Y7GM001760 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | | | | |
| 1M2BD02Y9GM001761 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | | | | |
| 1M1BD02Y8HM002003 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | | | | |
| 1M2BD02Y9GM001749 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | | | | |
| 1M2BD02Y4HM001779 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | 4,077.32 | | | | |
| | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 37,432.87 | 20,386.60 | - | - | - | - |

| Serial | 9/21/2020 | 10/22/2020 | 11/21/2020 | 12/22/2020 | Total |
|---|---|---|---|---|---|
| MPZ00723 | | | | | $ 78,193.76 |
| DGE00333 | | | | | $ 46,009.34 |
| DGE00334 | | | | | $ 46,009.34 |
| DGE00336 | | | | | $ 46,009.34 |
| DGE00337 | | | | | $ 53,087.70 |
| FJH01056 | | | | | $ 22,376.90 |
| FJH01258 | | | | | $ 22,690.50 |
| FJH01361 | | | | | $ 21,180.25 |
| FJH01401 | | | | | $ 24,120.00 |
| FJH01407 | | | | | $ 24,126.00 |
| FJH01413 | | | | | $ 24,126.00 |
| FJH01417 | | | | | $ 24,126.00 |
| FJH01461 | | | | | $ 21,180.25 |
| FJH01506 | | | | | $ 21,110.25 |
| FJH01508 | | | | | $ 21,110.25 |
| FJH01510 | | | | | $ 21,110.25 |
| FJH01578 | | | | | $ 24,126.00 |
| FJH01580 | | | | | $ 24,126.00 |
| FJH01584 | | | | | $ 22,690.50 |
| FJH01590 | | | | | $ 22,690.50 |
| FJH01628 | | | | | $ 22,376.90 |
| FJH01662 | | | | | $ 25,932.00 |
| FJH01664 | | | | | $ 22,376.90 |
| FJH01758 | | | | | $ 25,573.60 |
| FJH01761 | | | | | $ 22,376.90 |
| FJH01763 | | | | | $ 22,376.90 |
| FJH01819 | | | | | $ 25,573.60 |
| KSB00452 | | | | | $ 11,302.04 |
| KSB01300 | | | | | $ 15,409.36 |
| KSB01360 | | | | | $ 15,409.36 |
| KSB01364 | | | | | $ 15,409.36 |
| KSB01425 | | | | | $ 15,409.36 |
| KSB01426 | | | | | $ 15,409.36 |
| KSB01629 | | | | | $ 27,652.43 |
| KSB01631 | | | | | $ 27,652.43 |
| KSB01655 | | | | | $ 27,652.43 |
| KSB01682 | | | | | $ 27,652.43 |
| KSB01705 | | | | | $ 27,652.43 |
| KSB01711 | | | | | $ 27,652.43 |
| KSB01717 | | | | | $ 27,652.43 |
| KSB01755 | | | | | $ 32,040.96 |
| KSB01759 | | | | | $ 32,040.96 |
| KSB01769 | | | | | $ 31,566.36 |
| KSB01831 | | | | | $ 32,040.96 |
| KSB01835 | | | | | $ 32,040.96 |
| KSB01841 | | | | | $ 32,040.96 |
| KSB01842 | | | | | $ 32,040.96 |
| KSB01881 | | | | | $ 32,041.66 |

| Serial | 9/21/2020 | 10/22/2020 | 11/21/2020 | 12/22/2020 | Total |
|---|---|---|---|---|---|
| KSB01900 | | | | | $ 29,752.97 |
| KSB01901 | | | | | $ 29,752.97 |
| KSB01902 | | | | | $ 29,752.97 |
| KSB01974 | | | | | $ 29,311.62 |
| KSB01975 | | | | | $ 29,311.62 |
| MPZ00719 | | | | | $ 50,779.04 |
| MPZ00819 | | | | | $ 55,804.71 |
| MPZ00820 | | | | | $ 55,804.71 |
| MPZ00821 | | | | | $ 55,804.71 |
| KKJ00229 | | | | | $ 122,641.29 |
| KKJ00251 | | | | | $ 122,641.29 |
| KKJ00242 | | | | | $ 122,641.29 |
| KKJ00241 | | | | | $ 122,641.29 |
| KKJ00233 | | | | | $ 122,641.29 |
| KKJ00234 | | | | | $ 122,641.29 |
| KKJ00220 | | | | | $ 122,641.29 |
| KKJ00243 | | | | | $ 122,641.29 |
| TEC00221 | | | | | $ 661,017.46 |
| TEC00222 | | | | | $ 659,997.46 |
| TEC00223 | | | | | $ 660,994.00 |
| TEC00236 | | | | | $ 605,260.26 |
| TEC00237 | | | | | $ 605,260.26 |
| TEC00238 | | | | | $ 605,260.26 |
| TEC00239 | | | | | $ 586,919.04 |
| TEC00240 | | | | | $ 586,919.04 |
| TEC00241 | | | | | $ 586,919.04 |
| TEC00242 | | | | | $ 586,919.04 |
| TEC00243 | | | | | $ 586,919.04 |
| TEC00244 | | | | | $ 586,919.04 |
| TEC00245 | | | | | $ - |
| TEC00246 | | | | | $ - |
| TEC00247 | | | | | $ - |
| TEC00249 | | | | | $ - |
| TBD | | | | | $ - |
| TEC00250 | | | | | $ - |
| TBD | | | | | $ - |
| TBD | | | | | $ - |
| TBD | | | | | $ - |
| TBD | | | | | $ - |
| TBD | | | | | $ - |
| FMC1108 | | | | | $ 506,488.48 |
| FMC1109 | | | | | $ 506,488.48 |
| FMC1111 | | | | | $ 506,488.48 |
| FMC1113 | | | | | $ 506,488.48 |
| FMC1114 | | | | | $ 506,488.48 |
| FMC1116 | | | | | $ 506,488.48 |
| FMC1117 | | | | | $ 506,488.48 |
| FMC1118 | | | | | $ 506,488.48 |
| FMC1119 | | | | | $ 506,488.48 |
| FMC1128 | | | | | $ 506,488.48 |
| CB200148 | | | | | $ 514,469.30 |
| CB200157 | | | | | $ 578,382.50 |
| CB200158 | | | | | $ 578,382.50 |
| CB200159 | | | | | $ 578,382.50 |

| Serial | 9/21/2020 | 10/22/2020 | 11/21/2020 | 12/22/2020 | Total |
|---|---|---|---|---|---|
| CB200162 | | | | | |
| CB200173 | | | | | $ 561,186.66 |
| CB200175 | | | | | $ 561,186.66 |
| CB200183 | | | | | $ 514,469.30 |
| CB200184 | | | | | $ 514,469.30 |
| CB200185 | | | | | $ 514,469.30 |
| CB200187 | | | | | $ 514,469.30 |
| CB200197 | | | | | $ 514,469.30 |
| CB200198 | | | | | $ 514,469.30 |
| CB200199 | | | | | $ 514,469.30 |
| CB200200 | | | | | $ 514,469.30 |
| CB200201 | | | | | $ 514,469.30 |
| CB200202 | | | | | $ 514,469.30 |
| CB200203 | | | | | $ 514,469.30 |
| CB200204 | | | | | $ 514,469.30 |
| CB200205 | | | | | $ 514,469.30 |
| CB200206 | | | | | $ 514,469.30 |
| CB200207 | | | | | $ 514,469.30 |
| CB200208 | | | | | $ 514,469.30 |
| CB200209 | | | | | $ 514,469.30 |
| CB200210 | | | | | $ 514,469.30 |
| CB200211 | | | | | $ 514,469.30 |
| CB200212 | | | | | $ 514,469.30 |
| CB200213 | | | | | $ 514,469.30 |
| CB200214 | | | | | $ 514,469.30 |
| CB200215 | | | | | $ 514,469.30 |
| PLR00697 | | | | | $ 436,345.80 |
| PLR00698 | | | | | $ 436,345.80 |
| PLR00699 | | | | | $ 436,345.80 |
| PLR00700 | | | | | $ 436,345.80 |
| PLR00701 | | | | | $ 436,345.80 |
| PLR00702 | | | | | $ 436,345.80 |
| PLR00703 | | | | | $ 436,345.80 |
| PLR00704 | | | | | $ 436,345.80 |
| PLR00705 | | | | | $ 436,345.80 |
| PLR00706 | | | | | $ 436,345.80 |
| PLR00707 | | | | | $ 436,345.80 |
| CMX00464 | | | | | $ 217,877.28 |
| CMX00229 | | | | | $ 243,103.68 |
| CMX00191 | | | | | $ 243,103.68 |
| CMX00228 | | | | | $ 243,103.68 |
| CMX00235 | | | | | $ 243,103.68 |
| CMX00234 | | | | | $ 243,103.68 |
| 935200578 | | | | | $ 420,524.92 |
| 935200574 | | | | | $ 420,422.92 |
| 935200566 | | | | | $ 420,422.92 |
| 935200573 | | | | | $ 420,524.92 |
| 2NP2HJ7X7GM339323 | | | | | $ 145,523.92 |
| 2NP2HJ7X1GM340290 | | | | | $ 154,912.56 |
| 2NP2HJ7X3GM340291 | | | | | $ 154,912.56 |
| | $ - | $ - | $ - | $ - | $ 39,165,586.66 |
| | | | | | |
| | | | | | |
| | | | | | |
| PACCAR Leases | | | | | |

| Serial | 9/21/2020 | 10/22/2020 | 11/21/2020 | 12/22/2020 | Total |
|---|---|---|---|---|---|
| 1XPXP4EX0FD270286 | | | | | |
| 1XPXD49X4HD391313 | | | | | |
| 1XPXD49X0JD433188 | | | | | |
| 1XPXD49X7JD433186 | | | | | |
| 1XPXD49X8JD433245 | | | | | |
| 1XPXD49XXJD433246 | | | | | |
| 1XPTD40X1FD270294 | | | | | |
| 1XPTD40X3FD270295 | | | | | |
| 1XPTD40X4FD270290 | | | | | |
| 1XPTD40X5FD270296 | | | | | |
| 1XPTD40X6FD270291 | | | | | |
| 1XPTD40X8FD270289 | | | | | |
| 1XPTD40X8FD270292 | | | | | |
| 1XPTD40XXFD270293 | | | | | |
| 1XPXP4EX1FD270281 | | | | | |
| 1XPXP4EX3FD270282 | | | | | |
| 1XPXP4EX5FD270283 | | | | | |
| 1XPXP4EX7FD270284 | | | | | |
| 1XPXP4EXXFD270280 | | | | | |
| 1XPXP4EX5JD433183 | | | | | |
| 1XPXP4EX7JD433184 | | | | | |
| 1XPCP4EX7GD345890 | | | | | |
| 1XPCP4EX9GD345891 | | | | | |
| 1XPCP4EX7HD409010 | | | | | |
| 1M2BD02Y7GM001760 | | | | | |
| 1M2BD02Y9GM001761 | | | | | |
| 1M1BD02Y8HM002003 | | | | | |
| 1M2BD02Y8GM001749 | | | | | |
| 1M2BD02Y4HM001779 | | | | | |
| | | | | | |
| | - | | | | |

| Unit | Make | Model | CategoryID | Type | Location | LeaseStartDate | LeaseEndDate | Start Price | Capture Price |
|------|------|-------|-----------|------|----------|----------------|--------------|-------------|---------------|
| 23-1000 | Chevy | 3500 | Pickups | 4x4 | Lebanon, PA | 3/21/2014 12:00 AM | 3/21/2017 12:00 AM | $ 36,528.29 | |
| 23-1001 | Chevy | 2500 | Pickups | 4x4 | Alliance, OH | 3/21/2014 12:00 AM | 3/21/2017 12:00 AM | $ 35,546.62 | |
| 23-1002 | Chevy | 3500 | Pickups | 4x4 | Alliance, OH | 3/21/2014 12:00 AM | 3/21/2017 12:00 AM | $ 31,812.50 | |
| 23-1005 | Chevy | 2500 | Pickups | 4x4 | Alliance, OH | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 35,475.99 | |
| 23-1008 | Chevy | 2500 | Pickups | 4x4 | Coldwater, MI | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 32,965.32 | |
| 23-1009 | Chevy | 2500 | Pickups | 4x4 | Lebanon, PA | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 32,965.32 | |
| 23-1010 | Chevy | 3500 | Pickups | 4x4 | Lebanon, PA | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 36,223.55 | |
| 23-1013 | Chevy | 2500 | Pickups | 4x4 | Alliance, OH | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 31,919.35 | |
| 23-1015 | GMC | 3500 | Pickups | 4x4 | Coldwater, MI | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 31,935.63 | |
| 23-1018 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 31,756.98 | |
| 23-1019 | GMC | 3500 | Pickups | 4x4 | Coldwater, MI | 3/21/2014 12:00 AM | 3/31/2017 12:00 AM | $ 32,550.09 | |
| 23-1016 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 3/25/2014 12:00 AM | 3/31/2017 12:00 AM | $ 36,212.86 | |
| 23-1017 | GMC | 3500 | Pickups | 4x4 | Coldwater, MI | 3/25/2014 12:00 AM | 3/31/2017 12:00 AM | $ 31,756.98 | |
| 23-1003 | Chevy | 3500 | Pickups | 4x4 | Lebanon, PA | 3/28/2014 12:00 AM | 3/31/2017 12:00 AM | $ 35,593.82 | |
| 23-1004 | Chevy | 3500 | Pickups | 4x4 | Coldwater, MI | 3/28/2014 12:00 AM | 3/31/2017 12:00 AM | $ 35,593.82 | |
| 23-1006 | Chevy | 3500 | Pickups | 4x4 | Alliance, OH | 3/28/2014 12:00 AM | 3/31/2017 12:00 AM | $ 34,787.81 | |
| 23-1007 | Chevy | 3500 | Pickups | 4x4 | Coldwater, MI | 3/28/2014 12:00 AM | 3/31/2017 12:00 AM | $ 34,787.81 | |
| 23-1014 | Chevy | 3500 | Pickups | 4x4 | Lebanon, PA | 3/28/2014 12:00 AM | 3/31/2017 12:00 AM | $ 35,087.36 | |
| 23-1037 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 5/9/2014 12:00 AM | 5/31/2017 12:00 AM | $ 33,177.20 | |
| 23-1011 | Chevy | 3500 | Pickups | 4x4 | Perrysburg, OH | 5/15/2014 12:00 AM | 5/31/2017 12:00 AM | $ 35,991.25 | |
| 23-1021 | GMC | 3500 | Pickups | 4x4 | Lodi, Ohio | 6/12/2014 12:00 AM | 6/30/2017 12:00 AM | $ 33,177.20 | |
| 23-1012 | Chevy | 3500 | Pickups | 4x4 | Cambridge, OH | 6/20/2014 12:00 AM | 6/30/2017 12:00 AM | $ 34,700.77 | |
| 23-1024 | GMC | 3500 | Pickups | 4x4 | Lodi, Ohio | 6/24/2014 12:00 AM | 6/30/2017 12:00 AM | $ 33,177.20 | |
| 23-1031 | GMC | 3500 | Pickups | 4x4 | Lodi, Ohio | 6/24/2014 12:00 AM | 6/30/2017 12:00 AM | $ 33,177.20 | |
| 23-1029 | GMC | 3500 | Pickups | 4x4 | Perrysburg, OH | 6/30/2014 12:00 AM | 6/30/2017 12:00 AM | $ 33,177.20 | |
| 23-1034 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 6/30/2014 12:00 AM | 6/30/2017 12:00 AM | $ 33,177.20 | |
| 23-1026 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 7/8/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | |
| 23-1027 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 7/8/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | |
| 23-1020 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 7/9/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | |
| 23-1023 | GMC | 3500 | Pickups | 4x4 | Port Allegany, PA | 7/9/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | |
| 23-1033 | GMC | 3500 | Pickups | 4x4 | Port Allegany, PA | 7/9/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | |
| 23-1035 | GMC | 3500 | Pickups | 4x4 | Perrysburg, OH | 7/9/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | |

| Unit | Make | Model | CategoryID | Type | Location | LeaseStartDate | LeaseEndDate | Start Price | Capture Price | |
|------|------|-------|------------|------|----------|----------------|--------------|-------------|---------------|---|
| 23-1025 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 7/10/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1032 | GMC | 3500 | Pickups | 4x4 | Cambridge, OH | 7/10/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1028 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 7/11/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1039 | GMC | 3500 | Pickups | 4x4 | Lebanon, PA | 7/11/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1030 | GMC | 3500 | Pickups | 4x4 | Cambridge, OH | 7/14/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1036 | GMC | 3500 | Pickups | 4x4 | Port Allegany, PA | 7/14/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1022 | GMC | 3500 | Pickups | 4x4 | Port Allegany, PA | 7/16/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 23-1038 | GMC | 3500 | Pickups | 4x4 | Port Allegany, PA | 7/16/2014 12:00 AM | 7/31/2017 12:00 AM | $ 33,177.20 | | |
| 25-1000 | GMC | 3500 | Pickups | 1 Ton Flatbed | Lodi, Ohio | 7/17/2014 12:00 AM | 7/31/2017 12:00 AM | $ 39,096.43 | $ | 12,354.55 |
| 25-1001 | GMC | 3500 | Pickups | 1 Ton Flatbed | Cambridge, OH | 7/17/2014 12:00 AM | 7/31/2017 12:00 AM | $ 39,096.43 | $ | 12,354.55 |
| 23-1040 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1041 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1042 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1043 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1044 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1045 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1046 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1047 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| 23-1049 | GMC | GMC | Pickups | 3500 | 4x4 | 4/1/2015 12:00 AM | 4/1/2018 12:00 AM | $ 24,446.83 | $ | 9,045.31 |
| | Chevy | Tahoe | SUV | | | | | $ 57,509.00 | $ | - |

| Unit | Payment | Terms (Mo.) / Hour or Miles | 2017 January | | 2017 February | | 2017 March | | 2017 April | | 2017 May | |
|------|---------|------------------------------|---|---|---|---|---|---|---|---|---|---|
| 23-1000 | $ 816.68 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1001 | $ 796.43 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1002 | $ 718.62 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1005 | $ 794.97 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1008 | $ 742.71 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1009 | $ 742.71 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1010 | $ 809.68 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1013 | $ 720.83 | 36 Months / 45,000 Miles | $ | 720.83 | $ | 720.83 | $ | 720.83 | | | | |
| 23-1015 | $ 721.16 | 36 Months / 45,000 Miles | $ | 721.16 | $ | 721.16 | $ | 721.16 | | | | |
| 23-1018 | $ 717.48 | 36 Months / 45,000 Miles | $ | 717.48 | $ | 717.48 | $ | 717.48 | | | | |
| 23-1019 | $ 733.84 | 36 Months / 45,000 Miles | $ | 733.84 | $ | 733.84 | $ | 733.84 | | | | |
| 23-1016 | $ 810.17 | 36 Months / 45,000 Miles | $ | 810.17 | $ | 810.17 | $ | 810.17 | | | | |
| 23-1017 | $ 717.48 | 36 Months / 45,000 Miles | $ | 717.48 | $ | 717.48 | $ | 717.48 | | | | |
| 23-1003 | $ 797.39 | 36 Months / 45,000 Miles | $ | 797.39 | $ | 797.39 | $ | 797.39 | | | | |
| 23-1004 | $ 797.39 | 36 Months / 45,000 Miles | $ | 797.39 | $ | 797.39 | $ | 797.39 | | | | |
| 23-1006 | $ 780.77 | 36 Months / 45,000 Miles | $ | 780.77 | $ | 780.77 | $ | 780.77 | | | | |
| 23-1007 | $ 780.77 | 36 Months / 45,000 Miles | $ | 780.77 | $ | 780.77 | $ | 780.77 | | | | |
| 23-1014 | $ 786.80 | 36 Months / 45,000 Miles | $ | 786.80 | $ | 786.80 | $ | 786.80 | | | | |
| 23-1037 | $ 750.59 | 36 Months / 45,000 Miles | $ | 750.59 | $ | 750.59 | $ | 750.59 | $ | 750.59 | $ | 750.59 |
| 23-1011 | $ 809.88 | 36 Months / 45,000 Miles | | | | | | | | | | |
| 23-1021 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1012 | $ 782.79 | 36 Months / 45,000 Miles | $ | 782.79 | $ | 782.79 | $ | 782.79 | $ | 782.79 | $ | 782.79 |
| 23-1024 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1031 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1029 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1034 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1026 | $ 750.59 | 36 Months / 45,000 Miles | $ | 750.59 | $ | 750.59 | $ | 750.59 | $ | 750.59 | $ | 750.59 |
| 23-1027 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1020 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1023 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |
| 23-1033 | $ 750.59 | 36 Months / 45,000 Miles | $ | 750.59 | $ | 750.59 | $ | 750.59 | $ | 750.59 | $ | 750.59 |
| 23-1035 | $ 745.14 | 36 Months / 45,000 Miles | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 | $ | 745.14 |

| Unit | Payment | Terms (Mo.) / Hour or Miles | 2017 January | 2017 February | 2017 March | 2017 April | 2017 May |
|---|---|---|---|---|---|---|---|
| 23-1025 | $ 750.59 | 36 Months / 45,000 Miles | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 |
| 23-1032 | $ 750.59 | 36 Months / 45,000 Miles | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 |
| 23-1028 | $ 745.14 | 36 Months / 45,000 Miles | $ 745.14 | $ 745.14 | $ 745.14 | $ 745.14 | $ 745.14 |
| 23-1039 | $ 750.59 | 36 Months / 45,000 Miles | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 |
| 23-1030 | $ 745.14 | 36 Months / 45,000 Miles | $ 745.14 | $ 745.14 | $ 745.14 | $ 745.14 | $ 745.14 |
| 23-1036 | $ 750.59 | 36 Months / 45,000 Miles | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 |
| 23-1022 | $ 745.14 | 36 Months / 45,000 Miles | $ 745.14 | $ 745.14 | $ 745.14 | $ 745.14 | $ 745.14 |
| 23-1038 | $ 750.59 | 36 Months / 45,000 Miles | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 | $ 750.59 |
| 25-1000 | $ 930.90 | 36 Months / 45,000 Miles | $ 930.90 | $ 930.90 | $ 930.90 | $ 930.90 | $ 930.90 |
| 25-1001 | $ 930.90 | 36 Months / 45,000 Miles | $ 930.90 | $ 930.90 | $ 930.90 | $ 930.90 | $ 930.90 |
| 23-1040 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1041 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1042 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1043 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1044 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1045 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1046 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1047 | $ 581.84 | 36 Months / 45,000 Miles | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1049 | $ 559.33 | | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 |
| | $1,409.00 | 36 Months / 45,000 Miles | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 |
| | | | $ 32,648.64 | $ 32,648.64 | $ 32,648.64 | $ 24,284.56 | $ 24,284.56 |

| Unit | 2017 June | 2017 July | 2017 August | 2017 September | 2017 October | 2017 November | 2017 December | 2018 January |
|---|---|---|---|---|---|---|---|---|
| 23-1000 | | | | | | | | |
| 23-1001 | | | | | | | | |
| 23-1002 | | | | | | | | |
| 23-1005 | | | | | | | | |
| 23-1008 | | | | | | | | |
| 23-1009 | | | | | | | | |
| 23-1010 | | | | | | | | |
| 23-1013 | | | | | | | | |
| 23-1015 | | | | | | | | |
| 23-1018 | | | | | | | | |
| 23-1019 | | | | | | | | |
| 23-1016 | | | | | | | | |
| 23-1017 | | | | | | | | |
| 23-1003 | | | | | | | | |
| 23-1004 | | | | | | | | |
| 23-1006 | | | | | | | | |
| 23-1007 | | | | | | | | |
| 23-1014 | | | | | | | | |
| 23-1037 | | | | | | | | |
| 23-1011 | | | | | | | | |
| 23-1021 | $ 745.14 | | | | | | | |
| 23-1012 | $ 782.79 | | | | | | | |
| 23-1024 | $ 745.14 | | | | | | | |
| 23-1031 | $ 745.14 | | | | | | | |
| 23-1029 | $ 745.14 | | | | | | | |
| 23-1034 | $ 745.14 | | | | | | | |
| 23-1026 | $ 750.59 | $ 750.59 | | | | | | |
| 23-1027 | $ 745.14 | $ 745.14 | | | | | | |
| 23-1020 | $ 745.14 | $ 745.14 | | | | | | |
| 23-1023 | $ 745.14 | $ 745.14 | | | | | | |
| 23-1033 | $ 750.59 | $ 750.59 | | | | | | |
| 23-1035 | $ 745.14 | $ 745.14 | | | | | | |

| Unit | 2017 June | 2017 July | 2017 August | 2017 September | 2017 October | 2017 November | 2017 December | 2018 January |
|---|---|---|---|---|---|---|---|---|
| 23-1025 | $ 750.59 | $ 750.59 | | | | | | |
| 23-1032 | $ 750.59 | $ 750.59 | | | | | | |
| 23-1028 | $ 745.14 | $ 745.14 | | | | | | |
| 23-1039 | $ 750.59 | $ 750.59 | | | | | | |
| 23-1030 | $ 745.14 | $ 745.14 | | | | | | |
| 23-1036 | $ 750.59 | $ 750.59 | | | | | | |
| 23-1022 | $ 745.14 | $ 745.14 | | | | | | |
| 23-1038 | $ 750.59 | $ 750.59 | | | | | | |
| 25-1000 | $ 930.90 | $ 930.90 | | | | | | |
| 25-1001 | $ 930.90 | $ 930.90 | | | | | | |
| 23-1040 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1041 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1042 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1043 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1044 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1045 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1046 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1047 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 | $ 581.84 |
| 23-1049 | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 | $ 559.33 |
| | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 |
| | $ 23,533.97 | $ 19,025.48 | $ 6,693.57 | $ 6,693.57 | $ 6,693.57 | $ 6,693.57 | $ 6,693.57 | $ 6,693.57 |

| Unit | 2018 February | 2018 March | 2018 April | 2018 May | 2018 June | 2018 July | 2018 August |
|------|---------------|------------|------------|----------|-----------|-----------|-------------|
| 23-1000 | | | | | | | |
| 23-1001 | | | | | | | |
| 23-1002 | | | | | | | |
| 23-1005 | | | | | | | |
| 23-1008 | | | | | | | |
| 23-1009 | | | | | | | |
| 23-1010 | | | | | | | |
| 23-1013 | | | | | | | |
| 23-1015 | | | | | | | |
| 23-1018 | | | | | | | |
| 23-1019 | | | | | | | |
| 23-1016 | | | | | | | |
| 23-1017 | | | | | | | |
| 23-1003 | | | | | | | |
| 23-1004 | | | | | | | |
| 23-1006 | | | | | | | |
| 23-1007 | | | | | | | |
| 23-1014 | | | | | | | |
| 23-1037 | | | | | | | |
| 23-1011 | | | | | | | |
| 23-1021 | | | | | | | |
| 23-1012 | | | | | | | |
| 23-1024 | | | | | | | |
| 23-1031 | | | | | | | |
| 23-1029 | | | | | | | |
| 23-1034 | | | | | | | |
| 23-1026 | | | | | | | |
| 23-1027 | | | | | | | |
| 23-1020 | | | | | | | |
| 23-1023 | | | | | | | |
| 23-1033 | | | | | | | |
| 23-1035 | | | | | | | |

| Unit | 2018 February | 2018 March | 2018 April | 2018 May | 2018 June | 2018 July | 2018 August |
|---|---|---|---|---|---|---|---|
| 23-1025 | | | | | | | |
| 23-1032 | | | | | | | |
| 23-1028 | | | | | | | |
| 23-1039 | | | | | | | |
| 23-1030 | | | | | | | |
| 23-1036 | | | | | | | |
| 23-1022 | | | | | | | |
| 23-1038 | | | | | | | |
| 25-1000 | | | | | | | |
| 25-1001 | | | | | | | |
| 23-1040 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1041 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1042 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1043 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1044 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1045 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1046 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1047 | $ 581.84 | $ 581.84 | $ 581.84 | | | | |
| 23-1049 | $ 559.33 | $ 559.33 | $ 559.33 | | | | |
| | $ 1,479.52 | $ 1,479.52 | $ 1,479.52 | | | | |
| | $ 6,693.57 | $ 6,693.57 | $ 6,693.57 | | | | |

| Unit | 2018 September | 2018 October | 2018 November | 2018 December |
|------|----------------|--------------|---------------|---------------|
| 23-1000 | | | | |
| 23-1001 | | | | |
| 23-1002 | | | | |
| 23-1005 | | | | |
| 23-1008 | | | | |
| 23-1009 | | | | |
| 23-1010 | | | | |
| 23-1013 | | | | |
| 23-1015 | | | | |
| 23-1018 | | | | |
| 23-1019 | | | | |
| 23-1016 | | | | |
| 23-1017 | | | | |
| 23-1003 | | | | |
| 23-1004 | | | | |
| 23-1006 | | | | |
| 23-1007 | | | | |
| 23-1014 | | | | |
| 23-1037 | | | | |
| 23-1011 | | | | |
| 23-1021 | | | | |
| 23-1012 | | | | |
| 23-1024 | | | | |
| 23-1031 | | | | |
| 23-1029 | | | | |
| 23-1034 | | | | |
| 23-1026 | | | | |
| 23-1027 | | | | |
| 23-1020 | | | | |
| 23-1023 | | | | |
| 23-1033 | | | | |
| 23-1035 | | | | |

| Unit | 2018 September | 2018 October | 2018 November | 2018 December |
|------|----------------|--------------|---------------|---------------|
| 23-1025 | | | | |
| 23-1032 | | | | |
| 23-1028 | | | | |
| 23-1039 | | | | |
| 23-1030 | | | | |
| 23-1036 | | | | |
| 23-1022 | | | | |
| 23-1038 | | | | |
| 25-1000 | | | | |
| 25-1001 | | | | |
| 23-1040 | | | | |
| 23-1041 | | | | |
| 23-1042 | | | | |
| 23-1043 | | | | |
| 23-1044 | | | | |
| 23-1045 | | | | |
| 23-1046 | | | | |
| 23-1047 | | | | |
| 23-1049 | | | | |

Real Property Leases

# WCLP Active Surface Lease Agreements

As of:    October 22, 2018

| | Vendor | Location | Property Usage | Lease Expires | Monthly Rate | Job # | Status |
|---|---|---|---|---|---|---|---|
| 1 | Rexroth Equities, LP | Red Lion, PA | Pennsylvania Equipment Yard | - | $   3,075.00 | 50 | Active Lease / Month-to Month |
| 2 | Atlantis Self Storage | Washington, PA | Field Office/Yard (SUNOCO PPP-1) | 12/31/2018 | $   13,000.00 | 2016-02 | Active Lease (Lease Extension #3; expires 12-31-2018) |
| 3 | Morgantown, L.P. | Morgantown, PA | Field Office/Yard (SUNOCO PPP-5) | - | $   12,500.00 | 2016-03 | Active Lease / Month-to Month (Initial One-Year Lease expired 03-31-2018) **$20,000 Security Deposit |
| 4 | Mt. Joy Holding Company | Mt. Joy, PA | ASR Project Office | 12/5/2018 | $   10,400.00 | 2017-01 | Active Lease (Lease expires 12-05-2018) |
| 5 | CFV Group LLC | Clio, MI | Project Office (Consumers  - 3 Year Project-Planning) | 6/30/2019 | $   695.25 | 2018-03 | Active Lease; Renewed on 06/28/2018; Jobs 2017-07, 2018-03, 2016-07 and 2017-02 |

Exhibit A

Note

<u>Exhibit B</u>

Security Agreement

Exhibit C

Initial Budget

Exhibit D

Interim Order

<u>Exhibit E</u>

Closing Date Certificate