IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 18-12378 (CSS) |
| WELDED CONSTRUCTION, L.P., | ) | |
| et al.,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| WELDED CONSTRUCTION, L.P. and, | ) | |
| WELDED CONSTRUCTION | ) | |
| MICHIGAN, LLC | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No.: 19-50180 (CSS) |
| | ) | |
| PRIME NDT SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | **Related Adv. Docket No.: 85** |
| | ) | |
| _____ | ) | |

**MEMORANDUM ORDER**

Upon consideration of *Defendant, Prime NDT Services, Inc.'s Motion for Partial Summary Judgment on the Issues of Breach of Warranty and Consequential Damages*, filed on January 7, 2020 (Adv. D.I. 85) (the "Motion") and the opposition thereto (Adv. D.I. 95) (the "Opposition"),[2] in which Defendant[3] seeks summary judgment on (i) the Subcontract's limitation on consequential damages and (ii) the breach of warranty claim;

---

[1] The debtors in these chapter 11 cases are: Welded Construction, L.P. and Welded Construction Michigan, LLC (collectively, the "Debtors").

[2] A reply brief was not filed pursuant to the *Fourth Amended Agreed Scheduling Order* (Adv. D.I. 72), ¶ 9.

[3] Capitalized words not defined herein shall have the meaning ascribed to them *infra*.

and the Court having scheduled a trial in this adversary action for February 18-21, 2020

(the "Trial"); and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    The Motion is GRANTED, in part, and DENIED, in part, as set forth herein.

## Jurisdiction and Venue

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Standard of Review

3.    "The court shall grant summary judgment if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."[4]  Where the record taken as a whole could not lead a rational trier of fact

to find for the summary judgment nonmovant, there is no genuine issue for trial.[5]   In

deliberating, courts must believe the non-movant's evidence and draw all reasonable

inferences in its favor.[6]

---

[4]  Fed. R. Civ. P. 56.

[5]  *Ricci v. DeStefano*, 129 S.Ct. 2658, 557 U.S. 557, 586, 174 L.Ed.2d 490 (2009).

[6]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L.Ed. 2d 202 (1986).

**Factual Background**

**A.  Procedural History**

4.    This adversary action was commenced by Welded Construction, L.P. ("Welded" or the "Plaintiff") on March 27, 2019, against Prime NDT Services, Inc. ("Prime" or the "Defendant").[7]  Prime answered the complaint.[8]  Pursuant to the *Fourth Amended Agreed Scheduling Order*,[9] Prime filed its motion for partial summary judgment on January 7, 2020.[10]  The underlying dispute is scheduled for trial on February 18-21, 2020.

**B.  General Background**

5.    The Plaintiff asserts causes of action against Prime arising from a breach of a subcontract (the "Subcontract") related to the construction of the Mariner East 2 Pipeline (the "Project").  Mariner East 2 is a pipeline project owned by Sunoco Marketing Partners & Terminals L.P. and Sunoco Pipeline L.P. (collectively, "Sunoco") designed to build new pipeline capacity from Ohio through West Virginia and Pennsylvania to transport natural gas liquids ("NGLs") to Sunoco's Marcus Hook Industrial Complex.

6.    To construct the pipeline, Welded's crews, and those of its various subcontractors, cleared the right of way, dug trenches, strung pipe along rocky and unpredictable terrain, welded such pipes together, tested each weld, and, once all parties

---

[7]  Adv. D.I. 1.

[8]  Adv. D.I. 39.

[9]  Adv. D.I. 72.

[10]  Adv. D.I. 85 and 88.  Welded responded to the Motion. Adv. D.I. 92.

were satisfied of the quality and safety of each weld, backfilled the pipe and restored the right of way.  Due to the linear progression of work on the pipeline, timing was critical.[11] Any backup or delay could create a domino effect, causing significant delays in the ultimate completion of the Project.  Welded and Sunoco agreed on, and required their Subcontractors to abide by, various safety procedures.[12]

7.      Pursuant to the Subcontract, Prime was to perform 100% of the non-destructive examination ("NDE") x-ray inspection of the welds on the "P1" and "P5" spreads of the pipeline.  Prime performed its NDE work by following Welded down the pipeline as it performed its 2 welds, and a Prime technician would take x-rays of the welds to determine whether the weld contained imperfections.

8.      More specifically, Prime agreed to provide the following (the "Work"):

Furnish all project; union labor; materials; tools; supplies; equipment; transportation (other than stipulated in this article); supervision; technical, professional and other services; and shall perform all operations necessary and required to satisfactorily perform the following:

• Subcontractor will provide all labor, equipment and material for 100% NDE inspection of welds in accordance with API Standard 1104, latest edition and approved by DOT Part 195.

• Subcontractor is responsible for storage of all records. Records are to be turned over to Contractor at the end of the project.

• Subcontractor shall maintain a record of each weld in the form of a weld log which is to be submitted to

---

[11] Subcontract at Exh. G, § 3.0 *Time is of the Essence.*

[12] Subcontract, Exh H.

Welded weekly as often as determined by the Spread Project Manager.

• Subcontractor will complete a daily report to be submitted to Welded Project Manager by noon of the next business day for the previous business day's work.

• Subcontractor shall submit all employee licenses and qualifications prior to the start of the Work.

• Subcontractor shall provide a written project specific procedure prior to the start of any work.

• Subcontractor will comply with all client specifications, standards, safety, and environmental project requirements that pertain to NDE activities as set forth herein by form of exhibits.[13]

9.    Additionally, Prime represented that Work should be performed:

(1) with due diligence and in a safe, workmanlike, and competent manner, in accordance with sound construction practices and standards and Company approved practices and standards;

(2) in compliance with all applicable laws, codes, regulations or other standards applied by any governmental entity having jurisdiction over the Work and shall secure, at its expense, all necessary permits and licenses, including but not limited to applicable state subcontractor licenses, for the performance and completion of the Work, including but not limited to the operation, hauling and transportation of all materials and/or equipment needed, used or supplied in and for the Work . . .

(3) in accordance with all applicable manufacturer's requirements;

(4) in accordance with all applicable standards and codes; and

---

[13]  Subcontract at pp. 1-2 (Sec. A WORK TO BE PERFORMED) ("Work").

(5) in accordance with the provisions of this [Sub]Contract.[14]

10.    Prime supplied teams comprised of a technician and an assistant who performed NDE in pickup trucks outfitted with mobile radiograph labs.    Prime's technicians were supposed to take three images of each weld, review and interpret each image, and submit a report to Welded and Sunoco assessing the quality of each weld. Once Welded obtained confirmation through various types of testing that each weld was of sufficient quality, Welded backfilled the trench and restored the right of way.

11.    In late June 2018, Sunoco's independent third-party auditor (the "Sunoco Auditor") identified irregularities in several of the images that one of Prime's technicians, Joshua Springer, had submitted.[15]    After the Sunoco Auditor and Prime's Level III technician, Robert Elliott, reviewed all of the radiographic films submitted by Mr. Springer to Welded and Sunoco, they determined that Mr. Springer had submitted fabricated images for seventy-three (73) individual welds over the span of nearly fifty (50) miles[16] (collectively, the "Sham Radiograph Films").    Thus, Welded and Sunoco could confirm the quality of the affected welds only by digging up portions of the pipeline, which was, in some cases, fully restored, and re-imaging each of the affected welds.[17]

---

[14]  Subcontract, Exh. G, § 20.0 *Representations.*

[15]  *See* Motion, Exh. 4 (Elliott Dep. Tr. at 30:17-31:21; 41:12-43:23); Opposition, Exh. B (Hawkins Dep. Tr. at 77:4-78:3).

[16]  Opposition Exh. A (Elliot Dep. Tr. at 42:25-44:11).

[17]  Opposition, Exh. C (Shumway Dep. Tr. at 178:20-178:23).

12.    The remedial work caused delays, diverted resources from other aspects of the project, and required Welded to incur significant costs.[18] Furthermore, Sunoco, citing, in part, the NDT fiasco, terminated Welded from the Project.[19]    These allegations comprise Welded's claim for consequential damages, which Prime claims are limited by the language of the Subcontract.

## C.  Prime's Corporate Structure

13.    In early 2018, RAE Energy, Inc. acquired Prime, and its former owner/president, Don Shumway, transitioned to the position of corporate Level III Technician and Radiation Safety Officer.[20]  Scott Elliott, the then-Vice President, assumed the role of President, and the then-operations manager, Tim Rapp, assumed the role of Vice President.[21]    Prime's management team comprises a handful of individuals, primarily led by Prime's current President, Mr. Elliott. According to him, Prime's management team does not abide by official titles.[22]  Mr. Elliott described in detail how he and his colleague, Tim Rapp, worked as a core unit to manage the daily operations of the company including supervising, scheduling, training, auditing, and managing employees, bidding for projects, communicating with pipeline owners, general contractors and their core management, including various project managers, and

---

[18] *See, e.g.*, Opposition, Exh. B (Hawkins Dep. Tr. at 95:1-96:14).

[19] Opposition, Exh. B (Hawkins Dep. Tr. at 209:22-210:11).

[20] Opposition, Exh. C (Shumway Dep. Tr. at 16:1 -16:9).

[21] Opposition Exh. C (Shumway Dep. Tr. at Pages 26:1-27:13).

[22] Opposition Exh. A (Elliot Dep. Tr. at Pages 18:12-19:11).

addressing general project concerns.[23]    Mr. Shumway testified that Mr. Elliott

coordinated all of Prime's pipeline project field operations, including sales.[24]  He further

testified that Mr. Rapp administered contracts, coordinated crews, assigned technicians

to projects, bid for projects, administered billing, and managed field crews.[25]

### D.  The Subcontract Provisions

14.    Exhibit G to the Subcontract is labelled GENERAL TERMS AND

CONDITIONS. It contains the following provision limiting the recovery of consequential

damages:

> **15.0 Consequential Damages**
>
> NOTWITHSTANDING ANYTHING TO THE CONTRARY
> IN THIS AGREEMENT, BUT SUBJECT TO THE EXPRESS
> EXCEPTION DESCRIBED AT THE END OF THIS CLAUSE,
> NEITHER PARTY HERETO NOR ANY OF THEIR
> RESPECTIVE PERSONNEL SHALL BE LIABLE FOR
> INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE,
> CONSEQUENTIAL, OR EXEMPLARY DAMAGES,
> INCLUDING LOSS OF PROFITS OR REVENUE, LOSS OF
> USE, COST OF CAPITAL, DOWN TIME COSTS, LOSS OF
> OPPORTUNITY, LOSS OF GOODWILL, AND/OR CLAIMS
> OF CUSTOMERS OF THE OTHER PARTY FOR SUCH
> DAMAGES AND HEREBY WAIVE ANY RIGHT TO THE
> SAME; AND EACH PARTY HEREBY RELEASES THE
> OTHER PARTY AND THEIR RESPECTIVE PERSONNEL
> FROM LIABILITY TO THE OTHER FOR SUCH DAMAGE.
> SUBCONTRACTOR AGREES, HOWEVER, TO INDEMNIFY
> CONTRACTOR AND COMPANY FOR CONSEQUENTIAL
> DAMAGES, SUCH AS LOSS OF USE AND LOSS OF

---

[23]  Opposition Exh. A (Elliot Dep. Tr., at Pages 18:12-19:11; 21:13-22:2; 32:23- 33:8; 44:13-49:22; 66:6- 67:2; 69:17-70:23; 76:25-78:5; 97:13- 97:25; 98:9-100:5; 106:5-107:5; 136:17-140:5; 140:6-143:12; 144:21-149:6).

[24]  Opposition Exh. C (Shumway Dep. Tr. at 29:20-30:12; 31:6-31:15).

[25]  Opposition Exh. C (Shumway Dep. Tr. at 32:12-32:19; 33:5-35:5).

REVENUE, TO THE EXTENT THEY ARE CAUSED BY THE
GROSS NEGLIGENCE AND WILLFUL MISCONDUCT OF
SUBCONTRACTOR'S PROJECT MANAGER, PROJECT
ENGINEERING        MANAGER,        CONSTRUCTION
MANAGER,        AND        SUPERINTENDENT        FOR
SUBCONTRACTOR,        WHILE        WORKING        ON        THE
PROJECT.        GROSS        NEGLIGENCE        AND        WILLFUL
MISCONDUCT        SHALL        BE        DEFINED        AS        THE
INTENTIONAL FAILURE TO PERFORM A MANIFEST
DUTY        IN        RECKLESS        DISREGARD        OF        THE
CONSEQUENCES        AS        AFFECTING        THE        LIFE        OR
PROPERTY OF ANOTHER.[26]

15.        The parties do not dispute that Prime's indemnity obligation under the
Consequential Damages Provision is limited to damages caused by the gross negligence
and willful misconduct of Prime's project manager, project engineering manager,
construction manager or superintendent (each a "Manager Role" and, together, the
"Manager Roles").

## Analysis

### A.  Consequential Damages Provision

16.        Prime asserts that it did **not** employ a project manager, project engineering
manager, construction manager, or superintendent on the Project.  Prime alleges that it
sourced crews of x-ray technicians and helpers that followed the direction of Welded's
personnel.  Prime further asserts that any wrongful conduct on Prime's behalf that
extended beyond the one technician, that such conduct did not rise to the level of gross
negligence because Prime lacked knowledge of the technician's wrongful acts.

---

[26] Subcontract at Exh. G §15.0 *Consequential Damages* (hereinafter, the "Consequential Damages Provision").

17.     Prime asserts that words such as "project managers, project engineering managers, construction managers, and superintendents" are terms commonly used in the construction industry and are defined in secondary sources.  Prime asserts that these Manager Roles are supervisory construction professionals who exercise supervisory oversight over a project.[27]  Prime asserts that it "did not oversee its technicians['] work." Prime further asserts that it never sent someone in a Manager Role to the Project.  Prime further asserts that if the Subcontract is ambiguous, it should be construed against the drafter (in this case, Welded and Sunoco) if Prime's interpretation is reasonable.[28]

18.     The Subcontract contains a choice of law provision providing that Pennsylvania substantive law govern its interpretation.[29]

19.     The Manager Roles are not defined in the Subcontract.  However, pursuant to Pennsylvania law, such terms should be given their natural meaning.[30]  As stated by Welded in its Opposition:

> The term, "project manager" is defined in Black's Law Dictionary as one "who sketches out the functioning, along with organization of relevant resources required to accomplish a project." BLACK'S LAW DICTIONARY (2d ed. 1910). "Superintendent" is defined in Black's Law Dictionary as "[a] person with the power to direct activities; a manager." BLACK'S LAW DICTIONARY (11th ed. 2019).[31]

---

[27] *See* Motion at ¶¶ 30-31.

[28] *See* Motion at ¶ 33.

[29] Subcontract at Exh. G, §10 *Applicable Law*.

[30] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, Inc., 247 F.3d 79, 94 (3d Cir. 2001) (*quoting Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (further citations omitted)).

[31] Opposition at p. 11.

20.     The Court does not find the Subcontract ambiguous. This Court is in agreement with Judge Gross' legal analysis:

> In contract interpretation, "the language is to be given its plain and ordinary meaning." *Mesabi Metallics Co. LLC v. Cleveland-Cliffs Inc. (In re Essar Steel Minnesota LLC)*, 590 B.R. 109, 117 (Bankr. D. Del. 2018) (citation omitted). A court should interpret the contract "in a manner that accords the words their fair and reasonable meaning and achieves a practical interpretation of the expressions of the parties." *Solus Alt. Asset Mgmt. LP v. Delphi Auto PLC (In re DPH Holdings Corp.)*, 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016). While a contract's plain meaning should be the point of departure, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Id.* (citation omitted). "[A] contract should not be construed [to] disregard[ ] common sense in favor of formalistic literalism that defies logic." *Id.* (internal quotations omitted) (citation omitted). If the contract is unambiguous, the plain meaning carries.[32]

The Court finds that the Subcontract's failure to define the Manager Roles does not make the Subcontract ambiguous and that such terms can be defined by their "natural meaning" as required by Pennsylvania law.

21.     As set forth in detail above (and in even more detail in the Opposition) Mr. Elliott and Mr. Rapp coordinated and directed Prime's work on the Project, including interfacing with Sunoco and Welded, dispatching technicians, procuring equipment, and managing employee issues, among other things.[33]

---

[32] *Welded Constr., L.P. v. Prime NDT Services, Inc. (In re Welded Constr., L.P.)*, 605 B.R. 35, 40 (Bankr. D. Del. 2019).

[33] *See, e.g.*, Opposition at Exh A. (Elliott Dep. Tr. at 69:17-70:23; 106:5 to 107:5); Opposition at Exh. D (Rapp Dep. Tr. at 45:23-46:16; 77:25-79:25).

22.    As stated by Judge Gross in review of Prime's limited motion to dismiss:[34]

> Prime's interpretation of the Subcontract, while convenient, is
> misplaced for two reasons.  First, Prime's reading of the
> consequential damages provision shirks commercial
> practicality. . . . The Subcontract bars nearly all consequential
> damages.  A narrow exception exists.  Consequential
> damages are recoverable if such damages were caused by the
> gross negligence and willful misconduct of Prime's project
> manager, project engineering manager, construction manager
> or a superintendent for subcontractor.[35]

23.    Here, Prime's interpretation also ignores the practical interpretation of the

contract, including all of the work being performed by Mr. Elliot and Mr. Rapp, including

planning, controlling and reporting the Project. Furthermore, Prime's interpretation

ignores that **supervisory role** Prime was obligated to perform under the Subcontract.[36]

Limiting Prime's role to *just* the technician at the Project site would be too simple of a

view of Prime's corporate structure and involvement.   The record submitted in

connection with the Motion is replete with examples of oversight, supervision, and

training.  Furthermore, the Subcontract also requires that Prime supervise and comply

with various standards.   As a result, the Court cannot limit its view of Prime's

performance under the Subcontract to just Mr. Springer's actions.

24.    Prime's interpretation does not give meaning to all the terms of the

Subcontract, including those obligating Prime to supervise its employees and the

---

[34]  Adv. D.I. 7.

[35]  *In re Welded Constr., L.P.*, 605 B.R. at 40–41.

[36]  *See* Subcontract, Art A (WORK TO BE PERFORMED) at p. 1-2.

provisions requiring the work to performed in compliance with applicable standards and codes.[37]    Prime's interpretation of the Consequential Damages Provisions is overly simplistic and does not provide a commercially reasonable interpretation of the Subcontract.    At the very least, there are genuine issues of material fact regarding the commercial reasonableness of Prime's supervision of its employees and technicians.    As such, summary judgement is not appropriate as to whether the Consequential Damages Provision bars Welded's claims based on whether Prime performed the work on the Project with employees in Manager Roles.

25.    Prime further asserts, that *even if* Prime's employees could be construed as a project manager, project engineering manager, construction manager or superintendent, Welded can show no evidence that any such individual acted in a grossly negligent or intentional manner.[38]

26.    As noted above, under the Subcontract, gross negligence is defined as "the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another."[39]    Courts have defined "gross negligence" as:

> It an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he

---

[37] *Id.*

[38] Motion at ¶ 34.

[39] Subcontract at Exh. G (all capitalization removed).

inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."[40]

27.    However, under the Subcontract, Prime was obligated to furnish all "**supervision**," "union labor" and "technical, professional and other services" and "shall perform all operations necessary and required to satisfactorily perform" the work proscribed in the Subcontract.[41]  In addition, Prime was obligated to "provide all labor, equipment and materials for 100% NDE inspection of welds in accordance with API Standard 1104, latest edition and approved by DOT Part 195."[42]  Under Exhibit G, section 17 of the Subcontract, Prime agreed to be

> solely responsible for conducting operations under this subcontract to avoid risk of harm to the health and safety of persons and property and for inspecting and monitoring all equipment, materials and work practices used in the Work to ensure compliance with [subcontractor's] obligations under this subcontract.[43]

There is a genuine issue of material fact as to whether Prime performed under the Subcontract, including its duty to supervise its employees.  The Court finds that the lack of supervision and whether such inaction was grossly negligent and willful misconduct is a question of fact for the Trial.  As such, summary judgment is again inappropriate as to whether Prime's actions (or inactions) were grossly negligent or willful misconduct.

---

[40] *Durrell v. Parachutes Are Fun, Inc.*, No. C.A. 85C-AU-82, 1987 WL 18117, at *3 (Del. Super. Ct. Oct. 8, 1987) (*quoting Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635, 495 A.2d 838, 846 (1985) (further citation omitted)).

[41] Subcontract, Art. A at p. 1 (emphasis added).

[42] *Id.*

[43] Subcontract, Exh. G, § 17.0.

28.    In sum, the Court finds the evidence submitted with the Motion and Opposition sufficient to reserve the issue for Trial as to whether Prime's Manger Roles were intentional in failing to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.  As a result, the Motion will be denied as to whether consequential damages are barred by the Subcontract as there are genuine issues of material fact as to whether Prime employed people in Manager Roles and whether those in Manager Roles acted grossly negligent and with willful misconduct.

**B.  Warranty**

29.    The Complaint seeks damages under a breach of warranty provision of the Subcontract.[44]  In its Opposition, Welded has decided not to proceed with its claims for breach of warranty.[45]  As a result, the Court will grant the Motion as to Welded's claim for breach of warranty.

**Conclusion**

30.    As set forth above, the Court hereby GRANTS the Motion, in part, and DENIES the Motion, in part.  The Plaintiff's claims for consequential damages under the Subcontract will proceed at Trial; however, the Plaintiff's claims for breach of warranty are hereby disallowed.  IT IS SO ORDERED.

_____
Christopher S. Sontchi
Chief United States Bankruptcy Judge

Date: February 5, 2020

---

[44] Subcontract, Exh. G at § 16.0 *Warranty*.

[45] Opposition at p. 19.