## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WELDED CONSTRUCTION, L.P., *et al.* | ) | Case No. 18-12378(CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## CENTRAL STATES PENSION FUND'S OBJECTION
## TO CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN

Central States Southeast and Southwest Areas Pension Fund ("Central States"), a general unsecured creditor of Debtors, objects to confirmation of the Debtors' *Amended Chapter 11 Plan of Welded Construction, L.P. and Welded Construction Michigan, LLC* (the "Plan"). Because the Plan proposes to treat Central States' general unsecured claim differently from and worse than other general unsecured claims, the Plan violates 11 U.S.C. §§ 1123(a)(4) and 1129(a)(1) and cannot be confirmed. In support of its objection, Central States states as follows:

### I.    SUMMARY OF THE ARGUMENT

1.    Debtors' Plan proposes to distribute to general unsecured creditors their pro rata share of the amounts set aside for the general unsecured claim distribution. (Article 3.3.2, docket entry 1363, p. 17.) Debtors also propose to establish a disputed claims reserve to be managed by a plan administrator who will be a fiduciary of the estate. (Docket entries 1363, p. 8; 1424-1, p. 2.) The reserve (defined in Article 1.39 of the Plan) is intended to ensure that once a disputed general unsecured claim is allowed, it will be paid in the same percentage as all other allowed general unsecured claims.

2.      At the same time, in Article 8.4.1 of their Plan, Debtors have valued Central States'
$38 million general unsecured claim at $0 "solely for purposes of determining the General
Unsecured Claim Distribution and any related reserve." (Docket 1363, p. 31.)[1]  The upshot of this
provision is that even if Central States' claim is upheld once such claim is resolved in arbitration,
there will most likely be no remaining funds available to distribute on account of Central States'
claim by the time it is resolved.  Specifically, as required under applicable non-bankruptcy law (29
U.S.C. § 1401), Welded has initiated arbitration to challenge Central States' claim for pension
withdrawal liability distributions.  By the time the arbitration has concluded it is highly likely
distributions on general unsecured claims will have been made (including on disputed claims that
have yet to be resolved), leaving no funds reserved to satisfy any portion of Central States' claim.

3.      As such, Debtors' Plan violates 11 U.S.C. §§ 1123(a)(4) and 1129(a)(1) by treating
Central States' general unsecured claim differently from and worse than all other general
unsecured claims. That is, Debtors do not provide Central States with the same opportunity to
recover on its general unsecured claim that Debtors provide all other general unsecured creditors.

4.      In their Plan, Debtors purport to address Central States' concerns through the plan
settlement agreement and indemnification agreement through which third party Bechtel Global
Corporation ("Bechtel") would indemnify Debtor Welded Construction, L.P. ("Welded") for their
joint and several withdrawal liability owed to Central States. However, given that Bechtel is
already jointly and severally liable for this same pension withdrawal liability, the proposed
indemnification is illusory and provides no value to Central States.  Bechtel is required to make,

---

[1]  Debtors stated in their Plan that Central States' claim would be valued at $0 solely for
purposes of the distribution and related reserve. Debtors then sent Central States a ballot in mid-
May listing Central States' claim at $38,813,994.99. (Exhibit C hereto.) However, when Central
States went to electronically vote against the Plan on Friday, June 12, Central States' claim was
listed at $0.

and is presently making, monthly payments of $378,436.74 toward this liability, with a final

payment of $32,932.48 due on or before January 1, 2032, and with the present value of the future

payments being approximately $35.5 million.   Bechtel is only offering to pay what it is already

required by law to pay, which provides no value to Central States.   Moreover, should Bechtel

become unable to make payments to Central States on the withdrawal liability obligation, it will

similarly be unable to fulfill its promises on the indemnification.   Given these deficiencies in the

proposed treatment of Central States' claim, this Court should deny confirmation of the Plan.

## II.    BACKGROUND

Parties and Relationships

5.    Central States is a multiemployer pension plan governed by the Employee

Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension

Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001, *et seq.*

6.    Debtor Welded, as well as affiliated non-debtors Bechtel Construction Company

("Bechtel Co.") and Bechtel Savannah River, Inc. ("Bechtel Savannah"), were subject to various

collective bargaining agreements with local unions affiliated with the International Brotherhood

of Teamsters under which they are required to make pension contributions to Central States on

behalf of certain of their employees.

ERISA and MPPAA Statutory Background

7.    ERISA was enacted to provide comprehensive regulation for employee benefit

funds. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986).   Subsequent to

ERISA's enactment, however, Congress found "that ERISA did not adequately protect

multiemployer plans from the adverse consequences that resulted when individual employers

terminate their participation in, or withdraw from, multiemployer plans." *Pension Benefit Guar.*

*Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984). Congress feared that if participating employers withdrew from multiemployer funds without providing funds to cover their employees' accrued benefits, those funds could become underfunded by the time the covered employees retired and their benefits became due. *Cent. States*, *Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 485-86 (7th Cir. 2000).

8.      Accordingly, Congress enacted MPPAA, §§ 1301-1461, which imposes withdrawal liability on employers withdrawing from multiemployer funds. *Connolly*, 475 U.S. at 215-17. By imposing withdrawal liability through MPPAA, Congress sought to both disincentivize employers from withdrawing from multiemployer funds and to help reduce the negative impact such withdrawals have on those funds' solvency. *Cent. States Se. & Sw. Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 432 (7th Cir. 1986). Under MPPAA, an employer that effects a withdrawal from a multiemployer fund must pay withdrawal liability in an amount roughly equal to its share of the fund's unfunded vested benefits, which is the difference between the present value of a fund's assets and the present value of the benefits it will be obligated to pay in the future. 29 U.S.C. §§ 1381, 1391; *R.A. Gray*, 467 U.S. at 725.

9.      To further protect the solvency of multiemployer funds, Congress decided that a broad definition of "employer" would apply to MPPAA. *See* 29 U.S.C. § 1301(b)(1). Thus, Congress defined "employer" for withdrawal liability purposes as follow: "all employees of trades or businesses . . . which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." *See* 29 U.S.C. § 1301(b)(1). Thus, under MPPAA, all trades or businesses under common control on the withdrawal date are treated as a single employer, and each such trade or business is jointly and severally liable for the withdrawal liability. 29 U.S.C. § 1301(b)(1); *Cent. States, Se. & Sw. Pension Fund v. SCOFBP,*

*LLC*, 668 F.3d 873, 876 (7th Cir. 2011). With joint and several liability, a creditor can pursue any

of the joint and several obligors to collect such liability, and in any ratio the creditor chooses. *Wells*

*Fargo Bank, N.A. v. Moore*, 599 Fed. Appx. 600, 601 (7th Cir. 2015).

10.     There are two types of withdrawals: a partial withdrawal (caused by certain

reductions of an employer's obligation to contribute) and a complete withdrawal (in which an

employer permanently ceases covered operations or permanently ceases to have an obligation to

contribute). 29 U.S.C. §§ 1383, 1385.

11.     When an employer effects a partial withdrawal, there is an adjustment to the

employer's withdrawal liability that requires the plan to compute a fraction, the numerator of

which is the employer's contribution base units ("CBUs") for the plan year following the plan year

of the partial withdrawal, and the denominator of which is the employer's average CBUs for the

five plan years preceding the plan year of the partial withdrawal. 29 U.S.C. § 1386(a)(2). With this

adjustment, the smaller the decrease in the employer's contributions to the plan, the lower the

employer's partial withdrawal liability will be.

12.     Congress also adopted provisions which address the situation where an employer

incurs partial withdrawal liability to a fund and then subsequently incurs additional partial

withdrawal liability or complete withdrawal liability. Specifically, MPPAA codified a credit

mechanism in 29 U.S.C. § 1386, which requires that the subsequent withdrawal liability "be

reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction

of such liability) of the employer with respect to the plan for a previous plan year." 29 U.S.C. §

1386(b)(1).

13.     Finally, if an employer wishes to dispute its withdrawal liability, it must first request review and then it must initiate arbitration. 29 U.S.C. §§ 1399, 1401; *Flying Tiger Line v. Teamsters Pension Trust Fund of Phila.*, 830 F.2d 1241, 1244 (3d Cir. 1987).

The Bechtel Controlled Group's Complete Withdrawal from Central States

14.     Central States determined that on or about November 1, 2015, Welded, Bechtel Co., Bechtel Savannah and all trades or businesses under common control with them within the meaning of 29 U.S.C. § 1301(b)(1) (which included Bechtel) and the regulations thereunder (collectively, the "Bechtel Controlled Group") permanently ceased to have an obligation to contribute to Central States, and thus incurred complete withdrawal liability, jointly and severally, within the meaning of 29 U.S.C. § 1383. As a result, Central States assessed the Bechtel Controlled Group $38,813,994.99 in withdrawal liability (the "Withdrawal Liability").

15.     Notably, the $38,813,994.99 in withdrawal liability reflected a credit of $11,036,509.67 as a result of a prior partial withdrawal of the Bechtel Controlled Group pursuant to 29 U.S.C. § 1385, and which credit (pursuant to 29 U.S.C. § 1386, as discussed above) was also negotiated as part of a settlement between Central States, Welded, Bechtel and the other members of the Bechtel Controlled Group of the prior partial withdrawal liability. [*See* Article 2.2 of settlement agreement attached hereto as Exhibit A; p. 5 of Central States' proof of claim, attached hereto as Exhibit B].

16.     On February 26, 2019, Central States timely-filed a proof of claim for the Withdrawal Liability against Welded ("Central States Claim"). [Claims Register No. 534 and Exhibit B hereto].

17.     On May 24, 2019, Central States and Welded, Bechtel, Bechtel Co., Bechtel Savannah and Bechtel National, Inc. entered into a tolling agreement whereby the deadline for

Welded and Bechtel and the related companies to request review of the Withdrawal Liability was extended to July 24, 2019.

18.     On July 23, 2019, Welded and Bechtel each requested review of the Withdrawal Liability pursuant to 29 U.S.C. § 1399(b)(2)(a).

19.     On January 8, 2020, Bechtel demanded arbitration with the American Arbitration Association ("AAA") to dispute the Withdrawal Liability, Case Number 01-20-0000-0757 (the "Bechtel Arbitration").  Similarly, on January 16, 2020, Welded demanded arbitration with the AAA to dispute the Withdrawal Liability, Case Number 01-20-0000-1812 (the "Welded Arbitration").  Welded subsequently asked the AAA to stay its arbitration proceeding.

The Plan of Reorganization

20.     As noted, Debtors propose to distribute to general unsecured creditors their pro rata share of the amounts set aside for the general unsecured claim distribution.  Further, Debtors' Plan (docket 1363) includes a Disputed Claims Reserve (defined at Article 1.39) which is to be "established and maintained by the Plan Administrator, pursuant to and in accordance with the terms of the Plan Administrator Agreement for the payment of Disputed General Unsecured Claims that become Allowed Claims after the Effective Date." The Plan Administrator is a fiduciary of the estate. (Docket 1424-1, p. 2.)

21.     However, in Article 8.4.1 of their Plan, Debtors propose that "the Central States Claim [of more than $38 million] shall be estimated at $0.00 solely for purposes of determining the General Unsecured Claim Distribution and any related reserve." Debtors assert that Central States' claim is properly estimated at $0.00 for distribution and reserve purposes to avoid delay in the administration of the Chapter 11 Cases and because of the indemnity provided by Bechtel

pursuant to the Plan settlement agreement (exhibit A to the settlement agreement). In the indemnity agreement, Bechtel agrees to indemnify Welded with respect to Central States' Claim.

22.     The Debtors believe that they can delay prosecution of the arbitration they commenced until the conclusion of the Bechtel arbitration, which is proceeding.[2]  Indeed, Welded has indicated to the AAA that it believes a stay of the Welded arbitration is the appropriate course of action.  Whether the Welded arbitration remains dormant, and whether the result of the Bechtel arbitration will be *res judicata* and fix the amount of the Debtors' withdrawal liability to Central States, may be determined by the outcome of the Bechtel arbitration.  In fact, both Debtors and Bechtel are making many of the same substantive arguments. .. [3]

---

[2]  On page 1 of the indemnity agreement, Bechtel and Welded claim that "Bechtel, Welded and Central States have entered into a written agreement that binds all parties to the outcome of the Bechtel Arbitration and under which the parties agreed to stay the Welded Arbitration." However, this statement is incorrect as the parties have not entered into any such agreement. The parties were unable to execute this agreement because Welded would not agree to consolidate its pending arbitration with Bechtel's (or conversely to dismiss the arbitration) unless this Plan, inclusive of all of all settlements included, was confirmed without material modifications. Central States would not agree to this requirement because Central States, (1) opposes its treatment under the Plan, including the indemnification agreement; and (2) felt the agreement failed to provide any assurances as to how the parties would proceed if the Plan was not confirmed without material modifications. Central States then requested the AAA consolidate the Welded and Bechtel arbitrations, but both parties objected and ultimately the AAA decided not to consolidate the arbitrations and rather stated it would hold the Welded arbitration without date pending further advice to proceed.

[3]  In discussions in this case, the Debtors have identified several arguments they intend to present in arbitration. One such argument (and one that Bechtel has not raised) is that they are entitled to the reduction of their withdrawal liability under 29 U.S.C. § 1405, which applies to an employer that is selling substantially all of its assets or an employer that is insolvent and undergoing liquidation.  In support of this argument, Debtors have cited a district court opinion from New Jersey in which the court did not apply the definition of "employer" as set forth in 29 U.S.C. § 1301 to section 1405. *Local 478 Trucking & Allied Indus. Pension Fund v. Jayne*, 778 F. Supp. 1289, 1318 (D.N.J. 1991). Central States asserts the exemption does not apply to Welded since the entire Bechtel Controlled Group (i.e., the "employer" for withdrawal liability purposes) is neither selling substantially all of its assets nor insolvent and undergoing liquidation.

However, in its ruling the court in *Jayne* ignored the plain language of section 1301(b)(1), which provides that the definition of employer in that section applies "[f]or purposes of this

### III.   **ARGUMENT**

**The Plan Cannot be Confirmed Because it Violates 11 U.S.C. §§ 1123(a)(4) and 1129(a)(1).**

23.     Section 1129(a)(1) provides that a bankruptcy court may only confirm a plan of reorganization if it complies with the provisions of the title. Further, section 1123(a)(4) requires that a plan of reorganization must "provide the same treatment for each claim or interest for a particular class." "Courts are to enforce this provision according to its plain language." *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009).  Accordingly, where a claimant in a class is being treated less favorably than other claimants in the same class and has not consented to the lesser treatment, the plan may not be confirmed. *Id.*

24.     As the Third Circuit reiterated in *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013),  "'equality of distribution among creditors is a central policy of the Bankruptcy Code;'" *see also, In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) (same). For purposes of 1123(a)(4), the relevant question is whether all creditors in a class have the same opportunity to recover on their claims. *W.R. Grace*, 739 F.3d at 327. Of course, complete equality is not required, such that a minor delay in receipt of some distributions does not in and of itself violate section 1123(a)(4). *Id.*

---

subchapter," and section 1405 is in that subchapter. Moreover, both Seventh Circuit and Third Circuit authority provide that "employer" is defined in subchapter III and includes all trades or businesses under common control. *Transport Motor Express, Inc. v. Central States, Se. & Sw. Areas Pension Fund*, 724 F.2d 575, 578 (7th Cir. 1983); *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d. Cir. 1986). Indeed, in *Barker & Williamson*, the Third Circuit understood the reference to "employer" in 29 U.S.C. § 1399 to reference the employer and its controlled group within the meaning of section 1301(b)(1). Thus, in an arbitration overseen by a AAA arbitrator, the arbitrator expressly rejected the Jayne analysis. *Ray C. Hughes, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, AAA Case No. 51 621 02686 09, at *25-26 (Feb. 16, 2011) (Exhibit D hereto).

25.     In *New Century TRS Holdings*, application of the unambiguous language of section 1123(a)(4) led a district court to reverse the entry of a confirmation order. 407 B.R. at 592.  In that case, certain joint and several creditors were paid at 130% of their claims against one debtor in exchange for giving up their rights to recover from another debtor. *Id.* at 583, 592. However, the district court said that the payment of 130% of the value of claims violated section 1123(a)(4) of the Bankruptcy Code with respect to creditors in the same class being paid at 100% of the value of their claims, notwithstanding the fact that the creditors being paid 130% on their claims were otherwise waiving collection on their claims in other classes. *Id.*

26.     The requirements of section 1123(a)(4) also apply with respect to disputed claims, such that debtors must establish reserves adequate to pay such claims (if and when allowed) the same as other allowed claims in the same class. *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011).

27.     Thus, in *In re Linens Holding Co.*, 2009 WL 2163235, at *9 (Bankr. D. Del. June 12, 2009), this Court in confirming a plan required that the disputed claims reserve contain sufficient assets to pay claims based on their asserted amount absent the Court estimating the claim at a lesser amount.

28.     Finally, in *In re Weiss-Wolf, Inc.* 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986), the court said that a plan would not be confirmable where the plan proposed to leave a creditor holding a disputed claim "with an empty bag as the Debtor proposes to distribute all known assets prior to the resolution of the disputes respecting the [disputed] claims." As the court noted, while a plan does not need to pay disputed claims until the dispute has been resolved and the amount of the claim has been fixed, the plan does need to provide a mechanism for payment of such disputed claim such that if and when it is resolved, the creditor holding such claim can receive identical

treatment to allowed claims in the same class. *Id.*; *see also In re Northwestern Corp.*, 362 B.R. 131, 134-35 (D. Del. 2007) (after creditors complained that a distribution prior to resolution of their disputed claims would result in unequal treatment of claims, district court remanding matter to bankruptcy court to make such determination).

29.    Here, Debtors' Plan plainly violates section 1123(a)(4) in that it gives all general unsecured creditors other than Central States the chance of recovering the same percentage on their allowed claims. That is, the disputed claim reserve for general unsecured claims, coupled with the fiduciary duties of the plan administrator, ensure that if and when a disputed general unsecured claim becomes allowed, such claim will be treated the same as all other general unsecured claims.

30.    But Debtors' Plan deprives Central States of the same opportunity afforded other general unsecured creditors holding disputed claims. Specifically, Debtors propose that Central States' claim be valued at $0 for both distribution and disputed claims reserve purposes. This almost certainly ensures that Central States will not receive the same percentage distribution on account of its claim as other general unsecured creditors, even if Central States' claim is ultimately allowed based upon the outcome of the parties' arbitration. That is because-- based upon the information set forth in Debtors' disclosure statement-- the amount of Central States' claim exceeds the amount of all other general unsecured claims.

31.    More specifically, Debtors estimate that other general unsecured claims (which Debtors estimate to be in the amount of $20.7 million) will be paid at 21.7%. (Docket 1364, p. 7.) But with Debtors proposing that Central States' $38 million claim be valued at $0 for distribution and disputed claims reserve purposes, the plan administrator will be able to make payments to the other general unsecured creditors (including those holding disputed claims that get resolved) without taking into account whether proceeds will remain available to distribute to Central States

if Central States prevails in the arbitration, and without violating the administrator's fiduciary duties. This violates sections 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code since Central States is not being given the same opportunity as other general unsecured creditors to recover on its class 4 general unsecured claim.

32.    Accordingly, the Plan cannot be confirmed since 1123(a)(4) must be enforced in accordance with its plain language. *See New Century TRS Holdings*, 407 B.R. at 592.

33.    Debtors suggest that Central States would not be harmed by this valuation, given that Bechtel has agreed to indemnify Debtors with respect to Central States' claim.  However, in light of the fact that Welded and Bechtel are jointly and severally liable for the withdrawal liability claim, Debtors are incorrect.  Bechtel's indemnification provides no value to Central States. Bechtel is only promising to provide indemnification for what it is already jointly and severally obligated under the MPPAA to pay Central States outside of the bankruptcy. And if Bechtel becomes unable to make the payments that it is presently making (see paragraph 4 above), then it will likewise be unable to fulfill its obligations under the proposed indemnification.

34.    For all intents and purposes, Debtors are arguing that Central States should be limited to collecting the Withdrawal Liability from Bechtel. But this proposal is inconsistent with Congress' express declaration in the MPPAA that all trades or businesses under common control shall be treated as a single employer, and thus jointly and severally liable for withdrawal liability. *See*, *e.g.*, *Steelworkers Pension Trust by Bosh v. Renco Group, Inc.*, 694 Fed. Appx. 69, 73 (3d Cir. 2017); *McDougall v. Pioneer Ranch Ltd. P'Ship*, 494 F.3d 571, 574 (7th Cir. 2007). Because the liability is joint and several, the pension fund "may choose to collect the entire indebtedness from one or more of the liable parties, to the exclusion of others." *In re Caesars Entertainment Operating Co., Inc.*, 540 B.R. 637, 644 (Bankr. N.D. Ill. 2015) (quoting *United States v. Charles*

*George Trucking, Inc.*, 34 F.3d 1081, 1087 (1st Cir. 1994)). Indeed, an employer liable for withdrawal liability under MPPAA does not have a right of contribution or indemnification. *Einhorn v. J & S, Inc.*, 577 F. Supp. 2d. 752, 763 (D.N.J. 2008) (citing *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981)).

35.     Thus, Debtors' attempt to force Central States to collect the withdrawal liability only from Bechtel violates MPPAA. It also violates sections 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code since Debtors do not treat Central States' claim the same as other unsecured claim and since Central States has not consented to the different treatment. Therefore, this Court should deny confirmation of Debtors' Plan.

36.     Instead, Central States urges Debtors to proceed with the arbitration Debtors initiated back in January, or conversely agree to consolidate Debtors' arbitration with Bechtel's. Proceeding expeditiously with the arbitration would eliminate or at least minimize Debtors' concerns of a delay in administering the estate. Arbitration is also the appropriate forum to address Debtors' factual and legal arguments against the Withdrawal Liability assessed by Central States. *See Gen'l Elec. Co. v. BoilerMaker-Blacksmith Nat'l Pension Trust*, 2020 WL 2113209, at *4, 7 (D. Kan. May 4, 2020) (where the building and construction industry exemption to withdrawal liability had been raised, as is the case with Welded and Central States, the court ruled that the issues in the arbitration necessitated the appointment AAA arbitrator with experience in withdrawal liability matters). *See also Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1410 (7th Cir. 1989) (noting that an arbitrator skill in pension matters is likely best suited to resolve disputes within his or her area or expertise); *see also In re BFW Liquidation, LLC*, 459 B.R. 757, 799 (N.D. Ala. 2011) (in a

chapter 11 bankruptcy, holding that a disputed withdrawal liability claim should be resolved in arbitration).

37.    In the meantime, this Court should deny confirmation of the Plan.

IV.    **CONCLUSION**

For the reasons set forth above, Central States requests that this Court deny confirmation since Debtors' Plan violates sections 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code.

Date:  June 17, 2020                              SULLIVAN · HAZELTINE · ALLINSON LLC
        Wilmington, DE

/s/ William D. Sullivan
William D. Sullivan (No. 2820)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
bsullivan@sha-llc.com

and

Brad R. Berliner (IL ARDC # 6228837)
Caitlin M. McNulty (IL ARDC # 6317985)
Central States Funds
8647 W. Higgins Road
Chicago, Illinois 60631
(847) 939-2463
cmcnulty@centralstatesfunds.org